## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **NICOLE WADE, AMY DISALVATORE,** ) | |
| **and DYLAN BARKASY** ) | |
| **Plaintiffs** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | |
| **UNIVERSITY OF CONNECTICUT** ) | |
| **BOARD OF TRUSTEES** ) | |
| <u>Defendant</u> ) | |

## MEMORANDUM OF LAW
## IN SUPPORT OF PRELIMINARY INJUNCTION

ATTORNEY FOR PLAINTIFFS:

Ryan P. McLane, Esq. (Juris: 438176)
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Ph. (413) 789-7771
Fax (413) 789-7731
E-mail: ryan@mclanelaw.com

**ORAL ARGUMENT REQUESTED**

1

Plaintiffs, in accordance with Fed. R. Civ. P. 65 and Local Rule 7, file this memorandum of law in support of their Motion for Preliminary Injunction against the defendant, UNIVERSITY OF CONNECTICUT BOARD OF TRUSTEES ("UConn").

## INTRODUCTION

Defendant has violated plaintiffs' procedural and substantive due process rights and other individual rights under the United States Constitution, along with violations of law regarding informed consent and civil rights violations under 42 U.S.C. § 1983, by enacting a policy ("mandate") that "requires" all UConn students be vaccinated against COVID-19 as a condition of their enrollment and/or attendance at the university. Defendant enacted the policy, which is vague and arbitrary, allowing for certain medical and "nonmedical" exemptions, yet it does not specify what constitutes a nonmedical exemption. Defendant does not specify what criteria must be satisfied in order to obtain a nonmedical exemption, nor does it specify the process for approving or denying nonmedical exemptions. None of the available COVID-19 vaccines have been approved by the Food and Drug Administration, but rather authorized for emergency use under the Emergency Use Authorization statute, 21 U.S.C. § 360bbb-3. This policy will cause irreparable harm to the plaintiffs, either by forcing them to take an unapproved drug that they do not wish to take, or by subjecting them to sanctions and/or loss of privileges. These sanctions have not been clearly defined, yet the only reasonable interpretation of the language "[a]ll UConn students are required to be fully vaccinated against

COVID-19" is that the plaintiffs face the loss of enrollment or ability to attend in-person classes if they fail to do report their vaccination status prior to the school year.

**Plaintiffs seek a preliminary injunction against the defendant's mandate requiring that they withdraw the policy mandating vaccination of student with a drug that has not been approved by the FDA unless the student chooses to take the vaccine. Time is of the essence with this request, as the Fall semester is scheduled to begin by August 30, 2021.** (V. Compl., ECF 1, ¶80-83, Prayer for Relief p.15).

## FACTS

On June 4, 2021, via a telephone meeting, the defendant implemented a policy that states that all UConn students are required to be vaccinated against COVID-19. This is reflected in the minutes of the defendant's June 4, 2021 meeting[1]. This policy was publicized on the UConn website, entitled "COVID-19 Immunization Record Requirement for Students" while the first sentence of the policy statement reads "[a]ll UConn students are required to be fully vaccinated against COVID-19[2]." The policy states that students who fail to comply face a "loss of privileges and/or sanctions," which can only mean prevention from enrollment or continued attendance at the university.

---

[1] https://boardoftrustees.uconn.edu/wp-content/uploads/sites/2924/2021/06/2021-06-04-UConn-Board-Agenda-Special-Telephone-Meeting-Revised.pdf
[2] https://policy.uconn.edu/2021/06/04/covid-19-immunization-record-requirement-for-students/

As for the policy's purpose, it reads: "To promote the health and safety of the University Community and to reduce the risk of transmission of COVID-19 among University students, consistent with federal, state and local efforts to minimize outbreaks of COVID-19." The policy allows for medical and "nonmedical" exemptions, subject to the school's approval, yet the policy contains no definition of what constitutes a nonmedical exemption, no criteria as to who would be entitled to receive a nonmedical exemption, nor any information as to who approves or denies the nonmedical exemptions, nor the criteria for approval and/or denial. Despite the purpose statement, the defendant's policy is not, in fact, consistent with federal, state and local efforts to minimize the spread of COVID-19.

## A. UCONN'S POLICY IS NOT CONSISTENT WITH FEDERAL EFFORTS

Currently, there is no federal mandate for vaccination against COVID-19. Although many agencies, such as the Centers for Disease Control (CDC), Food and Drug Administration and even the White House are strongly encouraging the vaccine, these agencies have not mandated the vaccine for even their own employees. The CDC has even published well-known guidelines for both vaccinated and unvaccinated individuals to prevent the spread of COVID-19, none of which encourages a vaccine mandate. (V. Compl., ECF 1, ¶24, p.6). In fact, the "Safer Federal Workforce," an agency comprised of several federal agencies and led in part by the White House, advise against mandating the COVID-19 vaccine for federal workers (See V. Compl., ECF 1, ¶21-22, pp.4-5, table below):

# Vaccinations

**NEW** Vaccination Status                                                                    —

**Q: Should agencies require employees to be vaccinated or inquire regarding their vaccination status?**

A: The Administration strongly encourages all Americans, including Federal employees and contractors, to be vaccinated. Employees should receive paid time off to be vaccinated and to deal with any side effects. At present, COVID-19 vaccination should generally not be a pre-condition for employees or contractors at executive departments and agencies (agencies) to work in-person in Federal buildings, on Federal lands, and in other settings as required by their job duties.

Federal employees and contractors may voluntarily share information about their vaccination status, but agencies should not require federal employees or contractors to disclose such information. Responding to agency inquiries should be voluntary, and agencies should comply with any applicable laws, including requirements under the Privacy Act and the Paperwork Reduction Act, and any applicable collective bargaining obligations. When an employee or contractor voluntarily discloses that they are unvaccinated or declines to provide vaccination information, agencies should use that information to implement CDC-recommended mitigation measures, including masking and physical distancing.

As stated in the complaint, rather than encourage mandating the vaccine, President Biden has initiated the "College Vaccine Challenge," in which defendant is an active participant, whereby colleges and universities are encouraged to create outreach programs to encourage maximum participation in campus vaccination. At no point were schools *ever* encouraged to mandate the vaccine.

The clear motive behind federal guidance "strongly encouraging," vaccination against COVID-19, while explicitly avoiding providing advice on mandating the available vaccines, is that the vaccines available are only authorized for distribution under 21 U.S.C. 360bbb-3, the Emergency Use Authorization statute. This authorization does not confer FDA approval of the drug (Johnson and Johnson

clinical trials are set to conclude in September of 2023:

https://clinicaltrials.gov/ct2/show/NCT04505722?term=Janssen&cond=Covid19&cntry=US&draw=2), but rather allows for direct distribution to the public in an effort to combat a public health emergency. The statute specifically states that individuals cannot be mandated to receive the vaccine. Specifically, the Health and Human Services Secretary is, per the statute, to ensure that individuals to whom the product is administered are informed "of the option to accept or refuse administration of the product, of consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." *Id.* The Executive Secretary of the CDC-ACIP stated that vaccines "are not allowed to be mandatory" under an EUA. (V. Compl., ECF 1, ¶18, pp. 3-4).

No federal agency has recommended mandating any of the COVID-19 vaccines, federal agencies are not requiring their own employees be vaccinated against COVID-19, and prominent members of the CDC have specifically stated that the vaccines should *not* be mandated.

As a matter of medical ethics, Uconn's policy is unethical. Dr. Aaron Kheriarty and Professor Gerard Bradley (Notre Dame Law), drafted an opinion in the Wall Street Journal entitled entitled "*University Vaccine Mandates Violate Medical Ethics*," (June 14, 2021) https://www.wsj.com/articles/university-vaccine-mandates-violate-medical-ethics-11623689220?reflink=share_mobilewebshare, where they address the "safety of others" argument, stating that "a person may

freely choose to accept medical risks for the benefit of others," and "those who make such sacrifices for others must truly be volunteers, not conscripts drafted by college administrators." In the article they address *Doe v. Rumsfeld,* D.D.C. 1:03-cv-00707 (2004), where District Court Judge Emmett Sullivan ruled that the Anthrax Vaccine, which had not been approved could not be administered to the members of the military without their consent, absent a statutory exception that includes a presidential waiver for members of the military. While *Rumsfeld* dealt with a military mandate, it is an influential opinion on the ethics of obtaining consent prior to administration of an unapproved drug.

All three of the available vaccines (Moderna, Pfizer and Johnson & Johnson), are required to provide fact sheets, publicly available to recipients of the vaccine. These fact sheets identify the health risks and benefits, along with the consequences of not taking the vaccine, in accordance with 21 U.S.C. § 360bbb-3. For example, the Moderna Fact Sheet states "It is your choice to receive or not receive the Moderna COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care[3]." Pfizer[4] and Johnson & Johnson[5] Fact Sheets also state that the recipient has the option to receive the vaccine.

Thus, defendant's mandate is contrary to federal guidance, policy and ethics.

---

[3] https://www.fda.gov/media/144638/download
[4] https://www.fda.gov/media/144414/download
[5] https://www.fda.gov/media/146305/download

## B. UCONN'S POLICY IS NOT CONSISTENT WITH STATE AND LOCAL EFFORTS

Similarly, at the state level, the guidance and policies do not match up with defendant's policy. The State of Connecticut mandates that its school students be immunized against only five diseases, none of which are COVID-19. General Statutes § 10a-155. Additionally, the Governor of Connecticut is currently the only person who has authority to mandate vaccinations for residents[6] of Connecticut and he has chosen not to do so[7]. General Statutes § 19a-131(e).

Connecticut state employees are not mandated to be vaccinated against COVID-19, *nor are the defendant's own employees and faculty*. The State of Connecticut also put out its own specific guidelines to reduce the spread of COVID-19, *consistent with* the CDC's guidance, which includes mask wearing and physical distancing[8]. It can hardly be argued that defendant's policy is therefore consistent with state efforts to minimize the spread of COVID-19. There are no local Mansfield or Storrs vaccination mandates or additional restrictions, and Tolland County, which makes up only 4.2% of the Connecticut population[9], has no vaccination mandate nor any further restrictions than provided by the State of Connecticut.

---

[6] After obtaining informed consent and subject to multiple exemptions.
[7] https://portal.ct.gov/vaccine-portal/COVID-19-Vaccination-FAQ
[8] https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-12A.pdf
[9] https://connecticut.reaproject.org/analysis/comparative-trends-analysis/population/reports/90013/90000/

### C. UCONN'S POLICY DOES NOT PROMOTE THE HEALTH AND SAFETY OF UCONN STUDENTS

Defendant's policy, with its purpose partly being to promote the health and safety of its student body, puts this student body at unnecessary risk. Dr. Andrew Bostom, MD, MS, compiled COVID-19 data from one hundred major universities within the United States, including UConn, from August through Thanksgiving break of 2020, included in a report he authored entitled *"Why Collegiate COVID-19 Vaccine Mandates Are Lysenkoist Anti-Science,"* which is attached hereto as Exhibit B. UConn had 381 reported cases of COVID-19 during that period of time, yet none of those cases resulted in hospitalization. Nationally during that period of time, out of 139,000 positive tests, 17 resulted in mostly short-term hospitalization, and 1 potential COVID-19 death. *Id.* This demonstrates that college-aged individuals have a low risk of infection and serious side-effects or death from COVID-19, even at UConn. As of July 3, 2021, the State of Connecticut had 356 active cases of COVID-19. As of May 5, 2021, there were 2 positive COVID-19 cases out of 1,500 Storrs residential students, while the faculty and staff, who defendant does ***not*** mandate take a COVID-19 vaccine, totaled 160 positive tests. (V. Compl. ECF 1, ¶57-58, p. 12). College students are also a limited factor in spreading the disease to their neighboring communities. Bostom, *Supra*, cited a study conducted in Pennsylvania: With the lack of prevalence of COVID-19 from the student body and given the evidence that college students do not widely spread COVID-19 to the neighboring communities, the need for the mandating of vaccines as being an improvement upon

UConn's current safety measures (aside from masks, temperature checks, self-reporting and physical distancing) is non-existent.

Even with the argument that the vaccines are more effective at prevention of the spread of COVID-19, the dangers from the vaccines can be incredibly serious. As stated in plaintiffs' complaint, nearly 7,000 vaccine-related deaths have been reported on the Vaccine Adverse Event Reporting system since these vaccines were released to the public, as compared to the 2019, pre-COVID vaccine-related deaths totaling 605. (V. Compl. ECF 1, ¶52, pp. 10). The following CDC VAERS table shows post-COVID vaccine deaths compared to prior years dating back to the year 1990:



Those of college age 12-24, who have received only 8.8% of all doses of the vaccines, have resulted in 52.5% of all reported myocarditis and pericarditis cases[10].

### Preliminary myocarditis/pericarditis reports to VAERS following dose 2 mRNA vaccination, Exp. vs. Obs. (data thru May 31, 2021)

| Age groups | Doses admin | Crude reporting rate* | Expected†,‡ Myocarditis/ pericarditis cases | Observed† Myocarditis/ pericarditis reports |
|---|---|---|---|---|
| 12–15 yrs | 134,041 | 22.4 | 0–1 | 2 |
| 16–17 yrs | 2,258,932 | 35.0 | 2–19 | 79 |
| 18–24 yrs | 9,776,719 | 20.6 | 8–83 | 196 |
| 25–39 yrs | 26,844,601 | 5.0 | 23–228 | 124 |
| 40–49 yrs | 19,576,875 | 3.0 | 17–166 | 51 |
| 50–64 yrs | 36,951,538 | 1.3 | 31–314 | 39 |
| 65+ yrs | 42,124,078 | 0.9 | 36–358 | 26 |
| NR | — | — | — | 11 |

8.8% of doses admin

n=277 reports
52.5% of total reports

\* Per million doses administered; † Assumes a 31-day post-vaccination observation window; 528 reports with symptom onset within 30 days of vaccination shown; ‡ Based on Gubernot et al. U.S. Population-Based background incidence rates of medical conditions for use in safety assessment of COVID-19 vaccines. Vaccine. 2021 May 14:50264-410X(21)00578-8.

However, myocarditis and pericarditis are not the only risks to the students being subjected to this mandate. "Four serious adverse events follow this arc, according to data taken directly from Vaers: low platelets (thrombocytopenia); noninfectious myocarditis, or heart inflammation, ***especially for those under 30***; deep-vein thrombosis; and death. Vaers records 321 cases of myocarditis within five days of receiving a vaccination, falling to almost zero by 10 days. Prior research has shown that only a fraction of adverse events are reported, so the true number of cases is almost certainly higher. This tendency of underreporting is consistent with our

---

[10] https://www.fda.gov/media/150054/download#page=17

clinical experience." "*Are Covid Vaccines Riskier Than Advertised?*" (June 22, 2021). https://www.wsj.com/articles/are-covid-vaccines-riskier-than-advertised-11624381749. The evidence of heart inflammation being connected to these vaccines has been addressed by the FDA through the issuance of a warning[11] and is further supported by a UMass Medical School study, as well. See "*UMass Medical School Cardiology Experts Report Link Between Mild Heart Problem. COVID Vaccine,*" (June 9, 2021). https://www.umassmed.edu/news/news-archives/2021/06/umass-medical-school-cardiology-experts-report-link-between-mild-heart-problem-covid-vaccine/?fbclid=IwAR2ZyiIXjI8FAgYz458cqfjHwXvQNO1GYingo31FqINIzHAU4dmiit9zHb4. These are just the adverse effects that experts are currently aware of. "For example, none of the current vaccines have passed fertility, teratogenicity, or mutagenicity testing, thus may be contraindicated in women of childbearing potential or those about to become pregnant." "*How College COVID Vaccine Mandates Put Students In Danger,*" (July 5, 2021). https://thefederalist.com/2021/07/05/how-college-covid-vaccine-mandates-put-students-in-danger/. Additionally, the defendant's policy excludes the ability for those who have had COVID-19 to refrain from taking the vaccine, despite between 90-99% of individuals who have recovered from the virus developing neutralizing antibodies to the disease[12]. Not only do those individuals develop antibodies, but

---

[11] https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-june-25-2021
[12] https://www.medpagetoday.com/infectiousdisease/covid19/92836?xid=nl_secondopinion_2021-06-01&eun=g1301936d0r

they are at a greater risk of adverse effects from the vaccine. *"How College COVID Vaccine Mandates Put Students In Danger," Supra.*

Lastly, defendant's narrative is that the "vast majority" of its students want the mandate in place and support vaccination[13]. If that is so, then the logical assumption is that the "vast majority" of Uconn students would be vaccinated, which, if the vaccines were as effective as we are told they are, would present an incredibly low risk of the spread of COVID-19.

In short, the defendant's policy is unlawful and puts its students at an unnecessary risk.

## LEGAL STANDARD FOR PRELIMINARY INJUNCTION

*Winter* v. *NRDC,* 555 U.S. 7 (2008) provides the four-part framework to determine whether to grant preliminary injunctive relief: "either show that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." The Second Circuit also employs the alternative of a movant showing: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Christian Louboutin S.A.* v. *Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206 (2d Cir. 2012). Both standards can be applied, however the "serious question" test need not be applied if

---

[13] https://www.stamfordadvocate.com/news/article/Families-threaten-to-sue-UConn-over-COVID-vaccine-16283806.php

the movant satisfies the *Winter* four-part test. *Vringo, Inc.* v. *ZTE Corp.*, S.D.N.Y.,

No. 14-CV-4988 LAK (June 3, 2015).

## ARGUMENT

### 1. LIKELIHOOD OF SUCCESS ON THE MERITS

#### 1. Defendant Exceeded its Statutory Authority When It Enacted its Mandate.

The defendant is given broad authority under § 19a-131(e) to "make rules for

the government of the university" and "determine the general policies of the

university," among other provisions. There is one note of decision on § 10a-104 from

the Supreme Court of Connecticut, *Connecticut State Employees Association* v.

*Board of Trustees of the University of Connecticut*, 165 Conn. 757 (1974). With

respect to the analysis of § 10a-104, the court stated:

> "The statute is clearly written in the broadest possible terms, evincing an obvious legislative intent to clothe the board of trustees with sole jurisdiction over the university in all phases. Section 10-119 grants the board the authority to make rules for the 'government' of the university, power to determine the general 'policies' thereof, and to 'direct' the expenditure of the university's funds. Section 1-1 of the General Statutes provides that 'in the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language.' State v. Benson, 153 Conn. 209, 214, 214 A.2d 903. Webster's Third New International Dictionary defines 'government' as 'the act or process of governing: authoritative direction or control.' 'Policy' is defined as 'a definite course or method of action selected (as by a government, . . .) from among alternatives . . . .' 'Direct' is a synonym of 'administer' and is defined to mean 'to guide and supervise: to carry out the organizing, energizing, and supervising of, especially in an authoritative capacity.'

The Court in *Connecticut State Employees Ass'n* did not address the issue of

whether the authority granted under the statute could not supersede or contravene

the "State Personnel Act," because the Court determined that the Board's actions were not inconsistent with the Act.

Here, however, the legislature has given the Governor, at the height of his power in a public health emergency, sole authority to mandate vaccinations by the Commissioner of Public Health of the citizens of the State of Connecticut per the language of § 19a-131(e):

> (a) In the event of a public health emergency declared by the Governor under section 19a-131a, the commissioner, as authorized by the Governor pursuant to section 19a-131a, may issue an order for the vaccination of such individuals or individuals present within a geographic area as the commissioner deems reasonable and necessary in order to prevent the introduction or arrest the progress of the communicable disease or contamination that caused the declaration of such public health emergency. The commissioner shall inform individuals subject to such vaccination order of the benefits and risks of the vaccine and an individual's option to refuse to be vaccinated for any reason, including, but not limited to, health, religious or conscientious objections. No individual shall be vaccinated unless such individual or, if such individual is a minor, such individual's parent or guardian has provided written consent for such vaccination.

Whereas, in *Connecticut State Employees Ass'n*, the Board's actions were consistent with the State Personnel Act, in our present case, the Connecticut Governor has not ordered the Commissioner of Public Health to mandate vaccines. Further, the legislature did not grant the defendant *more* authority under the laws of Connecticut to mandate vaccinations, including with lack of consent.

The legislature also mandates immunization for Connecticut schools, including for college, and the exemptions provided to those mandated vaccines. See § 10a-155 and House Bill 6423. Defendant's policy, which mandates a vaccine that has not been approved by the FDA, has not been mandated by the Governor and

Public Health Commissioner, and is not required by statute, therefore does contravene state (and federal) law, as defendant's power does not supersede that of the Legislature, Governor and Public Health Commissioner in a state of emergency. Plaintiff is highly likely to succeed on the merits that in that defendant does not have authority to mandate the COVID-19 vaccines on its campus.

> **2. Plaintiffs are Likely to Succeed on their Procedural Due Process Claims.**

Plaintiffs hold a liberty interest in continuing their education at UConn. *Danso* v. *University of Connecticut*, 50 Conn. Supp. 256 (2007). Defendant's policy essentially forces plaintiffs to take an unapproved vaccine against their will or leave. There is also nowhere for the plaintiffs to go with respect to public schooling, as the Board of Regents for the Connecticut State Colleges and Universities (CSCU) has also mandated the vaccine for those schools. Further, it is much too late, with the policy being enacted on June 4, 2021, for the students to re-apply and be accepted into a new school, either a more expensive private school within the State of Connecticut, or to travel to a neighboring state. The lack of any procedure, combined with the complete lack of clarity in the policy itself, demonstrates that plaintiffs are likely to succeed on the procedural due process grounds, and an injunction should be awarded.

> **3. Plaintiffs Are Likely to Succeed on Substantive Due Process Grounds.**

"No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, *unless by clear and*

16

unquestionable authority of law. *Union Pac. Ry. Co.* v. *Botsford,* 141 U.S. 250, 251 (1891). Every individual has a right to bodily autonomy, personal liberty and the right to refuse medical treatment. "A competent person has a liberty interest under the Due Process Clause in refusing unwanted medical treatment." *Cruzan* v. *Director, Mississippi Department of Health*, 110 S.Ct. 2841 (1990). To determine whether the plaintiffs' right has been violated, courts balance the liberty interest against relevant state interests. *Id.*

As stated in plaintiffs' complaint, *Jacobson* v. *Commonwealth of Massachusetts*, 197 U.S. 11 (1905), has been the go-to case with respect to vaccination mandates during a pandemic. Plaintiffs distinguished the instant case from Jacobson in their complaint by pointing out the following:

i. The Board of Health in *Jacobson* was actually given statutory authority to mandate vaccinations, while the defendant here does not have that authority;

ii. The Governor of Connecticut, who has that authority, has not exercised it; and

iii. The Supreme Court made their determination in *Jacobson* based on "well known" information regarding the smallpox vaccine's near century of use, whereas here we are dealing with a vaccine that has been in existence for less than a year and is not yet approved by the FDA.

It should also be noted that in *Roman Catholic Diocese of Brooklyn, New York* v. *Andrew Cuomo*, 141 S.Ct. 63 (2020), Justice Gorsuch, in his concurring opinion,

referred to Jacobson, stated "Rational basis review is the test this Court *normally* applies to Fourteenth Amendment challenges, so long as they do not involve suspect classifications based on race or some other ground, or a claim of fundamental right. *Jacobsen* didn't seek to depart from normal legal rules during a pandemic and it supplies no precedent for doing so. Instead, *Jacobson* applied what would become the traditional legal test associated with the right at issue – exactly what the Court does today. Here, that means strict scrutiny – showing it has employed the most narrowly tailored means available to satisfy a compelling state interest."

The defendant has not "employed the most narrowly tailored means available" to satisfy its interest, which is stated as promoting the health and safety of its students. This is evident in its own policies for exemption, mandating those exempt individuals must use specific precautions, such as mask wearing, physical distancing and/or potential quarantine. It allows its own faculty and staff to carry on throughout its campuses unvaccinated, presumably subject to the same alternative restrictions. We had the disease before the vaccine. The defendant used mitigation measures that were presented as an effective means to control the spread of COVID-19 before the vaccine, and there is no evidence to suggest that the effectiveness of those mitigation measures is any less after the vaccines have been put into the marketplace, and indeed may be more effective if the vaccines are as effective as we are being told.

Defendant's policy would also fail under the rational basis test, in that it bears no "rational relation to some independent legitimate legislative end," *Romer* v. *Evans*, 116 S.Ct. 1620 (1996). Defendant's policy does not specify who is exempt or by what

standard. Defendant's policy only requires students to be vaccinated, but not the staff and faculty that interact with them on a daily basis. Defendant's policy puts the students at an unnecessary risk, as the students who do obtain an exemption are required to take separate but purportedly effective measures that make it safe for them to attend classes. The entire policy is vague and arbitrary, serving no legitimate purpose. Thus, on substantive due process grounds, the plaintiffs show a high likelihood of success on the merits, regardless of which test is being applied.

### 4. Defendant Cannot Mandate the Vaccines Without Informed Consent.

Aside from the lack of statutory authority to mandate the vaccines, defendant also cannot mandate a drug that has not been approved by the FDA. It is necessary to obtain the consent of the person to whom the drug is being administered. Under 21 U.S.C. § 360bbb-3, it clearly states that individuals have the right to "accept or refuse" the products. Each of the authorized vaccines have an info sheet that clearly states that it is up to the individual to choose whether to take the vaccine. Even the Governor's broad powers in a time of emergency under Section 19a-131(e) require that individuals consent to the vaccine. As previously stated, these drugs are still being tested. As a matter of ethics, consent is required before administering them. *University Vaccine Mandates Violate Medical Ethics*, supra. Defendant is not absolved of the requirement of obtaining informed consent prior to administration of these vaccines. It's mandate, with a questionable and undefined exemption policy, under threat of disenrollment is not a process facilitating informed consent, but

instead undue pressure. Plaintiffs therefore are likely to succeed on the merits regarding informed consent, and an injunction should be granted.

### 5. Defendant's Policy is Unconstitutionally Vague.

Defendant's policy is unconstitutionally vague. It does not define what a "nonmedical" exemption is, or who qualifies. It does not specify, but only implies, that the "sanctions" and "loss of privileges" that students who do not comply will face is the lack of ability to enroll and/or attend classes. It also does not specify how or by what criteria the "nonmedical" exemptions are accepted or denied.

What is more, the policy simply states that all students are required to be vaccinated and does not factor in whether students who have had COVID and recovered or have natural immunity to the disease, may be exempt. The vagueness doctrine ensures that "all be informed as to what the state commands or forbids." *Lanzetta* v. *New Jersey,* 306 U.S. 451, 453 (1939). There is simply a complete lack of precision in the defendant's policy. This lack of clarity renders it unconstitutionally vague.

### 2. IRREPARABLE HARM

The refusal of medical treatment is a fundamental right. *Cruzan,* supra. That is not in dispute, but rather the authority under which the defendant is depriving plaintiffs of that right is at issue. Plaintiffs are therefore subject to imminent and irreparable harm. "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer "an injury that is neither remote nor speculative, but actual and imminent," and one that cannot be

remedied 'if a court waits until the end of trial to resolve the harm.'" *Grand River Enterprise Six Nations, Ltd.* v. *Pryor*, 481 F.3d 60 (2d Cir.2007). The harm to plaintiffs here is clear: they will be forced to either take a vaccine that they neither want to, nor under federal and state law be mandated to take, or they will be forced to miss out on their education, which could include financial losses. Additionally, all public four-year colleges and universities in the State of Connecticut have mandated these vaccines, leaving the plaintiffs without any public alternatives within the State of Connecticut. This harm will occur within sixty days of the date that this motion is filed, satisfying the "actual and imminent" requirement and supports allowing preliminary injunctive relief.

### 3. BALANCE OF EQUITIES

The defendant will suffer absolutely no loss if preliminary injunctive relief is awarded to plaintiffs. COVID-19 is not prevalent on the campus, and per the defendant's own statements, the "vast majority" of students are expected to be vaccinated against the disease. The faculty and staff are already able to carry on their business unvaccinated using the previous protection measures employed by the defendant, as are those students with medical and nonmedical exemptions. Defendant will increase their revenue and attendance without additional risk, compared to the plaintiffs, who will lose their bodily autonomy, their liberty, their education, potentially finances and the ability to transfer to another school. Plaintiffs' losses vastly outweigh the defendant's, tipping the balance in their favor to support preliminary injunctive relief.

### 4. INJUNCTION IS IN THE PUBLIC INTEREST

Defendant's policy, and other policies like it, should be struck down. The public's interest in informed consent and the adherence to state and federal law is a strong one. In fact, if plaintiffs had not filed suit, there would be no enforcement of the law against defendant. No federal, state or local agency has mandated the vaccine or stated that the vaccine should be mandated. In fact, quite the opposite. Allowing unlawful behavior to continue is *against* the public interest, therefore enforcing the laws is a strong public interest, which in this case justifies an injunction.

### 5. SERIOUS QUESTION STANDARD

Plaintiffs have established that sufficiently serious questions go to the merits of this case, as the case involves very significant liberty and bodily autonomy issues, such as informed consent, mandating unapproved vaccinations and depriving individuals of their right to refuse medical treatment. These issues raised are more than just "fair ground" for litigation. Additionally, the defendant will suffer virtually no hardship if an injunction is awarded, while the harms suffered by the plaintiffs would be incredibly significant. Plaintiffs also therefore satisfy the alternative Second Circuit "serious question" standard and should be awarded and injunction if this Court deems that they have not met the *Winter* standard.

**CONCLUSION**

Plaintiffs have far exceeded demonstrating the standard for preliminary injunctive relief. They have a high likelihood of success on the merits of their claims, significant, immediate irreparable harm as compared to the lack of harm that would be suffered by the defendant if the injunction were to be awarded, and the injunction is in the public's interest. Therefore, plaintiffs request that this Court ALLOW their motion and grant them preliminary injunctive relief.

Plaintiffs, by their attorney,

  /s/ Ryan P. McLane
Ryan P. McLane, Esq. (Juris: 438176)
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Ph. (413) 789-7771
Fax (413) 789-7731
E-mail: ryan@mclanelaw.com

<u>**CERTIFICATE OF SERVICE AND COMPLIANCE**</u>

I certify that on this 6th day of July 2021, I caused the foregoing to be served in this matter by electronic mail to:

**UNIVERSITY OF CONNECTICUT**
**BOARD OF TRUSTEES**
352 Mansfield Road, Unit 1048
Storrs, Connecticut 06269-1048
Email: boardoftrustees@uconn.edu

**NICOLE FOURNIER GELSTON, ESQ.**
General Counsel
343 Mansfield Road, Init 1177
Storrs, CT 06269
nicole.gelston@uconn.edu
generalcounsel@uconn.edu

  /s/ Ryan P. McLane      
Ryan P. McLane, Esq. (Juris: 438176)

# EXHIBIT A



*Board of*

# TRUSTEES

VOL. 221  JUNE 4, 2021

**SPECIAL TELEPHONE MEETING**
**UNIVERSITY OF CONNECTICUT BOARD OF TRUSTEES**

**AGENDA**

Meeting held by Telephone                                           June 4, 2021

Public Call In Number:
(415) 655-0002 US Toll
Access Code:  629 930 823

Public Access Link:
http://ait.uconn.edu/bot

*(A recording of the meeting will be posted on the Board website*
*https://boardoftrustees.uconn.edu/ within seven days of the meeting.)*

Call to order at **12:30 p.m.**

1.     Executive Session as needed

2.     Public Participation (limited to agenda items)*

       **\*** If members of the public wish to address the Board of Trustees during the Public
       Participation portion of the meeting, limited to agenda items, you must submit a request in
       writing 30 minutes prior to the start of the meeting (by 12:00 p.m.) to the following email
       address: boardoftrustees@uconn.edu.  Please indicate your name, telephone number, and
       topic to be discussed.  Per the University By-Laws, the Board may limit public comment to a
       maximum of 30 minutes.  As an alternative, you may also submit your comments via email
       which will be shared with the Board.

3.     Vaccination Policy

4.     Adjournment

PLEASE NOTE:  *If you are an individual with a disability and require accommodations, please*
*call or e-mail the Board of Trustees Office at (860) 486-2333 or boardoftrustees@uconn.edu*
*prior to the meeting.*



# Board of Trustees

## ADDITIONAL MATERIALS

**The following document was not noticed with the original Agenda. This is an item that was presented during the meeting of**

**Friday, June 4, 2021**

# COVID-19 Immunization Record Requirement for Students

| | |
|---|---|
| Title: | COVID-19 Immunization Record Requirement for Students |
| Policy Owner: | Division of Student Affairs |
| Applies to: | All University Students on any UConn Campus |
| Campus Applicability: | All UConn campuses |
| Effective Date: | June 4, 2021 |
| For More Information, Contact | Student Health and Wellness Services (SHaW) |
| Contact Information: | https://studenthealth.uconn.edu/ |
| Official Website: | https://uconn.edu/ |

## 1. Reason for Policy

To promote the health and safety of the University community and to reduce the risk of transmission of COVID-19 among University students, consistent with federal, state and local efforts to minimize outbreaks of COVID-19.

## 2. Applies To

All University students at the Storrs and regional campuses who participate in any on- campus activities in person for any reason.

## 3. Policy Statement

All UConn students are required to be fully vaccinated against COVID-19.  Students are required to report vaccination compliance to the University.

International students shall be considered in compliance with the COVID-19 vaccine requirement if they have been vaccinated with a COVID-19 vaccine that has either been authorized for use in the United States by the Food and Drug Administration (FDA) or been authorized for use outside of the United States by the World Health Organization (WHO).  International students must  present proof of vaccination  in the form of a copy of the WHO Certificate of Vaccination (WHO Vaccine Booklet) or documentation to include a statement signed by a healthcare provider/organization authorized to administer the vaccination attesting to the dates and name of COVID-19 vaccination given.  All documentation must be submitted in English or accompanied by a certified translation at the student's expense. International students who have received COVID-19 vaccines not authorized by the FDA or WHO will be managed on a case-by-case basis.

Students who receive an exemption from the COVID-19 vaccination requirement or who are not fully vaccinated prior to the beginning of the Fall 2021 semester will be required to comply with preventative measures as deemed necessary by the University.  Such measures may include, but not be limited to, a period of modified quarantine, surveillance testing, and mask-wearing.

Exemptions from this policy will be permitted under certain circumstances. To request an exemption, a student must complete the form found here for medical exemptions and here for non-medical exemptions.

The University is authorized to enact rules and/or procedures necessary to effectuate this policy.

**4. Enforcement**

Failure to comply with this policy may result in loss of privileges and/or sanctions.

This policy and any attendant procedures and/or rules may be amended as necessary based on factors such as the progress of the COVID-19 pandemic and guidance from governmental authorities.

# EXHIBIT B

# *Why Collegiate Covid-19 Vaccine Mandates Are Lysenkoist Anti-Science*

**Andrew Bostom, MD, MS**

United States covid-19 infection, hospitalization, and mortality rates continue to plummet nationally (i). These positive trends are consistent with the expansion of natural herd immunity conferred by those who have recovered from their infections, augmented by vaccination of vulnerable [especially elderly] populations (ii,iii). Under such conditions, as I will elaborate, mandating covid-19 vaccination of collegiate undergraduate and graduate students (iv) is an exercise in totalitarian control that recalls Stalin-era Lysenkoist anti-science, what Dr. Julian Huxley (in *Nature*,1949) aptly described *as "the appeal to doctrine and authority instead of observational  and experimental verification.* **(v)***"*

## *"*College/Graduate Students Comprise A *Very Low Risk Population* For Serious Covid-19 Illness

Mercifully, despite a high frequency of SARS-CoV-2 infections, as determined (primarily) by reverse transcriptase polymerase chain reaction (rtPCR) testing, serious covid-19  disease, among college and graduate students is an exceedingly rare event.(1-10) For example, I compiled data from 100 major university and college covid-19 data dashboards, in conjunction with national and local news reports of campus-related hospitalizations, August, 2020, through the November 2020, Thanksgiving holiday break [11/22/20] (2-10).  As depicted in Table-1, below, among students on campus (primarily) during this period, from 100 U.S. universities, notwithstanding 139,000 "covid-19 positive tests", there were a mere 17, typically short-term, reported covid-19 hospitalizations (2-10)—driven by a cluster of seven from Dayton University (3), i.e., only 0.012% of total positive tests resulting in hospitalization. Within this large sample, there were zero medically confirmed (4), albeit one possible, covid-19 death. These very reassuring data accrued in the absence of any covid-19 vaccination of the college/graduate student population.

Table1. Covid-19 positive tests and related hospitalizations from 100 universities/colleges, August-November, 2020

| University | Reported C19+, "Cases" (N)* | Reported Hospitalizations (N)** | Reported C19 Deaths (N)*** |
|---|---|---|---|
| (1) U of Alabama sys | 3624 | 0 | 0 |
| (2) U of Georgia | 3637 | 0 | 0 |
| (3) U of Kentucky | 2842 | 0 | 0 |
| (4) Ohio State U | 4516 | 0 | 0 |
| (5) U of Dayton | 1477 | 7 | 1*** |
| (6) Miami U of OH | 2330 | 0 | 0 |
| (7) Illinois State U | 1717 | 0 | 0 |
| (8) U of Iowa | 2549 | 0 | 0 |
| (9) Missouri State U | 1294 | 0 | 0 |
| (10) U of Kansas | 1249 | 0 | 0 |
| (11) Kansas State U | 1183 | 0 | 0 |
| (12) Penn State U | 4473 | 0 | 0 |
| (13) U of Wisconsin | 3340 | 1 | 0 |
| (14) U of Miami | 1005 | 0 | 0 |
| (15) U of S Carolina | 2781 | 0 | 0 |
| (16) U of Arizona | 2661 | 1 | 0 |
| (17) Notre Dame U | 1516 | 0 | 0 |
| (18) Temple University | 797 | 0 | 0 |
| (19) James Madison U | 1653 | 0 | 0 |
| (20) Texas Tech U | 2282 | 0 | 0 |
| (21) U of Texas | 1531 | 0 | 0 |
| (22) Texas Christian U | 1512 | 0 | 0 |
| (23) Texas A & M U (incl staff) | 2947 | 0 | 0 |
| (24) U of Illinois | 3786 | 0 | 0 |
| (25) Iowa State U | 1845 | 0 | 0 |
| (26) East Carolina U | 1397 | 0 | 0 |
| (27) U of N Carolina | 1273 | 2 | 0 |
| (28) N Carolina State U | 1268 | 0 | 0 |
| (29) Auburn U (incl staff) | 2031 | 0 | 0 |
| (30) Arizona State U | 2758 | 0 | 0 |
| (31) San Diego State U | 1475 | 1 | 0 |
| (32) Ball State U | 1331 | 0 | 0 |
| (33) U of N. Dakota | 1514 | 0 | 0 |
| (34) U of Cent Florida | 1916 | 0 | 0 |
| (35) U of Florida (+s since 3/18/20) | 3879 | 0 | 0 |
| (36) Oklahoma State U | 2015 | 0 | 0 |
| (37) SUNY-Oneonta | 740 | 0 | 0 |

| University (cont'd) | Reported C19+, "Cases" (N)* | Reported Hospitalizations (N)** | Reported C19 Deaths (N)*** |
|---|---|---|---|
| (38) U of Missouri | 2350 | 2 | 0 |
| (39) SUNY-Buffalo | 940 | 0 | 0 |
| (40) U of Michigan (+s since 3/8/20) | 2264 | 0 | 0 |
| (41) Michigan St (incl staff) | 2029 | 0 | 0 |
| (42) U of Nebraska (incl staff) | 1619 | 0 | 0 |
| (43) U of Tenn -Knoxville (incl staff) | 1869 | 2 | 0 |
| (44) Florida St U | 1691 | 0 | 0 |
| (45) Indiana U (incl staff) | 2412 | 1 | 0 |
| (46) U of Arkansas (incl staff) | 2032 | 0 | 0 |
| (47) Louisiana St U | 1281 | 0 | 0 |
| (48) U of Louisville (incl staff) | 1313 | 0 | 0 |
| (49) Arkansas St U (incl staff) | 873 | 0 | 0 |
| (50) Liberty U | 800 | 0 | 0 |
| (51) N Arizona U | 1283 | 0 | 0 |
| (52) Florida Int U (+s since 3/12/20) | 368 | 0 | 0 |
| (53) Florida Atlantic U | 326 | 0 | 0 |
| (54) U of Houston (+s since 3/20, incl faculty) | 402 | 0 | 0 |
| (55) U N. Texas | 810 | 0 | 0 |
| (56) Texas St U (+s since 3/1/20) | 955 | 0 | 0 |
| (57) GA Tech (+s since 3/20) | 1310 | 0 | 0 |
| (58) U N. Georgia | 559 | 0 | 0 |
| (59) Northeastern U | 276 | 0 | 0 |
| (60) U Mass Amherst | 401 | 0 | 0 |
| (61) U Conn | 381 | 0 | 0 |
| (62) U Maryland | 1249 | 0 | 0 |
| (63) U Rhode Island (+s since 1/22/20) | 681 | 0 | 0 |
| (64) Boise St | 816 | 0 | 0 |
| (65) Colorado St (incl staff; +s since May) | 1351 | 0 | 0 |
| (66) U of Utah | 1639 | 0 | 0 |
| (67) Utah St | 1554 | 0 | 0 |
| (68) Marquette U | 830 | 0 | 0 |
| (69) U of Pittsburgh | 587 | 0 | 0 |
| (70) Rutgers U | 497 | 0 | 0 |
| (71) Idaho St | 448 | 0 | 0 |
| (72) Villanova U | 379 | 0 | 0 |
| (73) U of Virginia | 1069 | 0 | 0 |
| (74) Virginia CU | 403 | 0 | 0 |
| (75) U of Delaware (incl staff) | 732 | 0 | 0 |
| (76) Western Kentucky U (incl staff) | 928 | 0 | 0 |
| (77) East Tenn St | 451 | 0 | 0 |
| (78) U of Toledo | 565 | 0 | 0 |
| (79) Purdue U | 2694 | 0 | 0 |
| (80) Rutgers U | 497 | 0 | 0 |
| (81) U of Mississippi (incl staff) | 924 | 0 | 0 |
| (82) Tulane U | 1332 | 0 | 0 |
| (83) Providence Coll | 363 | 0 | 0 |
| (84) Seton Hall U | 165 | 0 | 0 |
| (85) Brigham Young U (incl faculty) | 3032 | 0 | 0 |
| (86) Boston College | 332 | 0 | 0 |
| (87) Duke U | 152 | 0 | 0 |
| (88) Weber State U | 312 | 0 | 0 |
| (89) Lehigh U | 535 | 0 | 0 |
| (90) U of New Hampshire | 357 | 0 | 0 |
| (91) St. Louis U | 431 | 0 | 0 |
| (92) Georgetown U | 145 | 0 | 0 |
| (93) George Wash U | 133 | 0 | 0 |
| (94) Vanderbilt U | 736 | 0 | 0 |
| (95) U of Penn | 633 | 0 | 0 |
| (96) U of West Virginia (Morgantown) | 874 | 0 | 0 |
| (97) Coll of Charleston | 518 | 0 | 0 |
| (98) Monmouth U (NJ) | 462 | 0 | 0 |
| (99) N Carolina A & T | 468 | 0 | 0 |
| (100) Bowling Green St U | 741 | 0 | 0 |
| Totals | 138,703 | 17 | 1? |

## College/Graduate Students Play A Limited Role in Surrounding Community Covid-19 Transmission

Arnold and colleagues (12) reported the results of a longitudinal serosurvey (blood sampling) of community residents in Centre County, Pennsylvania, also home to The Pennsylvania State University, University Park campus. The return of some 35,000 students to the campus in August 2020 increased the county population size by nearly 20%. Over 4,500 cases of SARS-CoV-2 infections were detected among the student population during the Fall 2020 term (before and just after student return). Between August 7th and October 2nd 2020, these investigators enrolled a cohort of community residents and tested their serum for the presence of anti-Spike Receptor Binding Domain (S/RBD) IgG (a class of immunoglobulin "antibodies"), to confirm prior SARS-CoV-2 exposure. This was repeated in the same community cohort during December 2020 (after the departure of students), and seroprevalence for both sampling waves was recorded and analyzed. Moreover, returning students were enrolled in a longitudinal cohort, and IgG seroprevalence results were reported from the first wave of sampling (between October and November 2020, prior to the end of the term). Here is how Arnold and colleagues (12) summarized their findings:

> *"Of 345 community participants, 19 (5.5%) were positive for SARS-CoV-2 IgG antibodies at their first visit between 7 August and 2 October. Of 625 returning student participants, 195 (31.2%) were positive for SARS-CoV-2 antibodies between 26 October and 23 November. 28 (8.1%) of the community participants had returned a positive result by 9 December. Only contact with known SARS-CoV-2-positive individuals and attendance at small gatherings (20-50 individuals) were significant predictors of IgG antibodies among returning students (adjusted odds ratio, 95% Confidence Interval: 3.24, 2.14-4.91, p<0.001; and 1.62, 1.08-2.44, p<0.05; respectively)."*

They concluded (12):

> ***"Despite high seroprevalence observed within the student population, seroprevalence in a longitudinal cohort of community residents was low and stable from before student arrival for the Fall 2020 term to after student departure, implying limited transmission between these cohorts…The demographic shift associated with student return to campus was not associated with increased SARS-CoV-2 seroprevalence in this cohort of community residents."***

## College/Graduate Students Are At Low Risk For Serious Covid-19 Illness, And Do Not Spread The Disease To The Surrounding Community. *What Is Their Experimental "Emergency Use Authorization," Only Covid-19 Vaccine -Associated Risk, Versus Their Vaccination-Associated Risk From Established Influenza Vaccines?*

The Vaccine Adverse Event Reporting System [VAERS] (13) is a passive or "spontaneous" Centers For Disease Control and Prevention [CDC] and U.S. Food and Drug Administration [FDA] vaccine safety and monitoring system (14). Designed primarily for "safety signal detection," VAERS describes potential associations between vaccine administration and adverse events, "hypothesis generation," that could merit formal investigation (14). A recent example, which appears increasingly germane to covid-19 vaccination, in particular with mRNA covid-19 vaccines available in the U.S. [i.e., from Pfizer and Moderna] (15), was the relationship between smallpox vaccination and the development of myopericarditis in military personnel, especially young men (16-20). Although not "hypothesis generating," per se, a subsequent VAERS analysis (19), utilizing influenza vaccination (and other vaccinations) as a control, independently validated the association between smallpox vaccination and myopericarditis, as well as the lack of association, described earlier (20), with influenza vaccination. Granted understandable caveats about attributing "causality" to VAERS adverse events associations (14), if anything, the system chronically under reports adverse events of possible interest (21). Bearing in mind these prior data, and their limitations, the data in Table 2, for the U.S., clearly indicate VAERS "safety signals" unique to emergency use authorization only covid-19 vaccinations (22,23) for college/ graduate student aged adults, already detected in less than 6 months, which far exceed the 20 plus year experience with fully licensed influenza vaccines.

**Table 2. Vaccine Adverse Event Reporting System (VAERS) Data for United States 18 to 29 Year Olds, Comparing Covid-19 and Influenza Vaccines**

| Vaccine-Associated Adverse Events Among 18 to 29 Year Olds | Covid-19 Vaccines Given in <6 Months. (Feb 1-June 4, 2021) [a] | Influenza Vaccines Given in >20 Years (2000-2021)[b] |
|---|---|---|
| Hospitalizations | 1315 | 685 |
| Life Threatening Events | 391 | 179 |
| Myocarditis/Myopericarditis | 343 | 31 |
| Anaphylaxis/Severe Allergic Reaction | 388 | 90 |
| Bell's Palsy (Facial Paralysis) | 179 | 84 |
| Pulmonary Embolus | 17 | 0 |
| Venous Thrombosis | 26 | 1 |
| Thrombocytopenia/Low Platelets | 57 | 13 |
| Deaths | 55 | 35 |

[a,b] Using a very conservative comparison, the denominator for the number of persons given influenza vaccines over 20 years would be at least 10-fold the denominator for the number of persons receiving covid-19 vaccines in the past < 6 months. Data accessed at the VAERS weblink, https://wonder.cdc.gov/vaers.html 6/18/21.

**Naturally Acquired Immunity To SARS-CoV-2 Confers At Least As Robust Protection From Covid-19 Re-infection And Serious Covid-19 Disease, As Covid-19 Vaccine-Acquired Immunity**

The following very understated, self-explanatory comment is from a CDC document entitled, "Questions & Answers: Vaccine Against 2009 H1N1 Influenza Virus":

*"If you have had 2009 H1N1 flu, as confirmed by an RT-PCR test, you should have some immunity against 2009 H1N1 flu and CAN CHOOSE NOT (emphasis added) to get the 2009 H1N1 vaccine."* (24)

Fast forward just over a decade later, and after intensive investigation for the past 16-months, both laboratory and real world clinical data demonstrate convalescent, unvaccinated covid-19 immunity is just as robust as vaccine-acquired covid-19 immunity. Indeed multiple laboratory studies conducted by highly respected U.S. and European academic research groups have reported that convalescent mildly or severely infected SARS-CoV-2 (covid-19) patients, who are unvaccinated, can have greater virus neutralizing immunity—especially more versatile, long-enduring T-cell immunity—relative to vaccinated individuals who were never infected (25-30). An enormous real world Israeli national follow-up study of ~6.4 million individuals, demonstrated clearly that naturally-acquired covid-19 convalescence immunity was equivalent to vaccine-acquired immunity in preventing covid-19 infection, morbidity, and mortality. Faring at least as well as those vaccinated, 187,549 unvaccinated covid-19 positive persons who tested positive between June 1, 2020 to September 30, 2020, and were followed through March 20, 2021, revealed 894 [0.48%] were reinfected; 38 [0.02%] were hospitalized, a mere 16 [0.008%] hospitalized with severe disease, and only 1 [one]/187,549 died—an individual over 80 years old (31). **The Israeli investigators concluded,** *"Our results question the need to vaccinate previously infected individuals"* (31). Cleveland Clinic investigators have confirmed the Israeli findings in a study of their own employees (32). They found zero SARS-CoV-2 reinfections during 5-month follow-up among n=1359 infected employees who remained unvaccinated and concluded such persons are *"unlikely to benefit from covid-19 vaccination (32)."*

Pooled with vaccine-acquired immunity, i.e., unvaccinated with natural immunity, plus vaccinated, the U.S. has achieved de facto herd immunity (ii,33,34) in terms of clinical covid-19 disease: covid-19 hospitalizations and deaths are at low background rates (i) consistent with a very manageable endemic disease, like seasonal influenza (35,36).

**Punitive Covid-19 Testing and Mask Mandates For Unvaccinated Students Must Not Be Allowed: Asymptomatic Spread Of SARS-CoV-2 Is Relatively Trivial Which Obviates The Need For Asymptomatic Mass Testing, While Community Randomized Controlled Trials Have Demonstrated Masking Does Not Reduce Respiratory Viral, Including SARS-CoV-2 Infections, Highlighting The Inappropriateness of Mask Mandates**

Epidemic spread of covid-19, like all other respiratory viruses, again notably influenza (37), is driven by symptomatic persons; asymptomatic spread is trivial, and inconsequential. A meta-analysis of contact tracing studies published in The Journal of the American Medical Association showed asymptomatic covid-19 spread was 0.7% (38). Accordingly, a rational, ethical true prevention model alternative to "vaccine mandates" would be simple notifications, as part of formal policies, by public university systems that persons with active symptomatic, febrile (feverish) respiratory illnesses isolate themselves. Indeed during the H1N1 influenza A pandemic, fully open, unmasked college campuses were advised by federal health officials, *"Flu-stricken college students should stay out of circulation"* and *"if they can't avoid contact **they** need to wear surgical masks (39)."*

Lastly, "mask mandates" are also unwarranted, regardless of immune status, given the **established, randomized controlled-trial futility of community masking for the prevention of respiratory viral infections, including SARS-CoV-2 infection, or covid-19 disease** (40-42).

Last May, 2020, the U.S. Centers for Disease Control and Prevention's (CDC's) own "house journal" *Emerging Infectious Diseases* published a pooled (so-called "meta"-) analysis of 10 controlled trials which revealed non-medical setting masks did not reduce the rate of laboratory-proven infections with the respiratory virus influenza (40). The findings from this unique report (40) are directly germane to the question of masking to prevent covid-19 infection, and merit some elaboration.

Ten randomized, controlled trials reporting estimates of face mask effectiveness in lowering rates of laboratory-confirmed influenza within the community, published between 2008 and 2016, were analyzed, and pooled, applying a standardized, rigorous methodology. One study evaluated mask usage by Hajj pilgrims to Mecca, two university setting studies assessed the efficacy of face masks for prevention of confirmed influenza among student campus residents over 5-months of surveillance, and seven household studies examined the impact of masking infected persons, only (one), household contacts of infected persons, only (one), or both groups (five). None of these studies, individually, or their aggregated, pooled analysis, which enhanced the overall "statistical power" to detect smaller effects, demonstrated a significant benefit of masking for the reduction of confirmed influenza infection. The authors further concluded with a caution that using face masks improperly might, *"increase the risk for (viral) transmission (40)."*

Independently validating these pooled findings are the results from a single large randomized controlled trial of masking among another cohort of Hajj pilgrims (41) whose enrollment (n=6338) equaled the sum enrollment of all the ten studies in the May, 2020 "meta-analysis." Published online in mid-October, 2020, this "cluster randomized" (i.e., by tent) controlled trial confirmed mask usage did ***not*** reduce the incidence of clinically defined, or laboratory-confirmed respiratory viral infections, primarily influenza and/or rhinovirus. Indeed, there was a suggestion masking increased laboratory-confirmed infections by 40%, although this trend was not "statistically significant. (40)"

Finally, Danish investigators published the results during mid-November, 2020 of a randomized, controlled study conducted in 4862 persons which found that masking did not reduce SARS-CoV-2 (covid-19) infection rates to a statistically significant, or clinically relevant extent. Covid-19 infections (detected by laboratory testing or hospital diagnosis) occurred among 1.8% of those assigned masks, versus 2.1% in control participants. Moreover, a secondary analysis including only participants who reported wearing face masks "exactly as instructed," revealed a further narrowing of this non-significant, clinically meaningless infection rate "difference" to 0.1%, i.e., 2.0% in mask wearers versus 2.1% in controls.

University and college settings should never have employed mass, asymptomatic SARS-CoV-2 testing, nor imposed mask mandates. These institutions most certainly should not be allowed to impose these ineffective procedures selectively—and punitively—on students who choose not to receive covid-19 vaccines.

References
i) CDC Covid Data Tracker https://covid.cdc.gov/covid-data-tracker/#datatracker-home

ii) Kermack WO, McKendrick "A contribution to the mathematical theory of epidemics" *Proc R Soc London* 1927; 115: 700-7217 https://royalsocietypublishing.org/doi/10.1098/rspa.1927.0118

iii) Anderson R., May R. "Vaccination and herd immunity to infectious diseases. *Nature* 1985; 318: 323–329  https://www.nature.com/articles/318323a0

iv) "Here's a List of Colleges That Will Require Students or Employees to Be Vaccinated Against Covid-19." The Chronicle of Higher Education, June 16, 2021 https://www.chronicle.com/blogs/live-coronavirus-updates/heres-a-list-of-colleges-that-will-require-students-to-be-vaccinated-against-covid-19

v) Huxley, J. "Soviet Genetics: The Real Issue". 1949; *Nature* 163, 935–942 https://doi.org/10.1038/163935a0

1) * Per data accessed 11/15-22/20: testing ostensibly by reverse transcriptase polymerase chain reaction amplification and detection of covid-19 viral RNA [primarily], or covid-19 nucleocapsid protein antigen detection by immunofluorescent assay(s).

2) **As originally noted here: *https://twitter.com/andrewbostom/status/1302438825063591936*; "Kansas college student hospitalized with suspected case of multisystem inflammatory syndrome", but the Kansas college was unidentified. https://bit.ly/3mHD3Be

3) Seven University of Dayton students/1477 positive tests: "According to the public health department for Dayton and Montgomery counties, seven University of Dayton students were hospitalized in the campus's outbreak. https://spectrumnews1.com/oh/dayton/news/2020/10/06/at-least-a-dozen-ohio-college-students-suffered-medical-emergencies-from-covid-19

4) ***Dayton University student Michael Lang **_may_** have had a myocarditis related to SARSCoV2, which precipitated a cardiac arrest https://www.kake.com/story/43106955/wrecked-our-lives-families-of-3-young-adults-who-died-from-covid19-share-heartbreaking-stories

5) Two of 1869 University of Tennessee-Knoxville covid-19 positive students were hospitalized https://www.wvlt.tv/2020/09/16/at-least-2-ut-students-hospitalized-with-covid-19/;

6) One of the 1475 covid-19 positive students at San Diego State University (SDSU) was hospitalized "1st SDSU Student Among COVID-19 Surge Hospitalized as Cases Reach 440." https://www.nbcsandiego.com/news/investigations/1st-sdsu-student-among-covid-19-surge-hospitalized-as-cases-reach-440/2402332/;

7) One University of Wisconsin-Madison student was hospitalized out of 3340 who were covid-19 positive https://wkow.com/2020/09/16/first-known-uw-madison-student-hospitalized-with-covid-19/. Regarding this student: "'the actual time in the hospital was very limited' and the student has returned home to recover. The hospitalization was reported on September 16, and the school has not learned of any additional hospitalizations."

8) **One Indiana University hospitalization out of 2412 covid-19 positive tests was reported https://www.idsnews.com/article/2020/09/iu-first-coronavirus-hospitalization-flu-isolations**

9) University of Arizona one hospitalization/2661 covid-19 positive "Only one UA student has been hospitalized with COVID-19 symptoms, although the person was treated for dehydration and released, a UA spokesperson said last week" https://www.azcentral.com/story/news/local/arizona-health/2020/10/06/asu-ua-nau-decrease-number-active-positive-covid-cases/3633764001/

10) A CDC/MMWR report "Multiple COVID-19 Clusters on a University Campus — North Carolina, August 2020", reported zero hospitalizations: https://www.cdc.gov/mmwr/volumes/69/wr/mm6939e3.htm Subsequently, from 10/5/20, regarding North Carolina: *"UNC-Chapel Hill reported two known hospitalizations. Both cases involved students who were hospitalized in June and July. The cases were 'noncritical: Campus Health is aware of two students who were tested at Campus Health and then treated and released from a nearby hospital in June and July. Both were noncritical. These are the only instances we're aware of.' Seven schools said they had no reported hospitalizations."* https://www.jamesgmartin.center/2020/10/how-many-students-are-hospitalized-with-covid-19-nc-colleges-dont-know/

11) U of Missouri: "The Maneater is aware of at least two students [note: out of 2350 who tested positive] who have recently recovered after hospitalization. To protect their privacy, those students are not named." https://www.themaneater.com/stories/campus/impossible-for-the-university-to-know-mu-struggles-to-track-student-covid-19-hospitalizations

12. Arnold CRK, Srinivasan S, Herzog CM, et al. SARS-CoV-2 Seroprevalence in a University Community: A Longitudinal Study of the Impact of Student Return to Campus on Infection Risk Among Community Members. Preprint. *medRxiv*. 2021;2021.02.17.21251942. Published 2021 Feb 19. doi:10.1101/2021.02.17.21251942

13. Vaccine Adverse Event Reporting System, https://wonder.cdc.gov/vaers.html

14. Shimabukuro TT, Nguyen M, Martin D, DeStefano F. Safety monitoring in the Vaccine Adverse Event Reporting System (VAERS). Vaccine. 2015 Aug 26;33(36):4398-405. doi: 10.1016/j.vaccine.2015.07.035. Epub 2015 Jul 22. PMID: 26209838; PMCID: PMC4632204

15. Vaccines and Related Biological Products Advisory Committee June 10, 2021 Meeting Presentation. https://www.fda.gov/media/150054/download

16. Halsell JS, Riddle JR, Atwood JE, Gardner P, Shope R, Poland GA, Gray GC, Ostroff S, Eckart RE, Hospenthal DR, Gibson RL, Grabenstein JD, Arness MK, Tornberg DN; Department of Defense Smallpox Vaccination Clinical Evaluation Team. Myopericarditis following smallpox vaccination among vaccinia-naive US military personnel. JAMA. 2003 Jun 25;289(24):3283-9. doi: 10.1001/jama.289.24.3283. PMID: 12824210.

17. Morgan J, Roper MH, Sperling L, Schieber RA, Heffelfinger JD, Casey CG, Miller JW, Santibanez S, Herwaldt B, Hightower P, Moro PL, Hibbs BF, Levine NH, Chapman LE, Iskander J, Lane JM, Wharton M, Mootrey GT, Swerdlow DL. Myocarditis, pericarditis, and dilated cardiomyopathy after smallpox vaccination among civilians in the United States, January-October 2003. Clin Infect Dis. 2008 Mar 15;46 Suppl 3:S242-50. doi: 10.1086/524747. PMID: 18284365.

18. Poland GA, Grabenstein JD, Neff JM. The US smallpox vaccination program: a review of a large modern era smallpox vaccination implementation program. Vaccine. 2005 Mar 18;23(17-18):2078-81. doi: 10.1016/j.vaccine.2005.01.012. PMID: 15755574.

19. Su JR, McNeil MM, Welsh KJ, Marquez PL, Ng C, Yan M, Cano MV. Myopericarditis after vaccination, Vaccine Adverse Event Reporting System (VAERS), 1990-2018. Vaccine. 2021 Jan 29;39(5):839-845. doi: 10.1016/j.vaccine.2020.12.046. Epub 2021 Jan 6. PMID: 33422381.

20. Engler RJ, Nelson MR, Collins LC Jr, Spooner C, Hemann BA, Gibbs BT, Atwood JE, Howard RS, Chang AS, Cruser DL, Gates DG, Vernalis MN, Lengkeek MS, McClenathan BM, Jaffe AS, Cooper LT, Black S, Carlson C, Wilson C, Davis RL. A prospective study of the incidence of myocarditis/pericarditis and new onset cardiac symptoms following smallpox and influenza vaccination. PLoS One. 2015 Mar 20;10(3):e0118283. doi: 10.1371/journal.pone.0118283. PMID: 25793705; PMCID: PMC4368609.

21. Baker MA, Kaelber DC, Bar-Shain DS, et al. Advanced Clinical Decision Support for Vaccine Adverse Event Detection and Reporting. Clin Infect Dis. 2015;61(6):864-870. doi:10.1093/cid/civ430

22. FACT SHEET FOR HEALTHCARE PROVIDERS ADMINISTERING VACCINE (VACCINATION PROVIDERS) EMERGENCY USE AUTHORIZATION (EUA) OF THE PFIZER-BIONTECH COVID-19 VACCINE TO PREVENT CORONAVIRUS DISEASE 2019 (COVID-19) https://www.fda.gov/media/144413/download

23. FACT SHEET FOR HEALTHCARE PROVIDERS ADMINISTERING VACCINE (VACCINATION PROVIDERS) EMERGENCY USE AUTHORIZATION (EUA) OF THE MODERNA COVID-19 VACCINE TO PREVENT CORONAVIRUS DISEASE 2019 (COVID-19) https://www.fda.gov/media/144637/download

24. "Questions & Answers: Vaccine Against 2009 H1N1 Influenza Virus" https://www.cdc.gov/h1n1flu/vaccination/public/vaccination_qa_pub.htm

25. Kilpeläinen, A., Esther Jimenez-Moyano, Oscar Blanch-Lombarte, D. Ouchi, R. Peña, B. Quirant-Sánchez, A. Chamorro, I. Blanco, E. Martínez-Cáceres, R. Paredes, L. Mateu, J. Carrillo, J. Blanco, C. Brander, M. Massanella, B. Clotet and J. Prado. "Highly functional Cellular Immunity in SARS-CoV-2 Non-Seroconvertors is associated with immune protection.".bioRxiv 2021.05.04.438781; doi: https://doi.org/10.1101/2021.05.04.438781

26. Ma T, Ryu H, McGregor M, Babcock B, Neidleman J, Xie G, George AF, Frouard J, Murray V, Gill G, Ghosn E, Newell E, Lee S, Roan NR. Protracted yet coordinated differentiation of long-lived SARS-CoV-2-specific CD8+ T cells during COVID-19 convalescence. bioRxiv [Preprint]. 2021 Apr 29:2021.04.28.441880. doi: 10.1101/2021.04.28.441880. PMID: 33948597; PMCID: PMC8095211.

27. Claudia Gonzalez, Carla Saade, Antonin Bal, Martine Valette, Kahina Saker, Bruno Lina, Laurence Josset, MaryAnne Trabaud, Guillaume Thiery, Elisabeth BotelhoNevers, Stéphane Paul, Paul Verhoeven, Thomas Bo urlet, Sylvie Pillet, Florence Morfin, Sophie Trouillet-Assant, Bruno Pozzetto "Live virus neutralisation testing in convalescent patients and subjects vaccinated against 19A, 20B, 20I/501Y.V1 and 20H/501Y.V2 isolates of SARS-CoV-2." medRxiv 2021.05.11.21256578; doi: https://doi.org/10.1101/2021.05.11.21256578

28.Carmen Camara, Daniel LozanoOjalvo, Eduardo LopezGranados, Estela PazArtal, Marjorie Pion, Rafael C orreaRocha, Alberto Ortiz, Marcos LopezHoyos, MartaErro Iribarren, Jose Portoles, Pilar Portoles, Mayte Pere z-Olmeda, Jesus Oteo, Cecilia Berin, Ernesto Guccione, Antonio Bertoletti, Jordi Ochando. "Differential effects of the second SARS-CoV-2 mRNA vaccine dose on T cell immunity in naïve and COVID-19 recovered individuals." bioRxiv 2021.03.22.436441; doi: https://doi.org/10.1101/2021.03.22.436441

29. Ivanova EN, Devlin JC, Buus TB, Koide A, Cornelius A, Samanovic MI, Herrera A, Zhang C, Desvignes L, Odum N, Ulrich R, Mulligan MJ, Koide S, Ruggles KV, Herati RS, Koralov SB. Discrete immune response signature to SARS-CoV-2 mRNA vaccination versus infection. medRxiv [Preprint]. 2021 Apr 21:2021.04.20.21255677. doi: 10.1101/2021.04.20.21255677. PMID: 33907755; PMCID: PMC8077568.

30. Reynolds CJ, Pade C, Gibbons JM, Butler DK, Otter AD, Menacho K, Fontana M, Smit A, Sackville-West JE, Cutino-Moguel T, Maini MK, Chain B, Noursadeghi M; UK COVIDsortium Immune Correlates Network, Brooks T, Semper A, Manisty C, Treibel TA, Moon JC; UK COVIDsortium Investigators, Valdes AM, McKnight Á, Altmann DM, Boyton R. "Prior SARS-CoV-2 infection rescues B and T cell responses to variants after first vaccine dose." Science. 2021 Apr 30:eabh1282. doi: 10.1126/science.abh1282. Epub ahead of print. PMID: 33931567; PMCID: PMC8168614.

31.Yair Goldberg, Micha Mandel, Yonatan Woodbridge, Ronen Fluss, Ilya Novikov, Rami Yaari, Arnona Ziv, La urence Freedman, Amit Huppert. "Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three-month nationwide experience from Israel."
medRxiv 2021.04.20.21255670; doi: https://doi.org/10.1101/2021.04.20.21255670

32. Nabin K. Shrestha, Patrick C. Burke, Amy S. Nowacki, Paul Terpeluk, Steven M. Gordon. "Necessity of COVID-19 vaccination in previously infected individuals."
medRxiv 2021.06.01.21258176; doi: https://doi.org/10.1101/2021.06.01.21258176

33. Dudley SF. "Human Adaptation to the Parasitic Environment." Proc R Soc Med. 1929;22(5):569-592.
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2102678/pdf/procrsmed01176-0006.pdf

34. U.S. CDC vaccine data:
https://docs.google.com/spreadsheets/d/1xAQOZO7oyu6TPtE6SufKAuSDaF_EFzp7WeL9GPx0Zi8/edit#gid=1827290816

35. Simonsen L, Reichert TA, Viboud C, Blackwelder WC, Taylor RJ, Miller MA. "Impact of influenza vaccination on seasonal mortality in the US elderly population." Arch Intern Med. 2005 Feb 14;165(3):265-72. doi: 10.1001/archinte.165.3.265. PMID: 15710788.

36. Ioannidis JPA. "Infection fatality rate of COVID-19 inferred from seroprevalence data." Bull World Health Organ. 2021 Jan 1;99(1):19-33F. doi: 10.2471/BLT.20.265892. Epub 2020 Oct 14. PMID: 33716331; PMCID: PMC7947934.

37. Patrozou E, Mermel LA. Does influenza transmission occur from asymptomatic infection or prior to symptom onset? Public Health Rep. 2009 Mar-Apr;124(2):193-6. doi: 10.1177/003335490912400205. PMID: 19320359; PMCID: PMC2646474.

38. Madewell ZJ, Yang Y, Longini IM Jr, Halloran ME, Dean NE. Household Transmission of SARS-CoV-2: A Systematic Review and Meta-analysis. JAMA Netw Open. 2020 Dec 1;3(12):e2031756. doi: 10.1001/jamanetworkopen.2020.31756. PMID: 33315116; PMCID: PMC7737089.

39. "Advice: Flu-stricken college students should stay out of circulation," Great Falls Tribune, August 21, 2009, page 5, section A.  https://www.newspapers.com/image/243611045

40. Xiao J, Shiu E, Gao H, et al. Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures. *Emerging Infectious Diseases.* 2020;26(5):967-975. doi:10.3201/eid2605.190994.

41. Alfelali M, Haworth EA, Barasheed O, Badahdah AM, Bokhary H, Tashani M, Azeem MI, Kok J, Taylor J, Barnes EH, El Bashir H, Khandaker G, Holmes EC, Dwyer DE, Heron LG, Wilson GJ, Booy R, Rashid H; Hajj Research Team. Facemask against viral respiratory infections among Hajj pilgrims: A challenging cluster-randomized trial. PLoS One. 2020 Oct 13;15(10):e0240287. doi: 10.1371/journal.pone.0240287. PMID: 33048964; PMCID: PMC7553311.

42. Bundgaard H, Bundgaard JS, Raaschou-Pedersen DET, von Buchwald C, Todsen T, Norsk JB, Pries-Heje MM, Vissing CR, Nielsen PB, Winsløw UC, Fogh K, Hasselbalch R, Kristensen JH, Ringgaard A, Porsborg Andersen M, Goecke NB, Trebbien R, Skovgaard K, Benfield T, Ullum H, Torp-Pedersen C, Iversen K. Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers : A Randomized Controlled Trial. Ann Intern Med. 2021 Mar;174(3):335-343. doi: 10.7326/M20-6817. Epub 2020 Nov 18. PMID: 33205991; PMCID: PMC7707213.