**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NICOLE WADE ET AL., | : | No. 3:21-cv-00924-JAM |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT | : | |
| BOARD OF TRUSTEES, | : | |
| *Defendant.* | : | AUGUST 2, 2021 |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

The plaintiffs, three students at the University of Connecticut, ("Plaintiffs"), ask this Court for the extraordinary remedy of a preliminary injunction enjoining a vaccine policy, ("the Vaccine Policy"), recently enacted by the University of Connecticut Board of Trustees, ("UConn" or "Board"). That policy is the culmination of an extensive deliberative process and is one tool among many that UConn has put in place to protect the health and safety of returning students and ensure that university life can continue in the face of the ever-changing COVID-19 pandemic.

The Court should respect UConn's policy decision and deny Plaintiffs' request for preliminary relief. As a threshold matter, the Court does not have jurisdiction to consider Plaintiffs' claims. UConn has filed a Motion to Dismiss on subject matter jurisdiction grounds arguing that, because UConn, including the Board of Trustees, is an arm of the state, it is entitled to Eleventh Amendment immunity; and that Plaintiffs lack standing, as two of the individual plaintiffs already sought and received an exemption from the vaccine requirement, while the third plaintiff did not seek an exemption and cannot now be heard to challenge the policy given that deliberate choice. (*See* Exhibit A, Daugherty Decl.) However, even if the Court denies that motion and finds that it has jurisdiction, Plaintiffs' claims are foreclosed by longstanding and

binding precedents from both the Supreme Court and Second Circuit, and Plaintiffs have no likelihood of success on them. Plaintiffs also cannot establish irreparable harm or that the balancing of the equities support the extraordinary relief they seek. For these reasons the Court should deny the motion for preliminary injunction.

## I.    FACTUAL BACKGROUND

### A.  COVID-19

"The severity of the COVID-19 pandemic should, by now, need no elaboration." *Merrill v. People First,* ___ U.S. __, 208 L.Ed.2d 244, 245 (2020) (Sotomayor, J., dissenting from order granting stay); *see also Bay United Pentecostal Church v. Newsom*, __ U.S. __, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (describing pandemic as "extraordinary health emergency"). COVID-19 is an infectious disease caused by the novel coronavirus that primarily spreads through respiratory droplets, viral particles suspended in the air, and touching mucosal membranes with contaminated hands.[1] People in close proximity or direct contact with a carrier "are at greatest risk of infection." *Id.* But there is also evidence that respiratory droplets can linger in the air for "minutes to hours," infecting people at greater distances even after the carrier has left. *Id.* Moreover, carriers who are not showing symptoms and who therefore do not know they are infected "can still spread the virus to other people."[2] Initial presentation of an infection ranges from no symptoms at all (asymptomatic) to severe illness and death; and even after recovery, various long-term health problems may linger.[3] The United States is once again seeing a rise in COVID-19 cases, hospitalizations, and deaths. As of July 22, 2022, 35% of U.S. counties are experiencing high levels of community transmission. COVID-19 cases are on the rise in nearly 90% of U.S. jurisdictions, and we are seeing outbreaks in parts of the country that

[1] Ex. B. How Coronavirus Spreads | CDC
[2] Ex. C. COVID-19: Considerations for Wearing Masks | CDC
[3] Ex. D Symptoms of COVID-19 | CDC

have low vaccination coverage. These worrisome trends are due, in part, to the rapid spread of the highly transmissible B.1.617.2 variant, ("Delta Variant"). An increase in the number of cases will put more strain on healthcare resources and could lead to more hospitalizations and deaths.[4]

## B. UCONN

UConn is a public research university, with five campuses providing education to over 32,000 undergraduate and graduate students.[5] The flagship campus in Storrs, Connecticut, is home to over 12,500 residential students. Ex. A, ₱ 4. Most residence halls require students to share close living quarters with up to forty (40) other students, including sharing restrooms, kitchens, common areas, and laundry facilities. *Id.* The main campus in Storrs provides dining services to 10,329 students. *Id.* Students eating in dining halls eat in common areas unmasked, sitting close to one another. *Id.* The CDC has acknowledged that congregate settings, such as residence halls, have challenges preventing the spread of COVID-19 because the residents often gather together closely for social, leisure, and recreational activities, shared dining, and/or use of shared equipment, such as kitchen appliances, laundry facilities, stairwells, and elevators".[6]

The Connecticut General Assembly endowed the Board with the responsibility "to make rules for the government of the university and … determine the general policies of the university…." Conn. Gen. Stat. Section 10a-104(a). The Board also has authority to "establish policies for the university system and for the individual institutions and campuses under its jurisdiction…." *Id.* Pursuant to this authority, the Board has passed policies to ensure that the university provides a safe and healthy environment for all students.

## C. UConn's Response to the Pandemic

---

[4]Ex. E COVID Data Tracker Weekly Review | CDC
[5]Ex. F INS-008-Fact-Sheet-011620-FY20.pdf (uconn.edu)
[6]Ex. G https://www.cdc.gov/coronavirus/2019-ncov/community/shared-congregate-house/guidance-shared-congregate-housing.html

On March 10, 2020, the Governor declared a public health and civil preparedness emergency to combat the COVID-19 pandemic.[7]    Since that time, UConn has taken every possible measure to keep its community safe during the pandemic. Ex. A, ₱ 6. UConn directed residential students not to return to campus after March 13, 2020. *Id.* During the 2020-21 academic year, consistent with guidance from the Governor's Office, State of Connecticut Department of Public Health, the Center for Disease Control, and infectious disease specialists at the UConn Medical Center, UConn implemented a plan to allow the university to continue to operate on a reduced scale while minimizing the risk to the health and safety of all persons in the UConn community. *Id.* Without a vaccine available, measures to protect the community included mandating masks and social distancing, transitioning to online classes, conducting routine COVID 19 testing, limiting attendance at events, implementing quarantines and contact tracing protocols, developing waste water testing, setting aside beds for isolation and quarantine on our residential campuses, providing separate dining arrangements, and assisting students needing academic accommodation while they are undergoing quarantine or isolation. *Id.* Even with the mitigation measures in place, over the course of the 2020-21 academic year, the Storrs campus treated over 1,700 students as COVID-19 cases and quarantined over 3,000 students. *Id.* Further, without a vaccine option, UConn operated at only thirty-six percent (36%) of its residential capacity during the 2020-21 academic year due to the risks of COVID-19. *Id.* at ₱ 7.

### D.    Vaccines and CDC Guidance

The CDC has reported that available COVID-19 vaccines are the most effective way to prevent the incidence and spread of the disease.[8]    In making this recommendation, the CDC

---

[7] Ex. H https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200310-declaration-of-civil-preparedness-and-public-health-emergency.pdf
[8] Ex. I COVID-19 Vaccines Work | CDC

relies on real world studies that have documented the effectiveness of the vaccine.[9]   Since late 2020, the CDC has issued guidance, reports and data demonstrating that the vaccines are safe with a very low risk of side effects.[10]   As recently as July 27, 2021, it reissued its statement encouraging vaccines given the rapid rise in the extremely contagious Delta Variant.[11]   While The CDC has not ignored reports of adverse side effects and are continuing to monitor and assess the safety and efficacy of the vaccines, it continues to advise citizens that vaccination is the most effective way to stay safe as the risks of COVID-19 infection far outweigh any possible risk of side effects..[12]

In the last few months, vaccine mandates have become a tool to defeat the pandemic.  In recent days, the state of California announced vaccine mandates for state workers.[13]   On July 26, 2021, the U.S. Department of Veterans Affairs issued a mandate that all of its medical employees receive the vaccine in order to continue working.[14]   On July 29, 2021, citing the highly contagious Delta Variant, President Biden announced that federal employees must present proof of vaccination status or be subject to strict safety measures.

Currently, each of the vaccines available to persons in the United States have received Emergency Use Authorization ("EUA") from the United States Food and Drug Administration ("FDA").  The EUA is an expedited pathway to approval, one deemed necessary due to the severity of the pandemic.  *See* 85 Fed. Reg. 7316, 7316-17; 85 Fed. Reg. 18250, 18250-51. Despite the faster route to approval, products that receive EUA still are required to adhere to

---

[9]Ex. J CDC Real-World Study Confirms Protective Benefits of mRNA COVID-19 Vaccines | CDC Online Newsroom | CDC
[10]Ex. K Benefits of Getting a COVID-19 Vaccine | CDC; Ensuring COVID-19 Vaccine Safety in the US | CDC
[11]Ex. L Interim Public Health Recommendations for Fully Vaccinated People | CDC
[12]Ex. M Selected Adverse Events Reported after COVID-19 Vaccination | CDC
[13]Ex. NCalifornia Implements First-in-the-Nation Measures to Encourage State Employees and Health Care Workers to Get Vaccinated | California Governor;  Andrew Cuomo Says New York Will Mandate Vaccines For State Workers : NPR
[14]Ex. O VA mandates COVID-19 vaccines among its medical employees including VHA facilities staff

specific safety, efficacy and manufacturing criteria, 21 U.S.C. Section 360bbb-3(e)(1)(A)(ii)(I)-(III). The Department of Justice ("DOJ") recently issued guidance to President Biden stating that the EUA status of Covid-19 vaccines does not prohibit public and private entities from mandating those vaccines.[15]

### E.    UConn's Vaccine Policy

Beginning in early 2021, as vaccines became available, UConn carefully considered implementing a vaccine policy that would better protect the health and safety of the community and allow it to operate at a higher capacity to meet the needs of students. UConn consulted with infectious disease specialists at UConn Health, medical providers in the Student Health and Wellness ("SHaW") Center, and relied on guidance from the CDC regarding the efficacy and safety of COVID-19 vaccines as it contemplated its options. Given the CDC's guidance that vaccination is both safe and effective, UConn determined that a vaccine policy, in combination with other mitigation measures, would best protect the UConn community and allow it to resume near normal operations in areas of campus most impacted by COVID-19, including residential living and in-person learning. Ex. A, ₽ 8.

On June 4, 2021, UConn approved a policy requiring students to be vaccinated before returning to campus in August of 2021, (the "Vaccine Policy"). See Exhibit A. The Vaccine Policy provides that all UConn students who wish to attend any on-campus activity in person must either submit proof to UConn that they have been fully vaccinated against COVID-19 or apply for and be granted an exemption. *Id.* The Vaccine policy does not mandate vaccination of any student against his or her will. *Id.* Any student who does not wish to be vaccinated may apply for an

---

[15]Ex. P Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization (justice.gov)

exemption or choose not to attend UConn in person at this time. *Id.* As of July 29, 2021, nearly 90% of UConn residential students have reported that they are vaccinated. Ex. A, ₱ 12.

The Vaccine Policy permits students to apply for either medical or non-medical exemptions. To request either exemption, students complete the appropriate request form and submit it online through the SHaW Patient Portal. The policy explains the process for obtaining exemptions and provides hyperlinks for students to easily access the medical and non-medical exemption request forms. Ex. A, ₱ 13.

Requests for medical exemptions are reviewed and approved by medical providers at Shaw. A signed statement indicating a specific medical contraindication from the student's medical provider is required to obtain a medical exemption. *Id.* at ₱ 14. Non-medical exemption requests are reviewed by Eleanor Daugherty, Dean of Students and Associate Vice President of Student Affairs at UConn. In reviewing each student's non-medical exemption request form, she considers: (a) whether the student is enrolled; (b) whether the student will be living on-campus in a residence hall; (c) whether the student genuinely wants or needs an exemption (e.g., an international student mistakenly believes that because he/she has not yet been vaccinated he/she must request an exemption—UConn would vaccinate such students upon arrival on campus so no exemption would be necessary); and (d) the potential impact on the health and safety of the requesting student's campus cohort, such as his/her residence hall. *Id.* at ₱ 15. UConn's objective is to accommodate as many requests as possible while balancing the need to protect the health and safety of the UConn community. *Id.* at ₱ 16.

As of July 22, 2021, UConn had received 55 requests for medical exemptions through the SHaW Patient Portal. *Id.* at ₱ 17. As of July 23, 2021, Dean Daugherty had received 771 requests for non-medical exemptions and granted 504. The remainder had not yet been granted or denied.

Students who receive exemptions may be required to take additional preventative measures to mitigate the risks of spreading COVID-19, including, but not limited to: participating in asymptomatic, surveillance testing; wearing masks in locations where vaccinated students may not be required to do so; providing re-entry testing before arrival on campus; observing periods of isolation, quarantine or modified quarantine when there is a confirmed close contact with a person who has tested positive for COVID-19 or when the student him/herself has tested positive. *Id.* at ₱₱ 19-24.

Students who do not comply with the policy by either failing to report vaccination status or request an exemption are subject to registration holds, inability to use the Recreation Center, and are unable to sign up for a residential move-in slot. *Id.* at ₱ 25. Students who violate this policy may be referred to UConn's Office of Community Standards as is consistent with student violations of any other policy applicable to them. *Id.* at ₱ 26.

### F. Plaintiffs' Exemption Status

Plaintiff Nicole Wade alleges that she is a student enrolled in the Allied Health Sciences Department. She has not sought any exemption from the Vaccine Policy, nor has she uploaded proof of vaccination. Ex. A, ₱₱ 28-29. Plaintiff Amy Disalvatore alleges that she is the parent of a minor who is an incoming freshman for the fall 2021 semester. On June 15, 2021 Plaintiff Disalvatore submitted a request for a non-medical exemption for her minor child alleging that she and her minor child have "fear and apprehension" about the COVID vaccine given the lack of research on the potential side effects. Plaintiff Disalvatore's exemption request was granted on July 23, 2021. *Id.* at ₱₱ 30-31. On July 3, 2021, Plaintiff Dylan Barkasy submitted a request for a non-medical exemption citing concerns about potential side-effects, particularly given his

family's health history.  Plaintiff Barkasy's exemption request was granted on July 23, 2021.  *Id.* at ₱ 32.

## II.    PROCEDURAL BACKGROUND

On or about July 6, 2021, Plaintiffs filed a complaint seeking declaratory and injunctive relief in this court.  ECF 1.  In Counts I and II of the complaint, Plaintiffs allege that the Vaccine Policy violated both the procedural and substantive due process protections of the Fourteenth Amendment.  As to the procedural due process claim, Plaintiffs appear to allege that, should they choose not to be vaccinated, they will lose the right to attend UConn without the procedural protections to which they are entitled under the Fourteenth Amendment.  As to the substantive due process claim, Plaintiffs appear to allege that the Vaccine Policy deprives them of their right to refuse medical treatment.  In Count III, Plaintiffs first allege that the Vaccine Policy violates federal law because it denies them the right to informed consent before submitting to a vaccine. Second, they allege that the Vaccine Policy violates state law because Uconn did not have the necessary statutory authority to issue the policy.  In Count IV, Plaintiffs allege that Uconn violated 42 U.S.C. Section 1983 by depriving them of their liberty interest and property interests as set forth in Counts I and II.  Along with the complaint, Plaintiffs filed an Emergency Motion for Preliminary Injunction.  ECF 2.  In that motion, they allege that there is an immediate need for injunctive relief because they are at risk of suffering loss of their bodily autonomy, liberty and due process rights. On July 30, 2021, Uconn filed a motion to dismiss ("Motion to Dismiss") the complaint in its entirety.

## III.    ARGUMENT

The Emergency Motion for Preliminary Injunction must be denied for several reasons. First, as fully set forth in the Motion to Dismiss, ECF 16, the Court lacks subject matter

jurisdiction over the complaint in its entirety because the state is protected by Eleventh Amendment immunity and Plaintiffs lack standing to bring any of the claims. As such, the complaint should be dismissed.

Second, even if this court were to find that it has subject matter jurisdiction, Plaintiffs have failed to establish any of the requirements necessary to entitle them to preliminary injunctive relief. They fail to demonstrate a substantial likelihood of success on the merits of any of the claims presented. Further, they fail to establish that they will suffer irreparable harm if the motion is denied. Finally, they fail to establish that the balance of equities tips in their favor, and that the injunctive relief they seek is in the public interest. For all these reasons, more fully set forth herein, this court must deny the Emergency Motion for Preliminary Injunction.

### A.     STANDARD FOR A PRELIMINARY INJUNCTION

Preliminary injunctive relief "is an extraordinary and drastic remedy." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005). As "one of the most drastic tools in the arsenal of judicial remedies," *Onosamba-Ohindo v. Barr*, 2020 WL 5226495, at *21 (W.D.N.Y. Sept. 2, 2020), quoting *Hanson Tr. PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986), it is "never awarded as of right," *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008), or "as a routine matter." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990). Injunctive relief is used only where "the legal rights [of the plaintiff] at issue are 'indisputably clear' and even then, 'sparingly and only in the most critical and exigent circumstances.'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J. concurring).

To obtain such relief in the context of this case, it is not enough for Plaintiffs to show they are likely to succeed on the merits. Because they seek to change the status quo by

suspending an existing state policy, Plaintiffs must instead show a higher "'clear' or 'substantial' likelihood of success on the merits—as opposed to just a likelihood of success on the merits . . . ." *Amato v. Elicker*, 460 F. Supp. 3d 202, 211 (D. Conn. 2020), quoting *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)). They also must "make a strong showing of irreparable harm;" establish that the balance of equities tips in their favor, and that the injunctive relief they seek is in the public interest. *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020), citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006). Plaintiffs have failed to meet this burden.

## B. PLAINTIFFS HAVE NOT SATISFIED ANY OF THE REQUIREMENTS FOR THE ISSUANCE OF A PRELIMINARY INJUNCTION

### 1. Plaintiffs Have Not Presented A Factual Or Evidentiary Record To Support Their Claims

To obtain the extraordinary remedy of a preliminary injunction, Plaintiffs must, "by a clear showing, carr[y] the burden of persuasion." *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005), quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). That includes the burden to present a solid factual record supported by actual evidence—whether in the form of affidavit or testimony—that supports their claimed entitlement to relief. Mere allegations in an unverified complaint are therefore not a sufficient basis upon which the Court can enjoin a duly enacted state policy like that at issue here. *See Amato*, 460 F. Supp. 3d at 214 n.6, citing *Societe Comptoir De L'Industrie Cotonniere, Etablissements Boussac v. Alexander's Dep't Stores, Inc.*, 190 F. Supp. 594, 601 (S.D.N.Y. 1961), *aff'd*, 299 F.2d 33 (2d Cir. 1962).

Plaintiffs have not carried this burden. The complaint is unverified, and they have submitted no affidavits or other admissible evidence to support their claims. The Court should deny the motion on that basis alone.

**2.      Plaintiffs Have Not Established A Sufficient Likelihood Of Success On The Merits**

Even if the Court is inclined to consider Plaintiffs' motion despite their failure to present a factual record to support it, their claims lack merit and are unlikely to succeed for a number of reasons.

**a.)      The Court Lacks Subject Matter Jurisdiction over this Lawsuit**

As UConn explained in its motion to dismiss, ECF 16, the Court lacks subject matter jurisdiction over this lawsuit because (1) the Plaintiffs' claims are barred by the Eleventh Amendment because they brought them against UConn, specifically the Board of Trustees, an arm of the state; and (2) none of the three Plaintiffs have standing to challenge UConn's vaccination policy—two have obtained non-health exemptions, and one never sought an exemption. UConn incorporates those arguments as if fully set forth herein.

**b.)      Plaintiffs' Procedural Due Process Claim Lacks Merit**

Plaintiffs' have no likelihood of success on their procedural due process claim for several reasons.

As an initial matter, Plaintiffs have inadequately briefed this claim. Their analysis is limited to: (1) a conclusory and abstract citation to *Danso* v. *University of Connecticut*, 50 Conn. Supp. 256 (2007), for the proposition that students have a protected liberty interest in continuing their education; (2) irrelevant complaints about harms Plaintiffs fear if they are not able to attend UConn this year; and (3) a conclusory and speculative assertion that "[t]he lack of any procedure, combined with the complete lack of clarity in the policy itself, demonstrates that

12

plaintiffs are likely to succeed on the procedural due process grounds . . . ."  Pl. PI Br. at 16.

None of that establishes that the Vaccine Policy actually deprives Plaintiffs of their ability to

continue their education, whether now or in the future and whether at UConn or somewhere else.

And it certainly does not establish or explain how any such deprivation was achieved without

constitutionally adequate process.  Because the claim has been inadequately briefed, the Court

should reject it.

Moreover, contrary to Plaintiffs' conclusory and unsupported assertions, the Vaccine

Policy does not violate procedural due process, even if Plaintiffs could establish (which they

have not) that it infringes on a protected property interest.  As discussed above, UConn put in

place a straightforward and easy to use exemption process whereby students could seek an

exemption *before* returning to school simply by filling out a short form online.  Although the

exemption process is by design and necessity broad and flexible, *see* Ex. A, ¶¶ 15-16, UConn has

applied it—and will continue to apply it—in a fair and timely manner that respects students

wishes not to be vaccinated to the fullest extent possible while balancing the health and safety of

others on campus.  *Id.*, ¶ 16.  That is amply demonstrated by the fact that, as of July 23, 2021,

UConn had received 771 requests for non-medical exemptions, and had granted 504 of them.

*Id.*, ¶ 18.  UConn has not yet granted or denied the remaining requests—they remain pending.

*Id.*  Importantly, that includes exemption requests from Plaintiffs Disalvatore and Barksay, both

of whom sought and received a non-medical exemption under the procedures provided.  *Id.*, ¶¶

30-32.  Having used that administrative process to obtain the very same relief they seek in this

case, those plaintiffs cannot be heard to complain that the process they received was somehow

constitutionally inadequate.

Nor can Plaintiff Wade make such a claim. She did not even seek an exemption from the vaccine requirement, *id.*, ¶¶ 28-29, and a procedural due process claim will not lie where the plaintiff chooses not to invoke the very procedures she claims are inadequate. *See, e.g., Nenninger v. Port Jefferson*, 509 F. App'x 36, 39 n.2 (2d Cir. 2013) (holding that, "[h]aving failed to avail himself of [the remedies available to him], Nenninger cannot now be heard to complain of a denial of procedural due process"); *Riverhead Park Corp. v. Cardinale*, No. 07-CV-4133 (ADS)(ARL), 2013 U.S. Dist. LEXIS 45498, at *33 (E.D.N.Y. Mar. 28, 2013) (holding that "where a plaintiff was free to [invoke the state procedures] but did not, the plaintiff cannot now be heard to complain of a denial of procedural due process") (quotation marks omitted); *Grossman v. Schwarz*, No. 84 Civ. 3323 (CBM), 1986 U.S. Dist. LEXIS 30812, at *13 (S.D.N.Y. Jan. 6, 1986) (holding that "Plaintiffs cannot complain that due process has been denied them when they have rejected the state procedure that is available to them"). That is especially true when, as here, the procedures plainly are adequate, have been successfully used by hundreds of other students to obtain the same relief that Plaintiffs seek, and could (and almost certainly would) have afforded Plaintiff Wade that same relief had she sought it.

Finally, these procedures cannot be regarded as constitutionally inadequate in light of the extraordinary public health crisis presented by the COVID-19 pandemic. *See Francis v. Fiacco*, 942 F.3d 126, 142 (2d Cir. 2019) ("[i]n determining what process is due, we recognize that due process is flexible and calls for such procedural protections as the particular situation demands"). "[D]eprivation of property to protect the public health and safety is [one] of the oldest examples of permissible summary action." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981). Thus, "[d]uring the COVID-19 pandemic, district courts across the country have denied procedural due process claims relating to state governments' COVID-19

policies." *Hernandez v. Grisham*, No. CIV 20-0942 JB\GBW, 2020 U.S. Dist. LEXIS 238477, at *159-60 (D.N.M. Dec. 18, 2020) (collecting cases). Because the procedures UConn put in place would be adequate under normal circumstances, they are certainly adequate during the time of COVID-19.

### c) Plaintiffs' Substantive Due Process Claim Lacks Merit

Plaintiffs have no likelihood of success on their substantive due process claim, which is without merit. First, as already determined by the Second Circuit in *Phillips*, Plaintiffs' claim is foreclosed by the Supreme Court's decision in *Jacobson*. Second, even if *Jacobson* does not control, the Vaccine Policy survives standard Fourteenth Amendment constitutional review. Because the right to refuse a vaccine has never been recognized as a fundamental right, the policy is subject only to rational basis review, which is easily satisfied; alternatively, even if subject to strict scrutiny, it would satisfy that test.

### i. *Jacobson* forecloses the substantive due process claim.

The Second Circuit has definitively held that substantive due process challenges to vaccine mandates issued in the face of an epidemic are foreclosed by the Supreme Court's decision in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905). *See Phillips v. City of New York,* 775 F.3d 538, 542-43 (2d Cir. 2015). In *Jacobson*, the plaintiff brought a substantive due process challenge to a Massachusetts law that made it a crime to refuse to be vaccinated for smallpox alleging that it interfered with his right "to care for his own body and health in such way as to him seems best…" *Jacobson,* 197 U.S. at 26. Rejecting the claim, the Supreme Court held that mandatory vaccination was within the State's police power and did not violate due process. *Jacobson*, 197 U.S. at 25-27; *see Zucht v. King*, 260 U.S. 174, 176, 43 S. Ct. 24, 67 L. Ed. 194, 20 Ohio L. Rep. 452 (1922) ("*Jacobson . . .*

settled that it is within the police power of a state to provide for compulsory vaccination.")  The Court reasoned that "the liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Jacobson,* 197 U.S. at 26.  Under *Jacobson*, courts are authorized to review only whether "a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law."[16] *Jacobson,* 197 U.S. at 28, 31 (citations omitted); *see also DiMartile v. Cuomo*, 1:20-CV-0859, 478 F. Supp. 3d 372, 2020 U.S. Dist. LEXIS 141384, 2020 WL 4558711, at *8 (N.D.N.Y. Aug. 7, 2020) (discussing the police power in relation to the COVID-19 pandemic).

In *Phillips,* the Second Circuit affirmed that *Jacobson* was still controlling law in cases involving substantive due process challenges to a State's exercise of its police powers in a public

---

[16] The overwhelming majority of courts resolving constitutional challenges to COVID-19-related measures employ *Jacobson*. *See, e.g., Bill & Ted's Riviera, Inc. v. Cuomo*, 1:20-CV-1001 (FJS/TWD), 2020 U.S. Dist. LEXIS 188763, 2020 WL 6043991, at *3-6 (N.D.N.Y. Oct. 13, 2020) (denying injunctive relief aimed at COVID-19 gathering restrictions under *Jacobson*); *Luke's Catering Serv., LLC v. Cuomo*, 20-CV-1086S, 2020 U.S. Dist. LEXIS 165907, 2020 WL 5425008, at *5-7 (W.D.N.Y. Sept. 10, 2020) (upholding gathering restriction under *Jacobson*); *Martin v. Warren*, 20-CV-6538 CJS, 482 F. Supp. 3d 51, 2020 U.S. Dist. LEXIS 154979, 2020 WL 5035612, at *19 (W.D.N.Y. Aug. 26, 2020) (applying *Jacobson* in the course of denying request to enjoin public-gathering restriction partially intended to prevent the spread of COVID-19); *Page v. Cuomo*, 1:20-CV-732, 478 F. Supp. 3d 355, 2020 U.S. Dist. LEXIS 183769, 2020 WL 4589329, at *8 (N.D.N.Y. Aug. 11, 2020) (applying *Jacobson* and noting that "courts across the country have nearly uniformly relied on *Jacobson's* framework to analyze emergency public health measures put in place to curb the spread of coronavirus") (collecting cases); *McCarthy v. Cuomo*, 20-CV-2124 (ARR), 2020 U.S. Dist. LEXIS 107195, 2020 WL 3286530, at *3 (E.D.N.Y. June 18, 2020) (listing [**23] COVID-19 cases employing *Jacobson* standard).

This includes multiple circuit courts of appeals. *See League of Indep. Fitness Facilities & Trainers*, 814 F. App'x at 127-28 (applying *Jacobson* and finding that "the police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts"); *Elim Romanian Pentecostal Church v. Pritzker*, No. 20-1811, 2020 U.S. App. LEXIS 19049, 2020 WL 2517093, at *1 (7th Cir. May 16, 2020) (per curiam) (citing *Jacobson*); *In re Rutledge*, 956 F.3d 1018, 1028 (8th Cir. 2020) (faulting district court for failing to apply *Jacobson* analysis to Governor's COVID-19-related Executive Order); *In re Abbott*, 954 F.3d at 786 (referring to *Jacobson* as "the controlling Supreme Court precedent that squarely governs judicial review of rights-challenges to emergency public health measures").

health emergency.  *Phillips*, 775 F.3d at 542-43.  In that case, the plaintiffs claimed that New York's vaccine mandate requiring vaccination as a condition of attendance at public schools violated the children's substantive due process rights under the Fourteenth Amendment.  The Court rejected the claim, concluding that it was "foreclosed by" *Jacobson*.  *Id.*, 542; *see also id.* ("Plaintiffs' substantive due process challenge is therefore no more compelling than Jacobson's was more than a century ago"); *Caviezel v. Great Neck Pub. Schs.*, 500 F. App'x 16, 19 (2d Cir. 2012) (summary order) (rejecting substantive due process challenge to vaccination mandate based on *Jacobson*).

　　　　*Jacobson* and *Phillips* are dispositive.  Plaintiffs' substantive due process challenge to the Vaccine Policy is materially identical to the challenges rejected in those cases.  In fact, as *Phillips* recognizes, Plaintiffs' due process challenge in this case is, if anything, even weaker than the one rejected in *Jacobson* because the law upheld in *Jacobson* fully required vaccination, whereas the Vaccine Policy merely makes it a condition for attending on-campus activities in person.  *See Phillips*, 775 F.3d at 542 n.5 (distinguishing between vaccination law upheld in *Jacobson*, which required "all persons over age twenty-one be vaccinated for small pox and the *criminal prosecution* of the plaintiff for refusing to submit to vaccination," and New York's mandate which "requires only that children who are not otherwise exempted be vaccinated in order to attend school") (emphasis in original); *Doe v. Zucker*, No. 1:20-cv-840 (BKS/CFH), 2021 U.S. Dist. LEXIS 28937, at *69-70 (N.D.N.Y. Feb. 17, 2021) (mandatory vaccination as condition for attending school does not implicate right to privacy under substantive due process clause because "the parent may forgo vaccination and homeschool their child").  Based on these cases alone, Plaintiffs cannot show a likelihood of success on the merits if this claim.

Plaintiffs argue that *Jacobson* is not controlling authority in this case because UConn exceeded its statutory authority when it enacted the Vaccine Policy. Pl. Br., p. 14, 17. As UConn explained in its motion to dismiss (Doc. 16-1, pp. 4-5), this claim is foreclosed by *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984), which held that claims against the state based upon state law are barred by the Eleventh Amendment because federal courts do not have authority to declare the states in violation of their own laws.

Even if the Court could consider this argument, it fails on its merits. Plaintiffs base their argument on Conn. Gen. Stat. § 19a-131e. *Pl. Br.*, p. 15. Section 19a-131e enables the Governor to authorize the Connecticut Department of Public Health to impose vaccine requirements on the general population (or segments thereof) during a public health emergency. Nothing in that statute affects or limits UConn's authority to govern the conduct of its students within the confines of its campuses in order to protect their health and safety.

UConn's authority over such matters is set forth in Conn. Gen. Stat. § 10a-104(a), which provides in relevant part that UConn "shall: (1) Make rules for the government of the university and shall determine the general policies of the university . . . ." The Connecticut Supreme Court has observed that that statute was **"clearly written in the broadest possible terms**, evincing an obvious legislative intent to clothe the board of trustees with sole jurisdiction over the university in all phases." *Conn. State Emps. Asso. v. Bd. of Trs.*, 165 Conn. 757, 761 (1974). It is inconceivable that the broad statutory authority the legislature conveyed to UConn over "general policies" does not include the authority to require vaccinations to ensure the health and safety of student communities during an unprecedented pandemic.

UConn's authority to issue the mandate is no different than the Massachusetts's legislature's authority in *Jacobson*. As such, nothing about the fact that it was UConn, rather

than the Governor or the Department of Public Health, that enacted the Vaccine Policy allows this Court to ignore *Jacobson*.

Next, Plaintiffs argue that *Jacobson* is not applicable here because, unlike in *Jacobson*, the science here does not support UConn's view about the safety and efficacy of the COVID-19 vaccines. Plaintiffs make a number of allegations in their Complaint that the vaccines are dangerous and unnecessary. *Compl.,* ¶¶ 52-66. They echo these same arguments in their brief. *Pl. Br.,* pp. 9-13. Whatever "evidence" Plaintiffs attempt to produce to bolster these claims, it could not alter the results here. This Court cannot second-guess UConn's policy judgments about how best to protect the health and safety of its students during a pandemic where, as in this case, those judgments are fully consistent with prevailing scientific recommendations, as reflected in CDC guidance.

*Jacobson* is instructive here. As support for his claim that Massachusetts' law violated his substantive due process rights, the defendant sought to present expert testimony showing that the smallpox vaccines were ineffective and harmful. *Jacobson*, 197 U.S. at 23-24. The Supreme Court held that this proposed evidence had no bearing:

> [The defendant's evidence] seem[s] to have had no purpose except to state the general theory of those of the medical profession who attach little or no value to vaccination as a means of preventing the spread of smallpox or who think that vaccination causes other diseases of the body. . . . We must assume that when the statute in question was passed, the legislature of Massachusetts was not unaware of these opposing theories, and was compelled, of necessity, to choose between them. . . . It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease. That was for the legislative department to determine in the light of all the information it had or could obtain. . . . The state legislature proceeded upon the theory which recognized vaccination as at least an effective if not the best known way in which to meet and suppress the evils of a smallpox epidemic that imperiled an entire population. Upon what sound

principles as to the relations existing between the different departments of government can the court review this action of the legislature?

Id., 30-31 (emphasis added).

Thus, the Second Circuit held in *Phillips* that merely presenting evidence of a contrarian view about the merits of a chosen method of disease control does not permit the courts to second guess that method. "Plaintiffs argue that a growing body of scientific evidence demonstrates that vaccines cause more harm to society than good, but as *Jacobson* makes clear, that is a determination for the legislature, not the individual objectors." *Phillips*, 775 F.3d at 542; *see also In re Abbott*, 954 F.3d 772, 784-85 (5th Cir. 2020) ("*Jacobson* disclaimed any judicial power to second-guess the state's policy choices in crafting emergency public health measures" or "the wisdom or efficacy of the measures"); *Marshall v. United States*, 414 U.S. 417, 427 (1974) (noting that "medical uncertainties afford little basis for judicial responses," and that when officials "undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad"); *Collins v. Texas,* 223 U.S. 288, 297-298 (1912) (declaring "right of the state to adopt a policy even upon medical matters concerning which there is difference of opinion and dispute"); *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 773 (W.D.N.Y. 2020) ("[t]his limited review [under *Jacobson*] does not permit courts to pass judgment on the 'wisdom or efficacy' of the emergency measures implemented"). Plaintiffs' claim reduces to a mere dispute over the science surrounding the COVID-19 vaccines. And like the small pox vaccines in *Jacobson*, the overwhelming consensus is that COVID-19 vaccines are safe and effective. According to the CDC, the more people who are vaccinated the better; many millions of people have safely been vaccinated; and vaccination remains the most effective means of eliminating the pandemic.

Furthermore, under *Jacobson*, the fact that UConn has made a choice about a matter over which there is scientific agreement entitles that choice to more, not less, deference from the courts. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring) ("[w]hen [state] officials 'undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad")*; Conn. Citizens Def. League, Inc. v. Lamont,* No. 3:20-cv-646 (JAM), 465 F. Supp. 3d 56, 2020 U.S. Dist. LEXIS 99872, 2020 WL 3055983, at *11 (D. Conn. June 8, 2020) ("[C]ourts owe great deference to the protective measures ordered by government officials in response to the COVID-19 crisis, not simply because the virus has lethal consequences but also because the virus acts in unknown ways that engender uncertainty about what scope of protective measures are warranted."). *See also S. Bay United Pentecostal Church v. Newsom*, No. 20A136, 141 S. Ct. 716, 209 L. Ed. 2d 22, 2021 U.S. LEXIS 758, 2021 WL 406258, at *1 (Feb. 5, 2021) (Roberts, J., concurring) (Federal courts owe significant deference to politically accountable officials with the "background, competence, and expertise to assess public health.")  This is true even if the State's choices prove wrong:  The possibility that the belief may be wrong, and that science may yet show it to be wrong, is not conclusive; for the State has the right to take steps to prevent the spread of contagious diseases.

And the fact that the policy at issue was enacted by UConn, a public university, rather than a legislature, makes no difference.  In rejecting an identical request to enjoin Indiana University's mandatory COVID-19 vaccination policy, the District Court, citing *Phillips*, observed: "Overall, the students' arguments amount to disputes over the most reliable science. But when reasonable minds can differ as to the best course of action—for instance, addressing symptomatic versus asymptomatic virus spread or any number of issues here—the court doesn't

intervene so long as the university's process is rational in trying to achieve public health." *Klassan v. the Trustees of Indiana*, 2021 U.S. Dist. LEXIS 133300, at *103.

Because the Vaccine Policy fully accords with CDC guidance for pandemic control, it cannot be regarded as irrational, regardless of what "evidence" Plaintiffs produce in support of their contrarian views about vaccinations. UConn policymakers were not unaware of these anti-vaccine views when formulating the policy. Thus, considering any such evidence would "invite the court . . . to go over the whole ground gone over by [policymakers] when [they] enacted the [law] in question." *Jacobson*, 197 U.S. at 36. This "would practically strip the [policymakers] of their function to care for the public health and the public safety when endangered by epidemics of disease" and place it in the hands of the courts. Id., 37.

Having failed to present any sustainable reason why *Jacobson* does not apply to the facts of this case, *Phillips* dictates that Plaintiffs' substantive due process claim is foreclosed from review and fails.

> ii. **Even if *Jacobson* does not foreclose review, the Vaccine Policy survives under either the rational basis or strict scrutiny level of review.**

Should this court decide that *Jacobson* and *Phillips* do not foreclose review of Plaintiffs' substantive due process claim, the Vaccine Policy survives standard constitutional scrutiny under either the rational basis or strict scrutiny test. Since *Jacobson,* courts apply a tiered system of review to substantive due process claims under the Fourteenth Amendment. "[T]he level of scrutiny" to which a governmental regulation is subject "turns on the nature of the right at issue." *Id.* Generally, "[w]here the right infringed is fundamental, strict scrutiny is applied." *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003). To survive review, the "challenged regulation must be narrowly tailored to promote a compelling Government interest" and "must use the least restrictive means to achieve its ends." *Evergreen Ass'n, Inc. v. City of New York*,

740 F.3d 233, 246 (2d Cir. 2014) (citation omitted).  In contrast, "[w]here the claimed right is not fundamental," rational basis review is applied, and "the governmental regulation need only be reasonably related to a legitimate state objective." *Immediato*, 73 F.3d at 461 (citing *Reno v. Flores*, 507 U.S. 292, 303-06, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993)).

Because the right to refuse a vaccine during a pandemic is not a fundamental constitutional right, rational review applies and the Vaccine Policy easily satisfies this test. Further, even if this court finds that the right to refuse a vaccine is fundamental, subjecting the policy to strict scrutiny review, it passes that test as well.

> **(a.)      Rational basis is the appropriate standard of review in this case because the right to refuse a vaccine is not a fundamental right.**

In order to determine if a liberty interest is "fundamental", the "analysis must begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'" *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992)).   Armed with a careful description, the court must next determine whether that right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," such that it can be considered a "fundamental right.'" *Glucksberg*, 521 U.S. at 721.

Relying on *Cruzan v. Director, Missouri Dept. of Health,* Plaintiffs describe the right at issue in this case as the right to refuse unwanted medical treatment.  *Cruzan*, 497 U.S. 261, 279, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990).  Pl. Br. At 17.  Certainly, the Supreme Court has suggested that individuals have such a constitutionally protected liberty interest.  In *Cruzan*, the Court held that a competent individual had a constitutional right to refuse unwanted lifesaving hydration and nutrition, *Cruzan*, 497 U.S. at 279.    In *Washington v. Glucksberg*, the Court

recognized that an individual had a liberty interest in refusing unwanted lifesaving medical treatment, though not a fundamental right to assisted suicide. *Glucksberg*, 521 U.S. 702, 728, 117 S. Ct. 2258, 138 L. Ed. 772 (1997). No court, however, has held that the right to refuse a vaccine during a pandemic falls within this right and that it is fundamental.

The requirement of a "careful description" of the asserted liberty interest is significant here. *See Glucksberg*, 521 U.S. at 720-21. S*ee also Chavez*, 538 U.S. at 775-76 (reaffirming *Glucksberg's* requirement of a careful description of the asserted fundamental liberty interest); *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 359-61 (2d Cir. 2004) (discussing *Cruzan* and *Glucksberg*); *Jennis v. Rood*, 488 F. Supp. 2d 172, 185-87 (N.D.N.Y. 2007) (invoking *Glucksberg* and *Chavez* to deny plaintiff's due process claim). In *Glucksberg*, the Court warned of the consequence of broadly-defined liberty interests: "By extending constitutional protection to an asserted right or liberty interest, [the Supreme Court], to a great extent, place[s] the matter outside the arena of public debate and legislative action." *Id*. at 720; *see also Chavez v. Martinez*, 538 U.S. 760, 775, 123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003) ("[W]e have expressed our reluctance to expand the doctrine of substantive due process, in large part because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."); *Giordano v. Conn. Valley Hosp*., 2008 U.S. Dist. LEXIS 98338, *35. With that in mind, then, rather than defining the right at issue in this case as a general interest in refusing unwanted medical treatment, a more "careful description" of the right at stake is the right to refuse a vaccine in the midst of a global pandemic.

The court must next determine whether that right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," such that it can be considered a "fundamental right.'" *Glucksberg*, 521 U.S. at 721. In this case, Plaintiffs have

failed to point to any law, history or tradition in our country identifying the right to refuse vaccination during a pandemic as a fundamental right. In fact, the progeny of *Jacobson* establishes that, for over one hundred years, our county has espoused the belief that our states, pursuant to their police power, may mandate vaccines in order to protect the health and safety of members of the public from epidemics and contagious disease and that such mandates are subject only to the deferential review set forth in *Jacobson* or, at most, a rational basis standard of review. *See, e.g., Prince v. Massachusetts*, 321 U.S. 158, 166-67, 64 S. Ct. 438, 88 L. Ed. 645 (1944) (parent "cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds" and "[t]he right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death"); *Zucht*, 260 U.S. at 176-77; *Jacobson*, 197 U.S. at 30-31; *Phillips v. City of New York*, 775 F.3d 538, 542-43 (2d Cir. 2015); *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. Appx. 348, 355-56 (4th Cir. 2011); *W.D. v. Rockland Cnty.*, __ F. Supp.3d __, 2021 U.S. Dist. LEXIS 33515, 74 (S.D.N.Y. Feb. 22, 2021); *Doe v. Zucker*, __ F. Supp.3d __, 2021 U.S. Dist. LEXIS 28937, 111 (N.D.N.Y. Feb. 17, 2021); *Connecticut Citizens Defense League, Inc. v. Lamont*, 465 F. Supp.3d 56, 72 (D. Conn. 2020); *Middleton v. Pan*, 2016 U.S. Dist. LEXIS 197627, 20 (C.D. Cal. Dec. 15, 2016); *George v. Kankakee Cmty. Coll.*, 2014 U.S. Dist. LEXIS 161379, 8-9 (C.D. Ill. Oct. 27, 2014), *recommendation adopted*, 2014 U.S. Dist. LEXIS 160737, 1-2; *Boone v. Boozman*, 217 F. Supp.2d 938, 954 (E.D. Ark. 2002). *Cruzan* itself implicitly acknowledged that the right to refuse a vaccine is not a fundamental one when it affirmed that the court in *Jacobson* **properly** "balanced an individual's liberty interest in declining an unwanted smallpox vaccine against the State's interest in preventing disease." *Cruzan*, 497 U.S. at 278.

The language implicitly affirms that no fundamental interest was at stake to trigger a higher level of review.

In *Klaassen,* a district court reached the same conclusion. The court found that "[g]iven over a century's worth of rulings saying there is no greater right to refuse a vaccination than what the Constitution recognizes as a significant liberty, the court declines the students' invitation to extend substantive due process to recognize more than what already and historically exists." *Klaassen v. Trustees of Indiana University*, 2021 U. S. Dist. LEXIS 133300 *63. *See also Glucksberg*, 521 U.S. at 721; *Harper*, 494 U.S. at 221-22; *Prince*, 321 U.S. at 166-67; *Zucht*, 260 U.S. at 176-77; *Jacobson*, 197 U.S. at 30-31." The court pointed to a significant difference between the right to refuse lifesaving hydration and nutrition identified in *Cruzan* and the right to refuse a vaccine during a pandemic. While the right in *Cruzan* was "limited to an individual's choice related to the refusal of lifesaving subsistence or medical treatment—with no ramifications to the physical health of others", "[v]accines address a collective enemy, not just an individual one. Indeed, 'the elimination of communicable diseases through vaccination [is] one of the greatest achievements of public health in the 20th century,' A vaccine is implemented as a matter of public health, and historically hasn't been constitutionally deterred from state mandate." *Klassen*, at *50-51.

While the right to refuse a vaccine, even during a pandemic, is a liberty interest protected by the Fourteenth Amendment, it is not a fundamental right. Therefore, the Vaccine Policy is subject to rational basis review.[17]

---

[17] It should be noted that, while the plaintiffs claim that the right infringed is the right to be free from unwanted medical treatment, Plaintiffs are not being coerced into receiving a vaccine. Arguably, the right at stake is the right to attend a public university. Infringements on that right are clearly not entitled to strict scrutiny review.

Contrary to Plaintiffs' argument, the Supreme Court's decision in *Roman Catholic Diocese* is entirely consistent with this position. *Roman Catholic Diocese* involved a Free Exercise claim under the First Amendment, rather than a substantive due process challenge. Applying established free exercise jurisprudence, the Court held that the executive orders at issue were subject to strict scrutiny (which they did not meet) because they were not "neutral" and of "generally applicability". *Roman Catholic Diocese,* 141 S. Ct. at 66. Therefore, strict scrutiny applied. *Id.*

This is no way conflicts with *Jacobson* or a rational basis standard of review. Indeed, as Justice Gorsuch explained in this concurring opinion in *Roman Catholic Diocese*, the two decisions are easily reconcilable: "Rational basis review is the test this Court *normally* applies to Fourteenth Amendment challenges, so long as they do not involve suspect classifications based on race or some other ground, or a claim of fundamental right. Put differently, *Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, *Jacobson* applied what would become the traditional legal test associated with the right at issue…." *Roman Catholic Diocese*, 141 S.Ct. at 70 (Gorsuch, J., concurring).

The District Court in *Klaassen* agreed. "That [*Roman Catholic Diocese*] imposed heightened scrutiny of the government's interference with the free exercise of religion – a fundamental right under the First Amendment – was presciently contemplated a century beforehand by *Jacobson*: a court should intervene if a state imposes a regulation that is 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.' *Klaassen* at *45.

Because the right to refuse a vaccine is nothing "more than a significant liberty interest under the Fourteenth Amendment," *id*. at *50, it is only entitled to rational basis review.

### (b.)     *The Vaccine Policy survives rational basis review*.

"Legislative acts that do not interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality and must be upheld if 'rationally related to a legitimate state interest.'" *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). In order to meet this burden, Plaintiffs must "discredit any conceivable basis which could be advanced to support the challenged provision, regardless of whether that basis has foundation in the record, . . . or actually motivated [Defendants]." *Beatie*, 123 F.3d at 713.

Here, the Vaccine Policy is reasonably related to a legitimate state objective — curbing the spread of the COVID-19 virus in the UConn community. The Second Circuit has acknowledged that "stemming the spread of COVID-19 is unquestionably a compelling [governmental] interest." *Agudath Isr. v. Cuomo*, 983 F.3d 620, 633 (2d. Cir. 2020) (citation, quotation marks, and alteration marks omitted). UConn reasonably believes the Vaccine Policy best protects the UConn community and allows UConn to resume near normal operations in areas of campus most impacted by COVID-19, including residential living and in-person learning. It arrived at this decision after carefully considering available data and guidance from the CDC regarding the efficacy and safety of the COVID-19 vaccines and consulting with its own infectious disease specialists and medical providers in the SHaW Center. Ex. A, ¶¶ 8-10. Making a policy decision based on information and recommendations from the nation's leading institution in the area of infectious disease and advice from experts in the field of infectious disease and medical services for university students is evidence that the Vaccine Policy is

reasonably related to its ultimate goal of protecting the lives and health of the members of the UConn community.

Plaintiffs point to scientific and medical data to argue that the vaccines are not safe and, therefore, the policy cannot pass rational basis review. Such disputes regarding the scientific basis for the Vaccine Policy are simply not enough to state a plausible clam that it is not rationally related to a legitimate government interest. *See, e.g., Hopkins Hawley LLC v. Cuomo*, No. 20-CV-10932 (PAC), 2021 U.S. Dist. LEXIS 24580, 2021 WL 465437, at *7 (S.D.N.Y. Feb. 9, 2021) (reasoning plaintiffs averments that COVID-19 policy "went against the grain of scientific proof" did not satisfy the high bar for rational basis review). Plaintiffs also argue that the CDC has not recommended that schools "mandate" the vaccine. Pl. Brief at 5-6. But the Vaccine Policy is not inconsistent with CDC recommendations. The CDC recommends institutions of higher learning "can return to full capacity in-person learning, without requiring or recommending masking or physical distancing for people who are full vaccinated."[18] The CDC's guidance to universities is that "[v]vaccination is the leading prevention strategy to protect individuals from COVID-19 disease and end the COVID-19 pandemic." *Id.*

Plaintiffs also argue that the fact that the faculty are not required to be vaccinated defeats a rational basis argument as well. However, rational-basis review tolerates overinclusive classifications, underinclusive ones, and other imperfect means-ends fits. *Heller v. Doe*, 509 U.S. 312, 319-320, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993); *Gregory v. Ashcroft*, 501 U.S. 452, 473, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991); *Vance v. Bradley*, 440 U.S. 93, 107-09, 99 S. Ct. 939, 59 L. Ed. 2d 171 (1979). Therefore, even if the plaintiffs believe that the faculty should have been included, the fact that they were not is not sufficient to render the policy unreasonable. Further, as with every aspect of crisis management during this pandemic, it

---

[18] Ex. Q  Considerations for Institutions of Higher Education (IHEs) (cdc.gov)

is not a foregone conclusion that faculty and staff will not be subject to such a mandate in the future. Decisions are being made in a constantly changing environment. The fact that the faculty and staff are not required to be vaccinated under this version of the policy, does not preclude the possibility that they will be covered by a revised or separate policy down the road.

> **(c.)** **Even if this court applies strict scrutiny review, the Vaccine Policy meets that test.**

Should the court find that Plaintiffs' right to refuse a vaccine is a fundamental right entitled to strict scrutiny, the Vaccine Policy still passes review. Under that test, the Vaccine Policy is constitutional only if it is "'narrowly tailored' to serve a 'compelling' state interest." *Roman Cath. Diocese*, 141 S. Ct. at 67 (quoting *Lukumi*, 508 U.S. at 546). As the Supreme Court observed, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Id.* The question is thus whether the Vaccine Policy is narrowly tailored to address that public-health concern. It unquestionably is.

"To meet the 'narrowly tailored' requirement, courts ask whether the policy at issue was 'the least restrictive means of achieving' the government's compelling interest." *W.D. v. Rockland Cty.*, 2021 U.S. Dist. LEXIS 33515, at *82 (S.D.N.Y. Feb. 22, 2021) (*quoting Thomas v. Review Bd. Of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981)). UConn determined that its compelling interest in mitigating the spread of COVID-19, a highly communicable disease, required a vaccination policy that applies broadly to its student population. In fact, in light of this compelling interest, UConn would have been justified in excluding from campuses <u>all</u> unvaccinated students who had not obtained exemptions for health reasons (and perhaps them as well). Therefore, by providing a robust procedure for obtaining <u>non-health</u> exemptions, UConn's policy is drawn even more narrowly that it needs to be to satisfy strict scrutiny. *See Phillips*, at 543 ("[b]ecause the State could bar [the plaintiffs'] children from school altogether, *a*

*fortiori*, the State's more limited exclusion during an outbreak of a vaccine-preventable disease is clearly constitutional").Given the high risk presented by the Delta Variant and the effectiveness of the vaccines, combined with the option to seek an exemption from the requirement, the Vaccine Policy is narrowly tailored to serve the compelling interest in protecting the UConn community during a deadly pandemic.

Additionally, without the Vaccine Policy, UConn would have had to restrict its operations as it did in the 2020-21 academic year, especially given the Delta Variant. This would have denied many students the opportunity for in person learning, housing accommodations, research, and clinical work necessary to complete their educations. By implementing the Vaccine Policy, UConn chose the least restrictive means to accomplish the goal of protecting the health and safety of the community while also allowing the university to fulfill the mission for which it was created.

Because the Vaccine Policy would pass either rational basis or strict scrutiny review, the plaintiffs cannot demonstrate that they are likely to prevail on their substantive due process claim.

### e)The Informed Consent requirements of 21 U.S.C. § 360bbb-3(e), Do Not Apply To The Vaccine Policy, And Even If They Did The Vaccine's Policy Does Not Require Vaccination Without Informed Consent

Although it is not clear from their Complaint, in their motion for preliminary injunction, Plaintiffs appear to seek relief on the ground that the Vaccine Policy violates the informed consent requirement of 21 U.S.C. § 360bbb-3(e). *See* Pl. PI Br. at 19. Any such claim lacks merit. On its face § 360bbb-3(e) "confers certain powers and responsibilities to the Secretary of Health and Human Services in an emergency." *Bridges v. Hous. Methodist Hosp.*, No. H-21-1774, 2021 U.S. Dist. LEXIS 110382, at *5-6 (S.D. Tex. June 12, 2021). It does not, however,

"expand[] []or restrict[] the responsibilities" of educational institutions like UCONN or "confer a private opportunity to sue the government . . . ." *Id.* In any event, the Vaccine Policy does not preclude whoever gives a student a vaccine from informing the student of his or "option to accept or refuse administration of the product," and it certainly does not prevent students from making that ultimate choice. 21 U.S.C. § 360bbb-3(e)(1)(ii)(III). To the contrary, at all times students remain free to refuse the vaccine if they desire. The fact that doing so may have consequences for the conditions of their continued education at UConn does not violate the informed consent requirement of § 360bbb-3(e).

Plaintiffs also appear to allege that the fact that the vaccines have been approved for emergency use precludes any entity, including public universities, from mandating them. This argument lacks merit especially given a recently released DOJ opinion advising President Biden that the EUA status of the COVID 19 vaccines does not restrict any entity, public or private, from requiring those vaccines.[19] "Section 564(e)(1)(A)(ii)(III) of the Food, Drug, and Cosmetic Act concerns only the provision of information to potential vaccine recipients and does not prohibit public or private entities from imposing vaccination requirements for a vaccine that is subject to an emergency use authorization." *Id.* The EUA status of the vaccines does not prohibit UConn from mandating that students who choose to attend UConn are vaccinated.

### f.)The Vaccine Policy Is Not Unconstitutionally Vague

Plaintiffs argue that the Vaccine Policy is unconstitutionally vague because it fails to specify "what a 'nonmedical' exemption is, or who qualifies," or what exactly the sanctions will be for students who do not comply. Pl. Br., p. 20. The Court should reject this argument for multiple reasons. First, it has been inadequately briefed. Plaintiffs offer no legal support or

---

[19] Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization (justice.gov) (Exhibit N.)

analysis in support of their claim, beyond merely quoting the Supreme Court's abstract observation in *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939), that "all [must] be informed as to what the state commands or forbids." But that case involved a vagueness challenge to a criminal statute, which are "subjected to stricter vagueness review" than statutes that impose civil penalties. *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 396 (2d Cir. 2004). The Plaintiffs offer no explanation or analysis for why the constitutional vagueness requirements are even applicable to requirements imposed by a public institution as a condition for enrollment, much less why those standards have not been met in this case. Accordingly, the Court should disregard this claim as inadequately briefed.

In any case, the Vaccine Policy is not unconstitutionally vague. Because it is not a criminal or quasi-criminal statute, it is "deemed unconstitutionally vague only if it commands compliance in terms so vague and indefinite as really to be no rule or standard at all." Id., 396. The policy states quite clearly what is required: All UConn students "who participate in any on-campus activities in person for any reason" "are required to be fully vaccinated against COVID-19," and "are required to report vaccination compliance to [UConn]." Policy, p. 2. There is no ambiguity here. To participate in any on-campus activity, every student must submit adequate proof of vaccination, or obtain a medical or non-medical exemption.

The fact that the policy does not describe the standard by which UConn determines when to grant exemptions from the vaccination requirements is irrelevant. Unconstitutional vagueness comes into play only when the requirements for compliance are insufficiently clear. Any ambiguity in describing the standard for granting exemptions does not change the fact that the requirements themselves are abundantly clear and definite. Moreover, any imprecision in this area is by necessity. "The degree of statutory imprecision that due process will tolerate varies

with the nature of the enactment and the correlative needs for notice and protection form unequal enforcement." *Advance Pharm., Inc.,* 391 F.3d 377 at 396. The Vaccine Policy was designed as a response to the ever-changing COVID-19 pandemic in an environment (college campuses) where the risk of an outbreak is high. As a result, the policy is necessarily described in broad terms, giving discretion to UConn personnel to decide whether to grant non-medical exemptions based on the student's specific circumstances and any public health concerns that may (unpredictably) arise. Thus, any failure to delineate a specific standard for adjudicating non-medical exemptions does not give rise to a vagueness issue.

### g.)The Board Is Not A Person For Purposes Of 42 U.S.C. § 1983, And That Statute Does Not Confer Substantive Rights In Any Event

Plaintiffs have pled a separate Count alleging violations of 42 U.S.C. § 1983. *See* Compl., Count IV. In addition to the grounds for dismissal discussed above, any such claim lacks merit for the additional reason that the Board is not a person for purposes of Section 1983 and cannot be sued under that statute. *Gaby v. Bd. of Trs.*, 348 F.3d 62, 63 (2d Cir. 2003). Moreover, because all of the Plaintiffs' aforementioned claims fail, so too does any Section 1983 claim. It is well settled that Section 1983 does not create substantive rights but "merely provide[s] remedies for deprivations of rights established elsewhere." *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985).

### 3. Plaintiffs Have Not Established That They Will Be Irreparably Harmed Absent A Preliminary Injunction

A showing of irreparable harm "is the single most important prerequisite for the issuance of injunctive relief." *FEI Hong Kong Co. Ltd. v. GlobalFoundries, Inc.*, 2020 WL 1444956, at *2 (S.D.N.Y. Mar. 25, 2020) ("*FEI*"), citing *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F. 3d 110, 118 (2d Cir. 2009). The moving party must therefore "first demonstrate that such

injury is likely before the other requirements for the issuance of an injunction will be considered.'" *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). "In the context of a plaintiff's showing of likely irreparable injury, '[l]ikelihood sets, of course, a higher standard than possibility.'" *Joshi v. Trustees of Columbia Univ. in City of New York*, 2020 WL 5125435, at *4 (S.D.N.Y. Aug. 31, 2020), quoting *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). The plaintiff "must demonstrate that absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Raia v. Pompeo*, 2020 WL 1921573, at *3 (E.D.N.Y. Apr. 21, 2020), quoting *Faiveley*, 559 F.3d at 118. This standard is especially high where the injunction would upend the existing status quo, as such injunctions "should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Jones v. Wolf*, 2020 WL 1643857, at *2 (W.D.N.Y. Apr. 2, 2020), quoting *Tom Doherty*, 60 F.3d at 34); *see also N. Am. Soccer League, LLC*, 883 F.3d at 37. And that higher standard is "especially appropriate when a preliminary injunction is sought against government." *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006), *opinion amended on denial of reh'g*, 480 F.3d 138 (2d Cir. 2007).

Here, the only purported irreparable harm that Plaintiffs identify is their claim that "they will be forced to either take a vaccine that they neither want to, nor under federal and state law can be mandated to take, or they will be forced to miss out on their education, which could include financial losses." Pl. PI. Br. at 20-21. Plaintiffs provide no legal authority or analysis to demonstrate why those alleged harms are irreparable, and they cannot do so.

First, the injuries caused by this purported Hobson's choice are not real, especially for Plaintiffs Disalvatore and Barksay. Both of those individuals sought and received exemptions. Having done so, they do not have to "miss out on their education" at UConn or submit to a vaccine that they do not want. They are therefore not suffering any injury at all, much less an injury that is irreparable.[20]

Second, to the extent Plaintiff Wade is suffering a cognizable injury because she elected not to seek an exemption, Plaintiffs have not established that she has or will suffer an injury, much less one that is irreparable. Indeed, even assuming that Plaintiff Wade's choice will preclude her from attending UConn this year, Plaintiffs provide no concrete factual allegations— much less evidence—to demonstrate whether and what "financial losses" they think Plaintiff Wade "could" incur as a result. Further, Plaintiff Wade is free to enroll in a different university or college that does not require vaccines, and Plaintiffs likewise make no showing that Plaintiff Wade is unable to do that or that doing so will cause her a cognizable legal injury. To the extent Plaintiffs may seek to avoid that conclusion by arguing that Plaintiff Wade will be injured by any delay in seeking an education at a different institution, any such harm is not irreparable and can be adequately compensated through a claim for money damages filed with the Claims Commissioner. *Phillips v. Marsh*, 687 F.2d 620, 622 (2d Cir. 1982); *Hodges v. Bd. of Supervisors of La. State Univ.*, No. 20-1456, 2020 U.S. Dist. LEXIS 153949, at *7-13 (E.D. La. Aug. 25, 2020) (collecting cases); *see* Conn. Gen. Stat. § 4-141 et seq.

### 4.	The Equities And Public Interest Do Not Support A Preliminary Injunction

---

[20]Plaintiffs do not challenge or claim to be harmed by the additional health and safety measures that Plaintiffs Disalvatore and Barksay will have to comply with after their exemption. But even if they did, having to comply with those measures also does not constitute an irreparable injury. *Klaassen v. Trs. of Ind. Univ.*, No. 1:21-CV-238 DRL, 2021 U.S. Dist. LEXIS 133300, at *1116 (N.D. Ind. July 18, 2021)

"Whenever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Brody v. Vill. of Port Chester*, 261 F.3d 288, 290 (2d Cir. 2001). "Otherwise a claim that appears meritorious at a preliminary stage but is ultimately determined to be unsuccessful will have precipitated court action that might needlessly have injured the public interest." *Id*. Plaintiff bears the burden to establish that the balance of the equities and the public interest weigh in favor of the relief he demands. *See, e.g.*, *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). "Where the government is the opposing party," these two factors "merge." *Jones*, 2020 WL 1643857, at *13.

The balance here weighs heavily against granting Plaintiffs' Motion. Indeed, there are few—if any—circumstances where the state's side of the balance would be stronger. "[T]here is no question that limiting the spread of COVID-19 and protecting at-risk individuals from exposure to the virus are critically important public policies." *U.S. v. Donziger*, 2020 WL 5152162, at *2 (S.D.N.Y. Aug. 31, 2020). The Vaccine Policy is specifically designed and intended to advance that critical public purpose by "limit[ing] the spread" of the disease. *S. Bay*, 140 S.Ct. 1613 (Roberts, C.J., concurring in denial of application for injunctive relief). "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *Id*., quoting *Jacobson*, 197 U.S. at 38; *see also Belknap v. Leary*, 427 F.2d 496, 498-99 (2d Cir. 1970) (vacating a TRO directed to local officials "as an abuse of discretion," in part because responsibility "for protecting the people" in the exercise of the rights at issue "rests in the first instance on" the local officials). "The precise question of" what restrictions are necessary in a given state "is a dynamic and fact-intensive

matter subject to reasonable disagreement" and "'fraught with medical and scientific uncertainties.'" *S. Bay*, 140 S.Ct. 1613 (Roberts, C.J., concurring in denial of application for injunctive relief)*, quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974). Where it is not clear that the Constitution's "broad limits" have been "exceeded," policies like that here "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id*., quoting *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985).

Importantly, "[t]hat is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground." *Id*. Under those circumstances, the risk that Plaintiffs' claim will "ultimately [be] determined to be unsuccessful [but] will have precipitated court action that might needlessly have injured the public interest" militates strongly against granting preliminary relief. That is particularly true where a litigant's claims of harm do not "remotely compare to the injury to the" state and its people that may come from hindering the state's "efforts to" respond to this deadly disease. *Brody*, 261 F.3d at 290–91 (quotation marks omitted.

In this case, two of the plaintiffs will suffer no harm. Plaintiffs DiSalvatore and Barkasy have been granted exemptions. Plaintiff Wade has not availed herself of the opportunity to apply for an exemption. Further, even without an exemption, no-one is forcing her to receive a vaccine. She has the option of not attending UConn while this policy in in place. Though she may have to forego a semester of school or transfer somewhere else, she has options. The lack of harm to be suffered by the Plaintiffs pales in comparison to the harm to the public should this court enjoin the Vaccine Policy.

Should the Vaccine Policy be enjoined, UConn will be deprived of one of the most effective tools available to fight the pandemic. And such deprivation would occur at the time when the campus, no less our country, is possibly facing the worst of this pandemic in the form of the Delta Variant. To deny UConn the right to enforce the Vaccine Policy, consistent with CDC guidance, essentially, leaves the UConn community far less protected than it could be. Furthermore, it cannot be ignored that Plaintiffs "'are not asking to be allowed to make a self-contained choice to risk only their own health' in making this decision—their decision necessarily bears on the health of other students, faculty, and staff." *Klaassen, 2021 U.S. Dist. LEXIS 133300, * 117Id.* On this record, the balance of harms tilts heavily in favor of UConn.

Furthermore, and as explained herein, the court isn't a policymaker: that role is left to the States. On multiple occasions, the Supreme Court has "recognized the role of the States as laboratories for devising solutions to difficult legal problems." *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787, 817, 135 S. Ct. 2652, 192 L. Ed. 2d 704 (2015) (quoting *Oregon v. Ice*, 555 U.S. 160, 171, 129 S. Ct. 711, 172 L. Ed. 2d 517 (2009)); *United States v. Lopez*, 514 U.S. 549, 581, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995) (Kennedy, J., concurring) ("States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear"); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S. Ct. 371, 76 L. Ed. 747 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."). Enabling the state university to work through these problems reasonably fosters public health and safety in areas of scientific uncertainty. *See Gonzales*, 550 U.S. at 163 (citing *Jacobson*, 197 U.S. at 30-31) (the law gives

"wide discretion to pass legislation in areas where there is medical and scientific uncertainty"); *Cassell*, 990 F.3d at 549 ("scientific uncertainty surrounding the pandemic further cautions against enjoining state coronavirus responses unless absolutely necessary"); *see also Cuomo*, 141 S. Ct. at 68 ("Members of this Court are not public health experts").

To be sure, if the students had shown a likelihood that the university was unreasonably infringing on their fundamental constitutional rights, enjoining that violation might be in the public interest. *See Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("upholding constitutional rights serves the public interest") (quoting *Newsom v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)); *Ind. Fine Wine & Spirits, LLC v. Cook*, 459 F. Supp.3d 1157, 1171 (S.D. Ind. 2020) (same). But this concern doesn't apply here because the students have such a low likelihood of success.

In short, the balance of harms and the public interest favor UConn. Plaintiffs and the public both benefit from ensuring public health and safety. *Jones*, 2020 WL 1643857, at *13, citing *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005). The balance of the equities and the public interest weigh heavily against granting this motion, and Plaintiffs cite no authority to the contrary.

## IV.   **CONCLUSION**

For all of the foregoing reasons, the Court should deny Plaintiff's motion for a preliminary injunction.

Respectfully submitted,

DEFENDANT, UNIVERSITY OF
CONNECTICUT BOARD OF TRUSTEES

WILLIAM TONG
ATTORNEY GENERAL

BY: /s/ Mary K. Lenehan
Assistant Attorney General
Federal Bar No. ct15436
165 Capitol Avenue, P.O. Box 120
Hartford, CT 06141-0120
Tel. (860) 808-5210
Fax: (860) 808-5385
Email: mary.lenehan@ct.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2021, a copy of the foregoing was electronically filed.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

/s/ Mary K. Lenehan
Mary K. Lenehan
Assistant Attorney General

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

NICOLE WADE, AMY DISALVATORE,  :
DYLAN BARKASY : CIVIL ACTION NO.  3:21-CV-924(JAM)
:
*Plaintiffs,* :
:
v. :
:
UNIVERSITY OF CONNECTICUT :
BOARD OF TRUSTEES :
*Defendant* : JULY 30, 2021

## DECLARATION OF ELEANOR DAUGHERTY

I, Eleanor JB Daugherty, EdD, hereby declare as follows:

1. I submit this Declaration in support of Defendant University of Connecticut Board of

   Trustees ("UConn" or "the Board") in *Wade v. University of Connecticut,* No. 3:21-cv-

   00924 (JAM).  I have compiled the information in the statements below through personal

   knowledge or on the basis of documents I have reviewed.  I also have familiarized myself

   with the allegations in Plaintiffs' Complaint and Motions for Preliminary Injunction in this

   case in order to understand how the relief sought by Plaintiffs will impact the students

   enrolled at the UConn.  ECF ## 1 and 2.

2. I am the Dean of Students and Associate Vice President of Student Affairs at UConn.  I

   have held this position since August 1, 2014.  In this role, I am responsible for student

   health and wellbeing, residential life, conduct, and crisis management.  Since the COVID-19

   health emergency was announced in March 2020, I have served on UConn's Executive

   Policy Group and specifically advised and developed mitigation and operational plans for

   student life on our  campuses.   I have served in this or similar roles over the course of the

last 25 years at several universities including the University of Chicago and Columbia University.

3. UConn's COVID-19 pandemic planning and policies related to student life, in which I have had a leadership role since early 2020, have been recognized in state, regional and national media. I believe it is a fair characterization to say UConn has been a leader among higher education institutions on how to respond to and adapt to the pandemic in a thoughtful and science-based way.

## I. Overview of UConn's Response to COVID-19

4. UConn is the state's flagship university. UConn has campuses in Storrs, Stamford, Avery Point, Hartford, and Waterbury. The campuses in Storrs and Stamford offer residential housing to over 12,500 students. The residence halls house between 15 and 725 students. Most residence halls require students to share close living quarters with up to 40 other students, including sharing restrooms, kitchens, common areas, and laundry facilities. The main campus in Storrs provides dining services to 10,239 students when fully operational. Students eating in dining halls eat in common areas unmasked and in close proximity to one another. The CDC has acknowledged congregate setting, such as residence halls, as having "challenges with social distancing to prevent the spread of COVID-19. Shared housing residents often gather together closely for social, leisure, and recreational activities, shared dining, and/or use of shared equipment, such as kitchen appliances, laundry facilities, stairwells, and elevators". See: https://www.cdc.gov/coronavirus/2019-ncov/community/shared-congregate-house/guidance-shared-congregate-housing.html

5. The Governor declared a public health and civil preparedness emergencies to combat the COVID-19 pandemic on March 10, 2020. https://portal.ct.gov/-/media/Office-of-the-

Governor/News/20200310-declaration-of-civil-preparedness-and-public-health-emergency.pdf

6.  Since March 10, 2020, UConn has engaged in a thorough and proactive approach to keep the UConn community safe during the pandemic. UConn directed residential students not to return to campus after March 13, 2020. During the 2020-21 academic year, consistent with guidance from the Governor's Office, State of Connecticut Department of Public Health, the Center for Disease Control, and infectious disease specialists at the UConn Medical Center, UConn implemented a plan to allow the educational and research missions of the students and faculty to continue while minimizing the risk to the health and safety of all persons in the UConn community. Without a vaccine available, measures to protect the community included mandating masks and social distancing, transitioning to online classes, conducting routine COVID 19 testing, limiting attendance at events, implementing quarantines and contact tracing protocols, developing waste water testing, setting aside beds for isolation and quarantine on our residential campuses, providing separate dining arrangements, and assisting students needing academic accommodation while they are undergoing quarantine or isolation. Over the course of the 2020-21 academic year, the Storrs campus treated over 1,700 students as COVID-19 cases and quarantined over 3,000 students while operating at a fraction of its residential capacity.

7.  Even with all the mitigation measures in place, without a vaccine option, UConn operated at only 36% of its residential capacity during the 2020-21 academic year due to the risks of COVID-19.

8.  With the approval and availability of vaccines beginning in the Spring of 2021, UConn carefully considered implementing a vaccine policy that would better protect the health and

safety of the community while also allow it to operate at a higher capacity to meet the needs of students. In reaching its decision, UConn consulted with UConn Medical infectious disease specialist, medical providers in Student Health and Wellness ("SHaW"), and relied on guidance from the CDC and other respected medical institutions reporting the results of studies regarding the efficacy of the COVID-19 vaccines. The CDC has stated that vaccination against COVID-19 is "effective against COVID-19, including serious outcomes of severe disease, hospitalization, and death". Since late 2020, the CDC has issued guidance, reports and data demonstrating that the vaccines are safe with a very low risk of side effects. Benefits of Getting a COVID-19 Vaccine | CDC; Ensuring COVID-19 Vaccine Safety in the US | CDC. Given the efficacy and safety of the vaccines, UConn determined that the vaccine policy, in combination with other mitigation measures, would best protect the UConn community and allow it to resume near normal operations in areas of campus most impacted by COVID-19, including residential living and in-person learning.

9. The recent rise in COVID-19 cases attributable to the Delta variant provides new and increasing justification for mandating vaccines for students given that research has shown that the vaccine is effective in reducing transmission of this variant. HAN Archive - 00447 | Health Alert Network (HAN) (cdc.gov)

10. On June 4, 2021, UConn's Board of Trustees approved a policy requiring students to be vaccinated before returning to campus in August, 2021, (the "Policy"). A true and accurate copy of the Policy is attached hereto as See Exhibit A. The Policy is also available at https://policy.uconn.edu/2021/06/04/covid-19-immunization-record-requirement-for-students/ .

   **II.     The Policy and Exemption process**

11. The Policy provides that all UConn students who attend any on-campus activity must either submit proof to UConn that they have been fully vaccinated against COVID-19 or apply for and be granted an exemption.

12. As of this date, nearly 90% of UConn residential students have reported that they are vaccinated.

13. The Policy permits students to apply for either medical or non-medical exemptions. To request either exemption, students complete the appropriate request form and submit it online through the SHaW Patient Portal. The Policy explains the process for obtaining exemptions and provides hyperlinks for students to easily access the medical and non-medical exemption request forms. Any non-medical exemption requests submitted after the deadline are reviewed on a case-by-case basis.

14. Requests for medical exemptions are reviewed and approved by medical providers at SHaW. A signed statement indicating a specific medical contraindication from the student's medical provider is required to obtain a medical exemption.

15. I am responsible for reviewing requests for non-medical exemptions. I review each student's exemption request form to determine: (a) whether the student is enrolled; (b) whether the student will be living on-campus in a residence hall; (c) whether the student genuinely wants or needs an exemption (e.g., an international student mistakenly believes that because he/she has not yet been vaccinated he/she must request an exemption—UConn would vaccinate such students upon arrival on campus so no exemption would be necessary); and (d) the potential impact on the health and safety of the requesting student's campus cohort, such as his/her residence hall.

16. The goal as I review each request is to accommodate as many requests as possible while balancing the need to protect the health and safety of the UConn community.

17. As of July 22, 2021, UConn has received 55 requests for medical exemption through the SHaW Patient Portal.

18. As of July 23, 2021, I have received 771 requests for non-medical exemptions. I have granted 504 of those requests. I have not yet granted or denied the remaining requests. They remain pending.

### III.     Students Who Receive Exemptions Will Be Required to Take Additional Preventative Measures

19. Students who receive exemptions may be required to take additional preventative measures to mitigate the risks of spreading COVID-19.

20. Students who receive exemptions may be subjected to additional asymptomatic, surveillance testing, defined as testing for active infection in the absence of symptoms at a yet-to-be defined regular testing interval, for example weekly.

21. Students who receive exemptions may be required to wear masks in locations where vaccinated students may not be required to do so.

22. Students who receive exemptions will be required to provide re-entry testing. Re-entry testing is proof of a COVID-19 test shortly before arrival on campus

23. Students who receive exemptions and who have a confirmed close contact with a person who has tested positive for COVID-19 may be required to observe a period of isolation, quarantine or modified quarantine.

24. All students, both vaccinated and exempt, who test positive or are presumed positive for COVID-19 will be required to observe a period of isolation, quarantine or modified quarantine.

**IV.     Students Who Do Not Upload Proof of Vaccination or Seek an Exemption**

25. Students who fail to report their vaccinations status or request an exemption are subject to registration holds, inability to use the Recreation Center, and are unable to sign up for a residential move-in slot.  See e.g. https://reslife.uconn.edu/wp-content/uploads/sites/1534/2021/03/Spring-2021-THSP-revised-3.11.21.pdf.

26. Students who violate the Policy may be referred to UConn's Office of Community Standards as is consistent with student violations of any other policy applicable to them.

**V.     Facts Related to the Plaintiffs**

27. I reviewed the complaint filed by Nicole Wade, Amy Disalvatore, and Dylan Barkasy.

*Nicole Wade*

28. Nicole Wade alleges that she is a student enrolled in the Allied Health Sciences Department.

29. She has not sought any exemption from the Policy, nor has she uploaded proof of vaccination.

*Amy Disalvatore*

30. Amy Disalvatore alleges that she is the parent of a minor who is an incoming freshman for the fall 2021 semester.

31. Ms. Disalvatore sought a non-medical exemption on June 15, 2021, alleging that she and her minor child have "fear and apprehension" about the COVID vaccine, given the lack of research on the potential side effects.  Ms. Disalvatore's exemption request was granted on

July 23, 2021.  True and accurate copies of the request and notification are attached hereto as Exhibit B.

**_Dylan Barkasy_**

32. Dylan Barkasy requested a non-medical exemption on July 3, 2021, citing concerns about potential side-effects, particularly given his family's health history.  Mr. Barkasy's exemption request was granted on July ##, 2021.  True and accurate copies of the request and notification are attached hereto as Exhibit C.

Pursuant to 28 U.S.C. § 1746, I, Eleanor JB Daugherty, state under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information and belief.

Executed: July 30,  2021

Eleanor Daugherty, EdD
Associate Vice President and Dean of Students
University of Connecticut

CONNECTICUT NOTARY ACKNOWLEDGEMENT

State of Connecticut

County of Hartford                              ss. Hartford

On this the 30th day of July, 2021, before me, Diane Malone, the undersigned officer, personally appeared Eleanor Daugherty, known to me or satisfactorily proven to the person whose name is subscribed to the within instrument and acknowledged that she executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.

_____

(Signature of Notary)

Date Commission Expires: _12/31/23_____

Diane Vorn Kahl Malone

(Printed Name of Notary)

# EXHIBIT A



# Policies & Procedures

## COVID-19 Immunization Record Requirement for Students

| | |
|---|---|
| **Title:** | COVID-19 Immunization Record Requirement for Students |
| **Policy Owner:** | Division of Student Affairs |
| **Applies to:** | All University Students on any UConn Campus |
| **Campus Applicability:** | All UConn campuses |
| **Effective Date:** | June 4, 2021 |
| **For More Information, Contact** | Student Health and Wellness Services (SHaW) |
| **Contact Information:** | https://studenthealth.uconn.edu/ |
| **Official Website:** | https://uconn.edu/ |

**PURPOSE**

To promote the health and safety of the University community and to reduce the risk of transmission of COVID-19 among University students, consistent with federal, state and local efforts to minimize outbreaks of COVID-19.

**APPLIES TO**

All University students at the Storrs and regional campuses who participate in any on- campus activities in person for any reason.

**POLICY STATEMENT**

All UConn students are required to be fully vaccinated against COVID-19. Students are required to report vaccination compliance to the University.

International students shall be considered in compliance with the COVID-19 vaccine requirement if they have been vaccinated with a COVID-19 vaccine that has either been authorized for use in the United States by the Food and Drug Administration (FDA) or been authorized for use outside of the United States by the World Health Organization (WHO). International students must present proof of vaccination in the form of a copy of the WHO Certificate of Vaccination (WHO Vaccine Booklet) or documentation to include a statement signed by a healthcare provider/organization authorized to administer the vaccination attesting to the dates and

name of COVID-19 vaccination given. All documentation must be submitted in English or accompanied by a certified translation at the student's expense. International students who have received COVID-19 vaccines not authorized by the FDA or WHO will be managed on a case-by-case basis.

Students who receive an exemption from the COVID-19 vaccination requirement or who are not fully vaccinated prior to the beginning of the Fall 2021 semester will be required to comply with preventative measures as deemed necessary by the University. Such measures may include, but not be limited to, a period of modified quarantine, surveillance testing, and mask-wearing.

Exemptions from this policy will be permitted under certain circumstances. To request an exemption, a student must complete the form found here for medical exemptions and here for non-medical exemptions.

The University is authorized to enact rules and/or procedures necessary to effectuate this policy.

**ENFORCEMENT**

Failure to comply with this policy may result in loss of privileges and/or sanctions.

This policy and any attendant procedures and/or rules may be amended as necessary based on factors such as the progress of the COVID-19 pandemic and guidance from governmental authorities.

**POLICY HISTORY**

Policy created: 06/04/2021 (Approved by the Board of Trustees)

This entry was posted in Academic and Student Life, Office of the VP for Student Affairs, Rules, Students.

← Previous

# Frequently Viewed

By-Laws of the University of Connecticut

By-Laws, Rules and Regulations of the University Senate

Information Security Policy Manual

Policy Against Discrimination, Harassment and Related Interpersonal Violence

# Reportline

The University welcomes and encourages good-faith reporting of compliance concerns and/or seeking advice regarding compliance issues. Visit https://compliance.uconn.edu/reporting-concerns/reporting-overview/ for more information.

© University of Connecticut     Disclaimers, Privacy & Copyright     Accessibility     Webmaster Login

# EXHIBIT B

June 15, 2021

To Whom It May Concern:

On behalf of my son who is still a minor, I am requesting an exemption from the Covid-19 vaccination currently being mandated for UConn students. ████ DiSalvatore is an incoming freshman and at this time I do not wish to vaccinate him due to apprehension and fear. I am requesting an exemption until more time has passed and there is more research supporting the need for it and refuting and dangerous short- or long-term effects from getting it.

He is healthy and in a low-risk population. It is currently allowed under Emergency Use only, leaving he and I fearful of what negative effects could occur.

I'm asking that our concerns regarding the vaccine be considered and that he will be granted exemption.

Kindest regards,
Amy DiSalvatore



**From:** DOS - Dean of Students
**Sent:** Friday, July 23, 2021 5:15 PM
**To:** ████████████████████ disalvatore@uconn.edu>
**Subject:** Non-Medical COVID-19 Vaccination Exemption


Dear ████████ DiSalvatore:

You have been granted a non-medical COVID-19 vaccination exemption.

Individuals who are not fully vaccinated against the SARS-CoV-2 virus are at increased risk of contracting and transmitting COVID-19. The following preventive measures are required to reduce this risk:

Residential Students
- Pre-arrival testing 3 -5 days prior to arrival on campus (student responsibility)
  - Upload your test results at myhealth.uconn.edu.
- Arrival testing.  Information will be provided in a separate communication from SHAW.
- <u>Modified quarantine</u> for 7 days after arrival on campus with repeat testing on day 5-7
- Wearing masks or face coverings in all indoor settings
- Surveillance testing weekly.  Information will be provided in a separate communication from SHAW.
- Medical quarantine after contact with a suspected or confirmed case of COVID-19
- Isolation for presumed or confirmed cases of COVID-19

Non-Residential Students
- Pre-arrival testing 3-5 days prior to arrival on campus (student responsibility)
- <u>Modified quarantine</u> for the first 7 days of your on campus presence with repeat testing recommended on day 5-7

- Wearing masks or face coverings in all indoor settings
- Surveillance testing.  Information will be provided in a separate communication from SHAW.
- Medical quarantine after contact with a suspected or confirmed case of COVID-19
- Isolation for presumed or confirmed cases of COVID-19

In the case of an outbreak of COVID-19 on any of our campuses, individuals who are not vaccinated against the SARS-CoV-2 virus may be excluded from the affected campus until the outbreak is declared over.

These preventive measures are necessary to protect individuals who are unvaccinated and the larger UConn community.

Sincerely,

Eleanor JB Daugherty, Ed.D.
Associate VP for Student Affairs & Dean of Students

# EXHIBIT C

Dylan Barkasy

University of Connecticut

Student Health and Wellness

Hilda May Williams Building

234 Glenbrook Road, Unit 4011

Storrs, CT 06269-4011

**RE: COVID-19 Vaccine Exemption Request – Dylan Barkasy (2871490)**          July 3, 2021

To whom it may concern,

My name is Dylan Barkasy, and I will be a sophomore at UConn this upcoming fall semester. I am appreciative and grateful for all the experiences and opportunities UConn has given me. I am asking respectfully for an exemption from the University of Connecticut's COVID-19 requirement for the 2021-2022 school year.

My objections include:

- If I were to have a severe reaction/debilitation/death my family or I would have no legal or financial recourse against the vaccine manufacturer.
- The vaccine has only been approved for Emergency Use Authorization and hasn't gone through the rigorous testing and clinical trials required to receive FDA approval.
- The side effects/risks of the COVID-19 vaccine are still ongoing and not fully known at this time.
- There have been many cases particularly among young men, of Myocarditis as well as Pericarditis which make me very apprehensive due to my medical history which includes:
  - numerous environmental and contact allergies
  - Vocal Cord Dysfunction (which from time to time has affected me pretty dramatically, similar to a severe asthma attack)
- I am also concerned about my family's medical history and its relation to the some of the vaccine's **known** side effects. Some of my family's health history includes:
  - enlarged heart
  - deep vein thrombosis

I am unwilling to risk my health knowing that some of the side effects (reported by VAERS – Vaccine Adverse Event Reporting System) may include symptoms/conditions that my family has a history of.

It is for these reasons that I am requesting to be exempt from the University of Connecticut's COVID-19 Vaccine Mandate. Thank you for your consideration of my concerns and please feel free to reach out, if necessary.

Kindest Regards,

Dylan Barkasy



**From:** DOS - Dean of Students
**Sent:** Friday, July 23, 2021 5:15 PM
**To:** Barkasy, Dylan <dylan.barkasy@uconn.edu>
**Subject:** Non-Medical COVID-19 Vaccination Exemption

Dear Dylan Barkasy:

You have been granted a non-medical COVID-19 vaccination exemption.

Individuals who are not fully vaccinated against the SARS-CoV-2 virus are at increased risk of contracting and transmitting COVID-19. The following preventive measures are required to reduce this risk:

Residential Students
- Pre-arrival testing 3 -5 days prior to arrival on campus (student responsibility)
    - Upload your test results at myhealth.uconn.edu.
- Arrival testing.  Information will be provided in a separate communication from SHAW.
- <u>Modified quarantine</u> for 7 days after arrival on campus with repeat testing on day 5-7
- Wearing masks or face coverings in all indoor settings
- Surveillance testing weekly.  Information will be provided in a separate communication from SHAW.
- Medical quarantine after contact with a suspected or confirmed case of COVID-19
- Isolation for presumed or confirmed cases of COVID-19

Non-Residential Students
- Pre-arrival testing 3-5 days prior to arrival on campus (student responsibility)
- <u>Modified quarantine</u> for the first 7 days of your on campus presence with repeat testing recommended on day 5-7

- Wearing masks or face coverings in all indoor settings
- Surveillance testing.  Information will be provided in a separate communication from SHAW.
- Medical quarantine after contact with a suspected or confirmed case of COVID-19
- Isolation for presumed or confirmed cases of COVID-19

In the case of an outbreak of COVID-19 on any of our campuses, individuals who are not vaccinated against the SARS-CoV-2 virus may be excluded from the affected campus until the outbreak is declared over.

These preventive measures are necessary to protect individuals who are unvaccinated and the larger UConn community.

Sincerely,

Eleanor JB Daugherty, Ed.D.
Associate VP for Student Affairs & Dean of Students

# COVID-19



**UPDATE**

Getting vaccinated prevents severe illness, hospitalizations, and death. Unvaccinated people should get vaccinated and continue masking until they are fully vaccinated. With the Delta variant, this is more urgent than ever. CDC has updated <u>guidance for fully vaccinated people</u> based on new evidence on the Delta variant.

◻   Back to COVID-19 Home

# How COVID-19 Spreads

Updated July 14, 2021

| Languages |

Print

COVID-19 spreads when an infected person breathes out droplets and very small particles that contain the virus. These droplets and particles can be breathed in by other people or land on their eyes, noses, or mouth. In some circumstances, they may contaminate surfaces they touch. People who are closer than 6 feet from the infected person are most likely to get infected.

COVID-19 is spread in three main ways:

- Breathing in air when close to an infected person who is exhaling small droplets and particles that contain the virus.
- Having these small droplets and particles that contain virus land on the eyes, nose, or mouth, especially through splashes and sprays like a cough or sneeze.
  Touching eyes, nose, or mouth with hands that have the virus on them.

•

# Protect Yourself and Others

Anyone infected with COVID-19 can spread it, even if they do **NOT** have symptoms.

# What You Need to Know

- If you are not fully vaccinated and 2 or older, you should wear a mask in indoor public places.
- In areas with <u>high numbers of COVID-19 cases,</u> consider wearing a mask in crowded outdoor settings and for activities with close contact with others who are not fully vaccinated.
- Otherwise, you do not need to wear a mask in outdoor settings.

Learn more about what you can do to <u>protect yourself and others</u> and what you can do after you've been <u>fully vaccinated.</u>

# COVID-19 and Animals

COVID-19 can spread **from people to animals** in some situations. Pet cats and dogs can sometimes become infected after close contact with people with COVID-19. Learn what you should do <u>if you have pets.</u>

# Food and Water

## Food

**There is no evidence to suggest that handling food or consuming food is associated with COVID-19.** Follow *food* safety guidelines when handling and cleaning fresh produce. Do not wash produce with soap, bleach, sanitizer, alcohol, disinfectant or any other chemical.

## Drinking Water

There is also no current evidence that people can get COVID-19 by drinking water. The COVID-19 virus has not been detected in drinking water. Conventional water treatment methods that use filtration and disinfection, such as those in most municipal drinking water systems, should remove or kill the virus that

causes COVID-19.

# Natural Bodies of Water (Lakes, Oceans, Rivers)

There are no scientific reports of the virus that causes COVID-19 spreading to people through the water in lakes, oceans, *rivers*, or other natural bodies of water.

# Wastewater

Genetic material from has been found in <u>untreated wastewater</u>. There is little evidence of infectious virus in waste*water*, and no information to date that anyone has become sick with COVID-19 because of exposure to waste*water*. Waste*water* treatment plants use chemical and other disinfection processes to remove and degrade many viruses and bacteria. COVID-19 is inactivated by the disinfection methods used in wastewater*treatment.

## More Information

Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission

ASL Video Series: How does COVID-19 Spread?

<u>Top of Page</u>

☐ ☐ ☐ ☐

Last Updated July 14, 2021

☐ Your Health

**About COVID-19**

Protect Yourself

**Transmission**

What's this?

Submit

**HAVE QUESTIONS?**

Visit CDC-INFO

Call 800-232-4636

Email CDC-INFO

Open 24/7

**CDC INFORMATION**
About CDC
Jobs
Funding
Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

**CONNECT WITH CDC**

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer

## LANGUAGE ASSISTANCE

Español

中文

Tiếng Việt

한국어

Tagalog

Русский

العربية

Kreyòl Ayisyen

Français

Polski

Português

Italiano

Deutsch

日本語

فارسی

English

**EXHIBIT C**

# COVID-19



☐ **ARCHIVED WEBPAGE:** This webpage is for historical purposes and is **no longer being updated.** For the latest information, view the COVID-19 homepage.

☐  Back to COVID-19 Home

# Guidance for Wearing Masks

Help Slow the Spread of COVID-19

Updated Apr. 19, 2021

| Languages |
|---|

Print

## What you need to know

- When you wear a mask, you protect others as well as yourself. <u>Masks work best when everyone wears one.</u>
- A mask is NOT a substitute for <u>social distancing.</u> Masks should still be worn in addition to staying at least 6 feet apart, especially when indoors around people who don't live in your household.
- Masks should completely cover the nose **and** mouth and fit snugly against the sides of face without gaps.
- Masks should be worn <u>any time you are traveling</u> on a plane, bus, train, or other form of public transportation traveling into, within, or out of the United States and in U.S. transportation hubs such as airports and stations.
- People age 2 and older should wear masks in public settings and when around people who don't live in their household.

  Wear a mask inside your home if someone you live with is sick with <u>symptoms</u> of COVID-19 or

- has tested positive for COVID-19.
- Wash your hands with soap and water for at least 20 seconds or use hand sanitizer with at least 60% alcohol after touching or removing your mask.
- Masks may not be necessary when you are outside by yourself away from others, or with people who live in your household. However, some areas may have mask mandates while out in public, so please check the rules in your local area (such as in your city, county, or state). Additionally, check whether any federal mask mandates apply to where you will be going.
- CDC continues to study the effectiveness of different types of masks and update our recommendations as new scientific evidence becomes available. The most recent scientific brief is available here: Scientific Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2 | CDC
- CDC recently conducted a study in a laboratory that tested the performance of different mask combinations.
- There are several easy methods to improve the performance of your mask. Visit CDC's Improve the Fit and Filtration of Your Mask to Reduce the Spread of COVID-19 webpage to learn more.

# Evidence for Effectiveness of Masks

## Your mask helps protect those around you

COVID-19 spreads mainly from person to person through respiratory droplets. Respiratory droplets travel into the air when you cough, sneeze, talk, shout, or sing. These droplets can then land in the mouths or noses of people who are near you or they may breathe these droplets in.

Masks are a simple barrier to help prevent your respiratory droplets from reaching others. Studies show that masks reduce the spray of droplets when worn over the nose and mouth.

You should wear a mask, even if you do not feel sick. This is because several studies have found that people with COVID-19 who never develop symptoms (asymptomatic) and those who are not yet showing symptoms (pre-symptomatic) can still spread the virus to other people. Wearing a mask helps protect those around you, in case you are infected but not showing symptoms.

On This Page

Evidence for Effectiveness of Masks

Who Should Wear A Mask?

Types of masks

Other Types of Face Protection

Situations where wearing a mask may not be possible

Certain groups of people who may find it difficult to wear a mask

It is especially important to wear a mask when you are indoors with people you do not live with and when you are unable to stay at least 6 feet apart since COVID-19 spreads mainly among people who are in close contact with one another.

## Your mask offers some protection to you

A cloth mask also offers some protection to you too. How well it protects you from breathing in the virus likely depends on the fabrics used and how your mask is made (such as the type of fabric, the number of layers of fabric, and how well the mask fits). CDC is currently studying these factors.

## Who should or should not wear a mask

**Masks should be worn:**



- By people 2 years of age and older
- Any time you are in a public setting
- Any time you are traveling on a plane, bus, train, or other form of public transportation traveling into, within, or out of the United States and in U.S. transportation hubs such as airports and stations
- When you are around people who do not live with you, including inside your home or inside someone else's home
- Inside your home if someone you live with is sick with symptoms of COVID-19 or has tested positive for COVID-19

CDC recognizes there are specific instances when wearing a mask may not be feasible. In these instances, consider adaptations and alternatives.

The following categories of people are exempt from the requirement to wear a mask:

- A child under the age of 2 years;
- A person with a disability who cannot wear a mask, or cannot safely wear a mask, for reasons related to the disability;
- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the workplace risk assessment ☐ .

# Types of masks

Some masks work better than others to help slow the spread of the virus that causes COVID-19. Note: N95 respirators approved by CDC's National Institute for Occupational Safety and Health (NIOSH) should be prioritized for healthcare personnel.

Top of Page

**Recommended**



Medical procedure masks (sometimes referred to as surgical masks or disposable face masks)



Masks that fit properly (snugly around the nose and chin with no large gaps around the sides of the face)



Masks made with breathable fabric (such as cotton)



Masks made with tightly woven

fabric (i.e., fabrics that do not let
light pass through when held up
to a light source)



Masks with two or three layers



Masks with inner filter pockets

## Not Recommended



Masks that do not fit properly
(large gaps, too loose or too
tight)



Masks made from materials that
are hard to breathe through
(such as plastic or leather)



Masks made from fabric that is
loosely woven or knitted, such as

fabrics that let light pass through



Masks with one layer



Masks with exhalation valves or vents



Wearing a scarf/ski mask

# Cloth masks

**More effective fabrics for cloth masks are**

- Tightly woven fabrics, such as cotton and cotton blends
- Breathable
- Two or three fabric layers

**Less effective fabrics for cloth masks are**

- Loosely woven fabrics, such as loose knit fabrics
- Single layer

CDC is currently studying the effectiveness of various cloth mask materials. Refer to our Scientific Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2 | CDC for more information.

Top of Page

# Medical procedure masks (sometimes referred to as Surgical Masks or Disposable Face Masks)

Medical procedure masks are single-use masks that are not made of cloth and are not designed to be washed or laundered. They are sold online and through large retail stores. These are not the same as other medical masks.

You may prefer using medical procedure masks in situations where your mask is likely to get wet or dirty. As with cloth masks, make sure your medical procedure mask fits close to your face without large side gaps and completely covers your nose and mouth. Bring extra medical procedure masks with you in case you need to change out a dirty or wet mask.



# Masks with exhalation valves or vents

CDC **does not recommend** using masks with exhalation valves or vents. The hole in the material may allow your respiratory droplets to escape and reach others. Research on the effectiveness of these types of masks is ongoing.



# NIOSH-approved N95 respirators

N95 respirators are critical supplies that should be prioritized for healthcare workers and other medical first responders to prevent supply shortages.

# Clear masks or cloth masks with a clear plastic panel

Clear masks or cloth masks with a clear plastic panel are an alternative type of mask for people who interact with

- People who are deaf or hard of hearing
- Young children or students learning to read
- Students learning a new language
- People with disabilities
- People who need to see the proper shape of the mouth for making appropriate vowel sounds (for example, when singing)



<u>Top of Page</u>

If you use this type of mask, make sure

- You can breathe easily
- Excess moisture does not collect on the inside of the mask
- You remove the mask before sleeping, since the plastic part could form a seal around your mouth and nose and make it hard to breathe

The FDA recently approved a <u>transparent</u> ☐ [186 KB, 3 Pages] ☐  medical mask. These transparent medical masks should be reserved for use by healthcare workers and patients who require them.

There are several easy methods to improve the performance of your mask. Visit CDC's <u>Improve the Fit and Filtration of Your Mask to Reduce the Spread of COVID-19</u> webpage to learn more. You can also learn more by reading about a <u>CDC study</u> conducted in a laboratory that tested the performance of different mask combinations.

<u>Top of Page</u>

# Other Types of Face Protection

CDC <u>does not recommend</u> ☐ using face shields or goggles as a substitute for masks. Goggles or other eye protection may be used in addition to a mask. Do NOT put a plastic face shield (or a mask) on newborns or infants.

Face shields and goggles are primarily used to protect the eyes of the person wearing it. Goggles do not cover the nose and mouth. Face shields are not as effective at protecting you or the people around you from respiratory droplets. Face shields have large gaps below and alongside the face, where your respiratory droplets may escape and reach others around you and will not protect you from respiratory droplets from others. However, wearing a mask may not be feasible in every situation for some people.



<u>Top of Page</u>

# Face shields and goggles

For example, people who interact with those who are deaf or hearing impaired may find that a face shield is better than a mask when communicating. If you must wear a face shield instead of a mask:

- Choose a face shield that wraps around the sides of your face and extends below your chin or a hooded face shield. This is based on the limited available data that suggest these types of face

shields are better at preventing spray of respiratory droplets.

- Wash your hands after removing the face shield. Avoid touching your eyes, nose, and mouth when removing it.
- Clean and disinfect reusable face shields according to the manufacturer's instructions or by following CDC face shield cleaning instructions. If you use a disposable face shield, wear it once and throw it away according to the manufacturer's instructions.

# Mask adaptations and alternatives

CDC recognizes that wearing masks may not be possible in every situation or for some people. Those who cannot wear a mask are urged to prioritize virtual engagement when possible. For in-person activities, we have provided a few examples of what you can do to make wearing a mask more feasible and how to reduce the spread of COVID-19 if you cannot wear a mask.

## Situations where wearing a mask may not be possible

- Make sure to maintain physical distance from others when you cannot wear a mask.

### Dining

- CDC recommends wearing a mask while dining in a restaurant, particularly indoors and when speaking with restaurant workers and servers, except when actively eating or drinking. The risk of COVID-19 spread increases in a restaurant or bar setting as interactions within 6 feet of others increase. Masks may reduce the risk of COVID-19 spread when worn in any of these risk scenarios.

### Water activities

- Do not wear a mask when doing activities that may get your mask wet, like swimming at the beach or pool. A wet mask can make it difficult to breathe and may not work as well when wet.

### High intensity activities

- Masks should always be used in public settings, but if you are unable to wear a mask because of difficulty breathing during high intensity activities, choose a location with greater ventilation and air exchange (for instance, outdoors versus indoors) and where you can keep at least 6 feet of distance from others during the activity. If such a location is not available, opt for low-intensity activities such as walking or yoga that allow for mask wearing.
- If you are able to wear a mask, remove your mask if it gets moist from sweat and replace it with a clean mask.
- Opt for an activity that does not require using mouth guards or helmets. Wearing a mask with these types of protective equipment is not safe if it makes it hard to breathe.

- Supervise children who are wearing a mask while playing sports.

# Certain groups of people who may find it difficult to wear a mask

### Some children 2 years and older, and people of any age with certain disabilities

Appropriate and consistent use of masks may be challenging for some children and for people of any age with certain disabilities, including people who have high sensitivity to materials on their faces, difficulty understanding why wearing a mask is protective (such as those with an intellectual disability), or those who have problems controlling their behavior.

**When determining if children and people with certain disabilities should wear a mask, assess their ability to:**

- Use a mask correctly
- Avoid frequent touching of the mask and their face
- Limit sucking, drooling, or having excess saliva on the mask
- Remove the mask without assistance

**Those caring for children and people with certain disabilities who may need assistance with wearing masks should**

- Ask their healthcare provider for advice about the person you are caring for wearing a mask. If they are unable to wear a mask, ask their healthcare provider about alternative ways of reducing transmission risk
- Ensure proper mask size and fit
- Remove their mask before sleeping, napping, when they may fall asleep (such as in a car seat or stroller), and in situations when continual supervision is not possible
- Consider prioritizing wearing a mask in public settings and when around people who don't live in your household, particularly when indoors. Masks may not be necessary when you and the person you are caring for are outside and away from others, or with other people who live in the same household. However, some localities may have mask mandates while out in public and these mandates should always be followed.

Masks should **not** be worn by:

- Child under 2 years of age
- A person with a disability who cannot wear a mask, or cannot safely wear a mask, for reasons

related to the disability

- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the <u>workplace risk assessment</u> ☐

## People who are deaf or hard of hearing, and those who will interact with people who are hearing impaired

If you interact with people who rely on reading lips, you may have difficulty communicating while wearing a mask.

- Consider wearing a clear mask or a cloth mask with a clear panel
- If you are not able to get a clear mask, consider using written communication, closed captioning, or decreasing background noise to make communication possible while wearing a mask that blocks lips

## People with certain underlying medical conditions

Most people with <u>underlying medical conditions</u> can and should wear masks.

- If you have respiratory conditions and are concerned about wearing a mask safely, discuss with your healthcare provider the benefits and potential risks of wearing a mask.
- If you have <u>asthma</u>, you can wear a mask. Discuss with your healthcare provider if you have any concerns about wearing a mask.

## Outdoor workers

If you work in a setting where masks could increase the risk of <u>heat-related illness</u> or cause safety concerns (for example, straps getting caught in machinery):

- Discuss with an occupational safety and health professional what mask would be suitable.
- Prioritize wearing masks indoors and when in close contact with other people, like during group travel or shift meetings. Some localities may require wearing masks in public while outdoors, and these requirements should be followed.
- In cold weather, wear masks under winter gear such as scarves and ski masks. If masks become wet from breathing or snow, replace them with dry ones. Keep one or more backups for this purpose.

## What to do if you find wearing a mask uncomfortable?

- It may help to practice wearing a mask at home for short periods to get used to the feeling and try different styles and fabrics recommended above.
- Try relaxation techniques such as breathing in and out deeply or listening to soothing music while wearing a face mask, which can help to keep you calm.

# Mask use and carbon dioxide

Wearing a mask does not raise the carbon dioxide ($CO_2$) level in the air you breathe

A cloth mask does not provide an airtight fit across the face. The $CO_2$ completely escapes into the air through the cloth mask when you breathe out or talk. $CO_2$ molecules are small enough to easily pass through any cloth mask material. In contrast, the respiratory droplets that carry the virus that causes COVID-19 are much larger than $CO_2$, so they cannot pass **as easily** through a properly designed and properly worn cloth mask.

## Cold Weather

- In cold weather, masks may become wet from breathing, snow, or other precipitation. Change a mask when it becomes wet. A wet mask is harder to breathe through, is less efficient at preventing your respiratory droplets from reaching others, and allows for more respiratory droplets to escape around the edges of the mask. It is especially important to have one or more replacement masks during cold weather. If your reusable mask becomes wet, put it in a sealed plastic bag until you can wash it.
- Scarves and other headwear such as ski masks and balaclavas used for warmth are usually made of loosely knit fabrics that are not suitable for use as masks to prevent COVID-19 transmission. They can be worn over a mask.
- If you wear glasses, find a mask that fits closely over your nose or has a nose wire to help reduce fogging. Consider using an antifogging spray that is made for eyeglasses.

Top of Page

# People with beards

Certain types of facial hair, like beards, can make mask fitting difficult. People with beards can

- Shave their beards.
- Trim their beards close to the face.
- Use a mask fitter or brace.
- Wear one disposable mask underneath a cloth mask that has multiple layers of fabric. The second mask should push the edges of the inner mask snugly against the face and beard.





Top of Page

# References

- Brooks JT, Beezhold DH, Noti JD, et al. Maximizing Fit for Cloth and Medical Procedure Masks to Improve Performance and Reduce SARS-CoV-2 Transmission and Exposure, 2021. *MMWR Morb Mortal Wkly Rep*. 2021;70. Published online 2021 February 10. doi:10.15585/mmwr.mm7007e1

- Brooks JT, Butler JC. Effectiveness of Mask Wearing to Control Community Spread of SARS-CoV-2 ☐ . Published online 2021 February 10. doi:10.1001/jama.2021.1505

- Mueller AV, Eden MJ, Oakes JM, Bellini C, Fernandez LA. Quantitative Method for Comparative Assessment of Particle Removal Efficiency of Fabric Masks as Alternatives to Standard Surgical Masks for PPE ☐ . *Matter*. 2020;3(3):950-962. doi:10.1016/j.matt.2020.07.006

- Lustig SR, Biswakarma JJH, Rana D, et al. Effectiveness of Common Fabrics to Block Aqueous Aerosols of Virus-like Nanoparticles ☐ . *ACS Nano*. 2020;14(6):7651-7658. doi:10.1021/acsnano.0c03972

- Sousa-Pinto B, Fonte AP, Lopes AA, et al. Face masks for community use: An awareness call to the differences in materials ☐ . *Respirology*. 2020;25(8):894-895. doi:10.1111/resp.13891

- Chughtai AA, Seale H, Macintyre CR. Effectiveness of Cloth Masks for Protection Against Severe Acute Respiratory Syndrome Coronavirus 2. *Emerg Infect Dis*. 2020;26(10):e200948. doi:10.3201/eid2610.200948

- Hao W, Xu G, Wang Y. Factors influencing the filtration performance of homemade face masks ☐ . *J Occup Environ Hyg*. 2021;1-11. Published online ahead of print 2021 Jan 21. doi:10.1080/15459624.2020.1868482

- Gandhi M, Beyrer C, Goosby E. Masks Do More Than Protect Others During COVID-19: Reducing the Inoculum of SARS-CoV-2 to Protect the Wearer ☐ . *J Gen Intern Med*. 2020;35(10):3063-3066.

doi:10.1007/s11606-020-06067-8

- Zhao M, Liao L, Xiao W, et al. Household Materials Selection for Homemade Cloth Face Coverings and Their Filtration Efficiency Enhancement with Triboelectric Charging ⬚ . *Nano Lett.* 2020;20(7):5544-5552. doi:10.1021/acs.nanolett.0c02211

- Kimball A, Hatfield KM, Arons M, et al. Asymptomatic and Presymptomatic SARS-CoV-2 Infections in Residents of a Long-Term Care Skilled Nursing Facility — King County, Washington, March 2020. *MMWR Morb Mortal Wkly Rep.* 2020;69(13):377-381. Published 2020 Apr 3. doi:10.15585/mmwr.mm6913e1

- Byambasuren O, Cardona M, Bell K, Clark J, McLaws ML, Glasziou P. Estimating the extent of asymptomatic COVID-19 and its potential for community transmission: Systematic review and meta-analysis ⬚ . *J Assoc Med Microbiol Infect Dis Can.* 2020;5(4)223-234. doi:10.3138/jammi-2020-0030

- Johansson MA, Quandelacy TM, Kada S, et al. SARS-CoV-2 Transmission From People Without COVID-19 Symptoms ⬚ . *JAMA Netw Open.* 2021;4(1):e2035057. Published 2021 Jan 4. doi:10.1001/jamanetworkopen.2020.35057

- Abkarian M, Mendez S, Xue N, Yang F, Stone HA. Speech can produce jet-like transport relevant to asymptomatic spreading of virus ⬚ . *Proc Natl Acad Sci U S A.* 2020;117(41):25237-25245. doi:10.1073/pnas.2012156117

- Hamner L, Dubbel P, Capron I, et al. High SARS-CoV-2 Attack Rate Following Exposure at a Choir Practice — Skagit County, Washington, March 2020. *MMWR Morb Mortal Wkly Rep.* 2020;69(19):606-610. Published 2020 May 15. doi:10.15585/mmwr.mm6919e6

- Alsved M, Matamis A, Bohlin R, et al. Exhaled respiratory particles during singing and talking ⬚ . *Aerosol Sci Technol.* 2020;54(11):1245-1248. doi:10.1080/02786826.2020.1812502

- Bahl P, de Silva C, Bhattacharjee S, et al. Droplets and Aerosols Generated by Singing and the Risk of Coronavirus Disease 2019 for Choirs ⬚ . *Clin Infect Dis.* 2020;ciaa1241. Published online ahead of print 2020 Sep 18. doi:10.1093/cid/ciaa1241

- Davies A, Thompson KA, Giri K, Kafatos G, Walker J, Bennett A. Testing the efficacy of homemade masks: would they protect in an influenza pandemic? ⬚ . *Disaster Med Public Health Prep.* 2013;7(4):413-418. doi:10.1017/dmp.2013.43

- Leung NHL, Chu DKW, Shiu EYC, et al. Respiratory virus shedding in exhaled breath and efficacy of face masks ⬚ . *Nat Med.* 2020;26(5):676-680. doi:10.1038/s41591-020-0843-2

- Konda A, Prakash A, Moss GA, Schmoldt M, Grant GD, Guha S. Aerosol Filtration Efficiency of Common Fabrics Used in Respiratory Cloth Masks ⬚ . *ACS Nano.* 2020;14(5):6339-6347. doi:10.1021/acsnano.0c03252

- Aydin O, Emon B, Cheng S, Hong L, Chamorro LP, Saif MTA. Performance of fabrics for home-made masks against the spread of COVID-19 through droplets: A quantitative mechanistic study ⬚ . *Extreme Mech Lett.* 2020;40:100924. doi:10.1016/j.eml.2020.100924

- Ma QX, Shan H, Zhang HL, Li GM, Yang RM, Chen JM. Potential utilities of mask-wearing and instant

hand hygiene for fighting SARS-CoV-2 ☐ . *J Med Virol*. 2020;92(9):1567-1571. doi:10.1002/jmv.25805

- Gandhi M, Marr LC. Uniting Infectious Disease and Physical Science Principles on the Importance of Face Masks for COVID-19 ☐ . *Med*. 2021;2(1):29-32. doi: 10.1016/j.medj.2020.12.008

- Pan J, Harb C, Leng W, Marr LC. Inward and outward effectiveness of cloth masks, a surgical mask, and a face shield ☐ *MedRxiv*. 2020; Posted 2020 November 20. doi:10.1101/2020.11.18.20233353

- Lindsley WG, Blachere FM, Law BF, Beezhold DH, Noti JD. Efficacy of face masks, neck gaiters and face shields for reducing the expulsion of simulated cough-generated aerosols ☐ . *Aerosol Sci Technol*. 2021; doi:10.1080/02786826.2020.1862409

Top of Page

☐     ☐     ☐     ☐

Last Updated Apr. 19, 2021

☐ Your Health

About COVID-19

Variants of the Virus

Symptoms

Testing

Prevent Getting Sick

If You Are Sick

Different Groups of People

Daily Activities & Going Out

Travel

**Archive**                                                                                          collapse

  **Guidance for Wearing Masks**

**HAVE QUESTIONS?**

Visit CDC-INFO

Call 800-232-4636

Email CDC-INFO

Open 24/7

**CDC INFORMATION**
About CDC
Jobs
Funding
Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

**CONNECT WITH CDC**

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer

**LANGUAGE ASSISTANCE**

Español

中文

Tiếng Việt

中文

Tagalog

Русский

العربية

Kreyòl Ayisyen

Français

Polski

Português

Italiano

Deutsch

한국어

فارسی

English

# COVID-19



## UPDATE

Getting vaccinated prevents severe illness, hospitalizations, and death. Unvaccinated people should get vaccinated and continue masking until they are fully vaccinated. With the Delta variant, this is more urgent than ever. CDC has updated guidance for fully vaccinated people based on new evidence on the Delta variant.

Back to COVID-19 Home

# Symptoms

Updated Feb. 22, 2021

Languages

Print

# Watch for Symptoms

People with COVID-19 have had a wide range of symptoms reported – ranging from mild symptoms to severe illness. Symptoms may appear 2-14 days after exposure to the virus. Anyone can have mild to severe symptoms. People with these symptoms may have COVID-19:

- Fever or chills
- Cough
- Shortness of breath or difficulty breathing
- Fatigue
- Muscle or body aches

- Headache
- New loss of taste or smell
- Sore throat
- Congestion or runny nose
- Nausea or vomiting
- Diarrhea

This list does not include all possible symptoms. CDC will continue to update this list as we learn more about COVID-19. Older adults and people who have severe underlying medical conditions like heart or lung disease or diabetes seem to be at higher risk for developing more serious complications from COVID-19 illness.

## Feeling Sick?

| Check Symptoms with Self-Checker | | Get Tested for COVID-19 |

# When to Seek Emergency Medical Attention

Look for emergency warning signs* for COVID-19. If someone is showing any of these signs, **seek emergency medical care immediately:**

- Trouble breathing
- Persistent pain or pressure in the chest
- New confusion
- Inability to wake or stay awake
- Pale, gray, or blue-colored skin, lips, or nail beds, depending on skin tone

*This list is not all possible symptoms. Please call your medical provider for any other symptoms that are severe or concerning to you.

Call 911 or call ahead to your local emergency facility: Notify the operator that you are seeking care for someone who has or may have COVID-19.

## If You Are Sick

> ❯ Check symptoms with Coronavirus Self-Checker

> ❯ Get tested

> ❯ What to do if you are sick

> ❯ Isolate if you are sick

> ❯ When to quarantine

> ❯ How to care for someone who is sick

# Difference between COVID-19 & Flu

Influenza (Flu) and COVID-19 are both contagious respiratory illnesses, but they are caused by different viruses. COVID-19 is caused by infection with a new coronavirus (called SARS-CoV-2), and flu is caused by infection with influenza viruses.

COVID-19 seems to spread more easily than flu and causes more serious illnesses in some people. It can also take longer before people show symptoms and people can be contagious for longer. More information about differences between flu and COVID-19 is available in the different sections below.

Because some of the symptoms of flu and COVID-19 are similar, it may be hard to tell the difference between them based on symptoms alone, and testing may be needed to help confirm a diagnosis.

While more is learned every day about COVID-19 and the virus that causes it, there is still a lot that is unknown . This page compares COVID-19 and flu, given the best available information to date.

## Handouts & Videos









## Symptoms of COVID-19 (PDF)

Patients with COVID-19 have experienced mild to severe respiratory illness.

## Symptoms of COVID-19 (Video)

Symptoms can include fever, cough and shortness of breath.

## Symptoms of ASL (Video)

American Sign Languac symptoms.

## More Information

People at Increased Risk

Healthcare Professionals

Last Updated Feb. 22, 2021

☐ Your Health

About COVID-19

Variants of the Virus

**Symptoms**

Coronavirus Self-Checker

Testing

Prevent Getting Sick

If You Are Sick

Different Groups of People

Daily Activities & Going Out

Travel

Archive

## ☐ Get Email Updates

To receive email updates about COVID-19, enter your email address:

Email Address

What's this?

Submit

**HAVE QUESTIONS?**

☐
Visit CDC-INFO

☐
Call 800-232-4636

☐
Email CDC-INFO

☐
Open 24/7

**CDC INFORMATION**
About CDC
Jobs
Funding
Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

**CONNECT WITH CDC**

☐ ☐ ☐ ☐
☐

☐ ☐ ☐ ☐
☐

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer
☐

**LANGUAGE ASSISTANCE**

Español

☐☐☐☐

Tiếng Việt

☐☐☐

Tagalog

Русский

العربية

Kreyòl Ayisyen

Français

Polski

Português

Italiano

Deutsch

□□□

فارسی

English

EXHIBIT E



# COVID-19

**—COVID DATA TRACKER WEEKLY REVIEW** —————

☐ Back to COVID-19 Home

# Weekly Review

Print

Interpretive Summary for **July 30, 2021**

Subscribe to the Weekly Review

# Don't Run Down the Shot Clock

**COVID-19 cases, hospitalizations, and deaths are once again increasing in nearly all states, fueled by the B.1.617.2 (Delta) variant, which is much more contagious than past versions of the virus. The highest spread of cases and severe outcomes is happening in places with low vaccination rates. Although COVID-19 vaccination is the most effective prevention measure, vaccination rates across the United States have varied.**

COVID-19 vaccines are very effective, but no vaccine is perfect. In some instances, fully vaccinated people will get COVID-19 and may be contagious. These are called "vaccine breakthrough cases." A new CDC study finds that B.1.617.2 (Delta) can lead to breakthrough infections. This means that while vaccinated people are much less likely to get sick, it will still happen in some cases. As the number of people who are vaccinated goes up, the number of breakthrough cases is also expected to increase, even as the vaccines

remain highly effective.

**United States Levels of Community Transmission by County as of July 27, 2021**



☐ View Larger

Vaccines help protect people from getting COVID-19 or from getting severely ill from it. Unvaccinated people should get vaccinated and continue masking. CDC also recommends that fully vaccinated people wear masks in public indoor settings in areas of substantial or high transmission. With the B.1.617.2 (Delta) variant rapidly spreading throughout the country, this is more urgent than ever. To find a vaccine provider near you, visit Vaccines.gov or your state or local public health department website. If you or someone you know is hesitant about COVID-19 vaccination, CDC has information and answers to frequently asked questions to help them inform their decision.

*Note to readers:* On July 27, 2021, CDC announced updated Guidance for COVID-19 Prevention Strategies. Among strategies to prevent COVID-19, CDC recommends all unvaccinated people wear masks in public indoor settings. Based on emerging evidence of the B.1.617.2 (Delta) variant, CDC also recommends that fully vaccinated people wear masks in public indoor settings in areas of substantial or high transmission. To see the level of community transmission in your county, visit COVID Data Tracker.

## Reported Cases

The current 7-day moving average of daily new cases (66,606) increased 64.1% compared with the previous 7-day moving average (40,597). The current 7-day moving average is 73.8% lower than the peak observed on January 10, 2021 (254,063) and is 480.1%

higher than the lowest value observed on June 19, 2021 (11,483). A total of 34,722,631 COVID-19 cases have been reported as of July 28.

**34,722,631**
**Total Cases**
**Reported**

**66,606**
**Current 7-Day**
**Average***

**40,597**
**Prior 7-Day**
**Average**

**+64.1%**
**Change in 7-Day**
**Average since**
**Prior Week**

*Historical cases are excluded from daily new cases and 7-day average calculations until they are incorporated into the dataset for the applicable date. Of 77,785 historical cases reported retroactively, 2,086 were reported in the current week and 1,469 were reported in the prior week.

**Daily Trends in COVID-19 Cases in the United States Reported to CDC**

7-Day moving average



☐ View Larger

# SARS-CoV-2 Variants

Multiple variants of the virus that causes COVID-19 are circulating globally, including within the United States. Currently, four variants are classified as a variant of concern (VOC). Nowcast estimates* of SARS-CoV-2 cases caused by these VOCs for the two weeks ending July 17 are summarized here. Nationally, the proportion of cases attributed to B.1.617.2 (Delta) is predicted to increase to 82.2%; B.1.1.7 (Alpha) proportion is predicted to decrease to 9.0%; P.1 (Gamma) proportion is predicted to decrease to 3.8%; and B.1.351 (Beta) is predicted to remain steady at 0.1%. Nowcast estimates predict that B.1.617.2 (Delta) will continue to be the predominant lineage circulating in all HHS regions and be more than 70% in nine HHS regions. B.1.1.7 (Alpha) is predicted to be less than or equal to 21% in all HHS regions. P.1 (Gamma) is

predicted to be less than 9% in all HHS regions; and B.1.351 (Beta) is predicted to be less than or equal to 0.2% in all HHS regions.

*The median time from specimen collection to sequence data reporting is about 3 weeks. As a result, weighted estimates for the most recent few weeks may be unstable or unavailable. CDC's Nowcast is a data projection tool that helps fill this gap by generating timely estimates of variant proportions for variants that are circulating in the United States. View Nowcast estimates on CDC's COVID Data Tracker website on the <u>Variant Proportions</u> page.

## SARS-CoV-2 Variants Circulating in the United States



☐ <u>View Larger</u>



☐ <u>View Larger</u>

# Testing

The percentage of COVID-19 NAATs (nucleic acid amplification tests) that are positive (percent positivity) has increased from the previous week. The 7-day average of percent positivity from tests is now 7.8%. The 7-day average number of tests reported for July 16 – Jul 22 was 698,611 up 14.5% from 610,004 for the prior 7 days.

**698,611**
**7-Day Average**
**Tests Reported**

**7.8%**
**7-Day Average**
**% Positivity**

**6.0%**
**Previous 7-Day**
**Average %**
**Positivity**

**+31.0%**
**Change in 7-Day**
**Average %**
**Positivity since**
**Prior Week**

## COVID-19 NAAT Laboratory Test 7-day Percent Positivity by State/Territory



☐ View Larger

More Testing Data

# Vaccinations

The U.S. COVID-19 Vaccination Program began December 14, 2020. As of July 29, 344.1 million vaccine doses have been administered. Overall, about 189.9 million people, or 57.2% of the total U.S. population, have received at least one dose of vaccine. About 163.9 million people, or 49.4% of the total U.S. population, have been fully vaccinated.* As of July 29, the 7-day average number of administered vaccine doses reported (by date of CDC report) to CDC per day was 615,404, a 16.15% increase from the previous week.

CDC's COVID Data Tracker Vaccination Demographic Trends tab shows vaccination trends by age group. As of July 29, 89.7% of

people ages 65 or older have received at least one dose of vaccine and 79.9% are fully vaccinated. Over two-thirds (69.4%) of people ages 18 or older have received at least one dose of vaccine and 60.3% are fully vaccinated. For people ages 12 or older, 66.9% have received at least one dose of vaccine and 57.7% are fully vaccinated.

**344,071,595**
**Vaccines**
**Administered**

**189,945,907**
**People who**
**received at least**
**one dose**

**163,868,916**
**People who are**
**fully vaccinated***

**57.2%**
**Percentage of the**
**US population**
**that has received**
**at least one dose**

**49.4%**
**Percentage of the**
**US population**
**that has been fully**
**vaccinated***

**+0.8**
**Percentage point**
**increase from last**
**week**

**+0.6**
**Percentage point**
**increase from last**
**week**

*People are considered fully vaccinated 2 weeks after their second dose in a 2-dose series (such as the Pfizer or Moderna vaccines), or 2 weeks after a single-dose vaccine (such as Johnson & Johnson's Janssen vaccine).

**Daily Change in the Total Number of Administered Doses Reported to CDC by the date of CDC Report, United States**

━━━7-Day moving average



☐ View Larger

# Hospitalizations

## New Hospital Admissions

The current 7-day average for July 21–July 27 was 5,475. This is a 46.3% increase from the prior 7-day average (3,742) from July 14–July 20. The 7-day moving average for new admissions has consistently increased since June 25, 2021.

**2,381,644**
**Total New**
**Admissions**

**5,475**
**Current 7-Day**
**Average**

**3,742**
**Prior 7-Day**

**Average**

**+46.3%**
**Change in 7-Day**
**Average**

The start of consistent reporting of hospital admissions
data was August 1, 2020.

## Daily Trends in Number of New COVID-19
## Hospital Admissions in the United States



New Admissions of Patients with Confirmed COVID-19, United States
August 01, 2020 – July 26, 2021

☐ View Larger

New admissions are pulled from a 10 am EST
snapshot of the HHS Unified Hospital Timeseries
Dataset. Due to potential reporting delays, data
from the most recent 7 days, as noted in the figure
above with the grey bar, should be interpreted with
caution. Small shifts in historic data may also occur
due to changes in the CMS Provider of Services file,
which is used to identify the cohort of included
hospitals.

# COVID-NET: Trends in Hospitalizations in Adults Ages 18–49 Years

CDC's Coronavirus Disease 2019-Associated Hospitalization Surveillance Network (COVID-NET) shows that hospitalization rates are increasing in younger adults. While adults ages 65 years and older are most at-risk, younger adults are also at risk for COVID-19-associated hospitalizations. Rates of hospitalization remain low when compared to previous months of the pandemic, but preliminary data show that weekly rates of COVID-19-associated hospitalizations have increased significantly for adults ages 18 to 49 years. Compared to June 26, 2021, weekly rates in adults ages 18–49 years for the week ending July 10, 2021 have increased by nearly 40%. These are the first increases in rates of COVID-19-associated hospitalizations seen in this age group since April 2021.

**Trends in Rates of COVID-19-Associated Hospitalizations in Adults Ages 18–49 Years**



☐ View Larger

The Coronavirus Disease 2019 (COVID-19)-Associate¬¬d Hospitalization Surveillance Network (COVID-NET) is an additional source for hospitalization data collected through a network of more than 250 acute-care hospitals in 14 states (representing ~10% of the U.S. population). Detailed data on patient demographics, including race/ethnicity, underlying medical conditions, medical interventions, and clinical outcomes, are standardized case reporting form.

More COVID-NET Data

# Deaths

The current 7-day moving average of new deaths (296) has increased 33.3% compared with the previous 7-day moving average (222). The current 7-day moving average is 91.8% lower than the peak observed on January 13, 2021 (3,625) and is 77.1% higher than the lowest value observed on July 10, 2021 (167). As of July 28, a total of 609,853 COVID-19 deaths have been reported.

**609,853**
**Total Deaths**
**Reported**

**296**
**Current 7-Day**
**Average***

**222**
**Prior 7-Day**
**Average**

**+33.3%**
**Change in 7-Day**
**Average Since**
**Prior Week**

\*Historical deaths are excluded from the daily new deaths and 7-day average calculations until they are incorporated into the dataset by their applicable date. Of 6,143 historical deaths reported retroactively, 26 were reported in the current week and 8 were reported in the prior week.

## Daily Trends in Number of COVID-19 Deaths in the United States Reported to CDC

7-Day moving average



☐ View Larger

# Recent CDC
# COVID-19 Publications

1. Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage

2. SARS-CoV-2 Infection in Public School District Employees Following a District-Wide Vaccination Program — Philadelphia County, Pennsylvania, March 21–April 23, 2021

3. Disparities in COVID-19 Vaccination Coverage Among Health Care Personnel Working in Long-Term Care Facilities, by Job Category, National Healthcare Safety Network — United States, March 2021

4. Outbreak of SARS-CoV-2 Infections, including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021

## Recent COVID Data Tracker Updates

- The Vaccination Trends tab now displays trends by state and jurisdiction
- The Vaccination Among Pregnant People tab displays the percent of pregnant people ages 18-49 years receiving at least one dose of a COVID-19 vaccine during pregnancy overall and by race/ethnicity
- The Vaccine Confidence tab allows users to explore trends in vaccine confidence in the United States by visualizing trends in vaccination status and intent by week and by demographics

---

☐ Science & Research

Science Agenda for COVID-19

**Weekly Review**

Past Weekly Reports

Science Briefs

COVID Data Tracker

Forecasting

Variant Surveillance

About Epidemiology

CDC COVID-19 Data

Guidance for COVID-19

Archive

☐ Get Email Updates

To receive email updates about COVID-19, enter your email address:

Email Address

What's this?

Submit

**HAVE QUESTIONS?**

☐
Visit CDC-INFO

☐
Call 800-232-4636

☐
Email CDC-INFO

☐
Open 24/7

**CDC INFORMATION**
About CDC
Jobs
Funding

Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

**CONNECT WITH CDC**

☐ ☐ ☐ ☐
☐

☐ ☐ ☐ ☐
☐

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer
☐

**LANGUAGE ASSISTANCE**

Español

☐☐☐☐

Tiếng Việt

☐☐☐

Tagalog

Русский

العربية

Kreyòl Ayisyen

Français

Polski

Português

Italiano

Deutsch

□□□

فارسی

English

# UCONN
**UNIVERSITY OF CONNECTICUT**

# Fact Sheet 2020



## ■ THE UNIVERSITY
- Founded 1881
- Main Campus: Storrs
- 4 Regional Campuses: Avery Point, Hartford, Stamford, Waterbury
- School of Law and Graduate Business Learning Center: Hartford
- School of Social Work: Hartford
- UConn Health: Farmington (Schools of Medicine & Dental Medicine, graduate programs, medical & dental clinics, UConn John Dempsey Hospital), and UConn Health at Downtown Storrs
- Land Grant & Sea Grant college, Space Grant Consortium institution
- Storrs & Regionals ≈4,052 acres; UConn Health ≈210 acres

## ■ INITIATIVES
**UCONN 2000** – As of FY19:
- $3.5 billion in State GO bonds have been authorized
- $3.6 billion in construction-related contracts issued from all fund sources
  - 71% of funds to Connecticut contractors
  - 21% to set-aside contractors
- Bond Credit Ratings by Fitch, Moody's, and Standard & Poor's remain consistently strong

**Next Generation Connecticut**
- Next Generation Connecticut: $1.5 billion capital investment over 13 years includes construction, renovations, infrastructure, and equipment

**Bioscience Connecticut**
- Bioscience Connecticut: $864 million investment in genomics and personalized medicine

## ■ STUDENTS | FALL 2019
**Academic Programs & Degrees**
14 Schools & Colleges
   Agriculture, Health & Natural Resources; Business; Dental Medicine; Neag Education; Engineering; Fine Arts; Graduate; Law; Liberal Arts & Sciences; Medicine; Nursing; Pharmacy; Ratcliffe Hicks; Social Work
8 undergraduate degrees: 117 majors
17 graduate degrees: 88 research and professional practice fields of study
6 professional degree programs (J.D., LL.M., M.D., D.M.D., Pharm.D., S.J.D.)

| Degrees 2018-19 | 8,793 | | |
|---|---|---|---|
| Bachelor's | 5,656 | Dental Medicine | 40 |
| Master's | 1,895 | Graduate/Professional | |
| Doctorates | 418 | Certificates | 369 |
| Law (J.D., LL.M.) | 161 | 6 Yr. Education | 54 |
| Pharm.D. | 92 | 2 Yr. Agriculture | 16 |
| Medicine | 92 | | |
| Degrees by: Female | 54% | Minority | 25% |

**Total Student Enrollment** – 32,333

| | |
|---|---|
| 18,847 | Undergraduate at Main Campus |
| 5,053 | Undergraduate at Regional Campuses |
| **23,900** | **Subtotal Undergraduate** |
| 7,097 | Graduate (M.A./Ph.D., including 266 at UConn Health) |
| 536 | Law |
| 154 | Pharm.D. |
| 444 | Medicine |
| 202 | Dental Medicine |
| **8,433** | **Subtotal Graduate/Professional** |

**Entering Freshmen at Main Campus, Fall 2019** – 3,603
- 55% were in top 10% of high school class
- 87.6% were in top 25% of high school class
- 98 valedictorians and 67 salutatorians
- 322% more minority freshmen than in Fall 1995
- Since 1995: 2,755 valedictorians and salutatorians enrolled at all campuses

### Student Characteristics

| | Undergraduate - 23,900 | Grad/Professional - 8,433 |
|---|---|---|
| Female | 51% | 53% |
| Minority | 37% | 21% |
| International[1] | 9% | 25% |
| Connecticut Residents[2] | 77% | 65% |

[1] 103 countries were represented in the Fall 2019 international student population.
[2] 73% of undergraduates on Main Campus are Connecticut residents.
   All 169 Connecticut towns and 43 of 50 states are represented in the Fall 2019 total undergraduate student population.

### SAT Scores and Retention & Graduation Rates

| 2019 SAT Scores (Critical Reading and Math) | National High School | Connecticut High School | Main Campus Entering Freshmen |
|---|---|---|---|
| | 1059 | 1046 | 1296 |

| Main Campus | | All | Minority |
|---|---|---|---|
| Freshmen Retention: | 1-Year Rate | 94% | 92% |
| Graduation: | 4-Year Rate | 73% | 65% |
| | 6-Year Rate | 85% | 82% |

UConn (Main Campus) ranks 14 out of 58 public research universities in graduation rate for all freshmen and 21 out of 58 public research universities for minority freshmen. (Sources: *U.S. News 2020 America's Best Colleges & 2018 IPEDS Graduation Rate Survey*) UConn (Main Campus) average time to graduate is 4.2 years among those who graduate within 6 years, and ranks 4th out of 58 public research universities.

### Total Undergraduate Student Cost – 2019-2020

| | In-State | Out-of-State |
|---|---|---|
| Tuition, Fees, Room[1] & Board[2] | $30,484 | $53,152 |
| Tuition & Mandatory Fees | 17,226 | 39,894 |
| Tuition Only | 13,798 | 36,466 |

[1] 65% of Main Campus undergraduates live in campus housing (102 residential halls, 99 in Storrs, 3 in Stamford).
[2] Board rate shown reflects the Value Plan, which is the most popular plan available.

### Student Financial Aid – Fiscal Year 2019
Financial Aid Support: $509 Million

| | Main Campus/Regional[1] | UConn Health |
|---|---|---|
| Scholarships & Grants | $213 million | $6.7 million |
| Loans | 196 million | 20 million |
| Tuition Waivers | 73 million | |

[1] Approximately 21,700 students received financial aid packages in FY2019. 27% of all tuition dollars are dedicated to scholarships and grants.



## UConn ranks among the Top 25 public universities in the nation
— *U.S. News & World Report America's Best Colleges (2020)*

## ▣ STAFF | FALL 2019

### Number of Full-time & Part-time Faculty & Staff: 9,620

|  | Main Campus/Regional | UConn Health |
|---|---|---|
| Full-time & Part-time Faculty & Staff | 5,032 | 4,588 |
| Full-time Faculty & Staff | 4,834 (96%) | 3,541 (77%) |
| Part-time Faculty & Staff[1] | 198 ( 4%) | 1,047 (23%) |
| Full-time Faculty | 1,537 | 537 |
| Tenured & Tenure Track | 1,121 (73%) | 174 (32%) |
| Non-Tenure Track | 416 (27%) | 363 (68%) |
| Full-time Staff | 3,297 | 3,026 |
| Full-time & Part-time Faculty |  |  |
| Female | 43% | 43% |
| Minority | 20% | 38% |
| Full-time & Part-time Staff |  |  |
| Female | 57% | 78% |
| Minority | 13% | 28% |

[1] 749 adjunct lecturers teach at least one course at Storrs and regional campuses.

### Staff Covered by Collective Bargaining Agreements:

| | |
|---|---|
| Main Campus & Regional Campuses | 90% |
| UConn Health | 90% |

## ▣ BUDGET | FISCAL YEAR 2020

### Total Current Funds Budget: $2.7 billion

#### MAIN & REGIONAL CAMPUSES

| Revenues | In Millions |
|---|---|
| State Appropriation | $200.4 |
| Fringe Benefits | 171.1 |
| Student Tuition & Fees | 781.7 |
| Gifts, Grants & Contracts | 220.2 |
| Sales/Services - Auxiliary Enterprises | 26.3 |
| Sales/Services - Educational | 23.7 |
| All Other Revenues | 20.6 |
| *Total* | $1,444.0 |

| Expenditures | |
|---|---|
| Academic Services | $639.4 |
| Research Services | 104.6 |
| Student Services | 485.0 |
| Operating, Support & Physical Plant Services | 215.0 |
| *Total* | $1,444.0 |

#### UCONN HEALTH

| Revenues | In Millions |
|---|---|
| State Appropriation | $128.2 |
| Fringe Benefits | 167.2 |
| Student Tuition & Fees | 28.6 |
| Gifts, Grants & Contracts | 91.1 |
| Interns & Residents | 73.1 |
| Net Patient Care | 568.1 |
| Research Fund | 8.3 |
| All Other Revenues | 169.2 |
| *Total* | $1,233.8 |

| Expenditures | |
|---|---|
| Hospital & Health Services | $679.9 |
| Research Fund | 8.3 |
| Academic Services | 234.7 |
| Research Services | 140.7 |
| Operating, Support & Physical Plant Services | 170.2 |
| *Total* | $1,233.8 |

## ▣ ALUMNI AND GIVING

### UConn Alumni
- 264,039 total alumni worldwide.
- 140,227 alumni live in Connecticut.

### Private Giving Fiscal Year 2019
- In FY 2019, private donations to the University totaled $71.4 million. Of that amount, $21.7 million was donated for scholarships and student support, $25 million for program support, $14.1 million for research, $2.2 million for faculty support and $8.4 million for capital improvements.
- Alumni contributed $36.3 million in FY 2019. Parents and other individuals contributed $14.8 million. Corporations and organizations added an additional $20.3 million.
- Funds made available to support the University in FY 2019 totaled $44.4 million.
- The University endowment portfolio was valued at $462.8 million at the fiscal year-end, including more than $190 million for scholarships.

## ▣ RESEARCH, TRAINING AND PUBLIC SERVICE

### Fiscal Year 2019 external funding, sponsored awards:

**$258.0 million (excluding financial aid):**

| | |
|---|---|
| Main & Regional Campuses: | $164.4 million (64%) |
| UConn Health: | $ 93.6 million (36%) |

**Total by Funding Source**
Federal: 82.1%    State: 6.7%    Private/Other: 11.2%

**Sponsored Awards at Main & Regional Campuses**

| | |
|---|---|
| Research | 78% |
| Education and Training Programs | 22% |

**Sponsored Awards at UConn Health**

| | |
|---|---|
| Research | 82% |
| Public Service | 18% |

    

**Connect with us:    uconn.edu | health.uconn.edu**

011620



# COVID-19

⊓

**ARCHIVED WEBPAGE:** This webpage is for historical purposes and is **no longer being updated.** For the latest information, view the COVID-19 homepage.

▢   Back to COVID-19 Home

# COVID-19 Guidance for Shared or Congregate Housing

Updated Dec. 31, 2020

Languages

Print

## On This Page

| | |
|---|---|
| Plan and Prepare | Communicate to staff and residents |
| Emergency operations plans | Considerations for common spaces in your facility, to prevent the spread of COVID-19 |
| Key resources: emergency operations plans | Considerations for specific communal rooms in your facility |
| Planning strategies | |
| To maintain safe operations | If a resident in your facility has COVID-19 (suspected or confirmed) |
| Encourage staff and residents to prepare and take action to protect themselves and others | Accepting new residents at facilities that offer support services |

The following guidance was created to help owners,

administrators, or operators of shared (also called "congregate") housing facilities – working together with residents, staff, and public health officials – prevent the spread of COVID-19.

For this guidance, shared housing includes a broad range of settings, such as apartments, condominiums, student or faculty housing, national and state park staff housing, transitional housing, and domestic violence and abuse shelters. Special considerations exist for the prevention of COVID-19 in shared housing situations, and some of the following guidance might not apply to your specific shared housing situation.

People living and working in this type of housing may have challenges with social distancing to prevent the spread of COVID-19. Shared housing residents often gather together closely for social, leisure, and recreational activities, shared dining, and/or use of shared equipment, such as kitchen appliances, laundry facilities, stairwells, and elevators.

Be sure to consider the unique needs of your residents, such as people with disabilities, cognitive decline, or no access to technology. This guidance does not address infection prevention and control in healthcare settings. If your facility offers healthcare services, please consult CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings

There may also be specific guidance for certain types of shared housing, such as homeless shelters, that may apply to your facility.

State, territorial, local, and tribal public health departments can give you specific information on COVID-19 transmission and policies in your community, which can help you decide when and if you need to scale up or loosen prevention measures.

# Plan and prepare

## Review, update, and implement emergency operations plans (EOPs)

Some shared housing facilities have already experienced an outbreak of COVID-19, others have a handful of cases, and others have not yet had infection introduced.  Regardless of the status of a facility, the most important thing is for all facilities to plan **and prepare**. No matter the level of transmission in a community, every shared housing facility should have a plan in place to protect residents, workers, volunteers, and visitors from the spread of COVID-19.  This should be done in collaboration with state and local public health departments, housing authorities, local or state regulatory agencies, and other relevant partners. Focus should be on components, or annexes, of already-existing plans that address infectious disease outbreaks. If your shared housing facility does not have an emergency operations plans (EOP), now is the time to develop one.

# Reference key resources while developing, reviewing, updating, and implementing the EOP

- Multiple federal agencies have developed resources on emergency preparedness, which may be helpful for administrators of shared housing facilities.
  - The National Multifamily Housing Council (NHMC) ☐ provides guidance on emergency preparedness and response resources for the apartment industry. HUD also provides guidance for public health disaster readiness and preparation ☐ .
- CDC has specific consideration for people with disabilities as they may be at higher risk of getting COVID-19 or having severe illness.
- Additionally, FEMA's Planning Considerations for Organizations in Reconstituting Operations During the COVID-19 Pandemic ☐ outlines key considerations for planning to resume operations while protecting the well-being and safety of employees and communities.

# Planning strategies to include:

- Informing residents, workers, volunteers, and visitors about COVID-19. Develop information-sharing systems that are tailored to the needs of your setting. For instance, administrators can support residents who have no or limited access to the internet by delivering print materials to their residents. Printable materials for community-based settings are available on the CDC website.
- Promoting healthy behaviors that reduce spread, maintaining healthy environments and operations, and knowing what to do if someone gets sick.
- Taking action to prevent or slow the spread of COVID-19. This includes limiting the number of non-essential visitors to workers, volunteers, and visitors who are essential to preserving the health, including the mental health, well-being, and safety of residents.
- Consider identifying residents who have unique medical needs and behavioral health needs and encourage them to develop a plan for if they or their primary caregiver(s) become ill.

# To maintain safe operations

- Review the CDC guidance for businesses and employers to identify strategies to maintain operations and a healthy working and living environment.
- Develop flexible sick leave policies. Require staff to stay home when sick, even without documentation from doctors. Use flexibility, when possible, to allow staff to stay home to care for sick family or household members or to care for children in the event of school or childcare dismissals. Make sure that employees are aware of and understand these policies.
- Create plans to protect the staff and residents from spread of COVID-19 and help them put in place

personal preventive measures.

- Routinely clean common spaces (such as, exercise rooms, laundry facilities, shared bathrooms, and elevators) and high touched surfaces and objects using soap or detergent at least once a day or as often as needed.

- Identify services and activities (such as meal programs, religious services, and exercise rooms and programs) that might need to be limited or temporarily discontinued. Consider alternative solutions (e.g., virtual services) that will help programs continue while being safe for residents.

- Identify a list of healthcare facilities and alternative care sites ☐ where residents with COVID-19 can receive appropriate care, if needed.

# Encourage staff and residents to prepare and take action to protect themselves and others

- Follow the guidance and directives on community gatherings from your state and local ☐ health departments.

- Encourage social distancing by asking staff and residents to stay at least 6 feet (2 meters) apart from others and wear masks in any shared spaces, including spaces restricted to staff only.

- Consider any special needs or accommodations for those who need to take extra precautions, such as older adults, people with disabilities, and people of any age who have serious underlying medical conditions.

- Limit staff entering residents' rooms or living quarters unless it is necessary. Use virtual communications and check ins (phone or video chat), as appropriate.

- Limit the presence of non-essential volunteers and visitors in shared areas, when possible.

- Use physical barriers, such as sneeze guards, or extra tables or chairs, to protect front desk/check-in staff who will have interactions with residents, visitors, and the public.

- Provide COVID-19 prevention supplies for staff and residents in common areas at your facility, such as soap, alcohol-based hand sanitizers that contain at least 60% alcohol, tissues, trash baskets, and, if possible, masks that are washed or discarded after each use.

- Consider any special communications and assistance needs of your staff and residents, including persons with disabilities.

- Suggest that residents keep up-to-date lists of medical conditions and medications, and periodically check to ensure they have a sufficient supply of their prescription and over-the-counter medications.

- If possible, help residents understand they can contact their healthcare provider to ask about getting extra necessary medications to have on hand for a longer period of time, or to consider using a mail-order option for medications.

- Make sure that residents are aware of serious symptoms of their underlying conditions and of COVID-19 symptoms that require emergency care, and that they know who to ask for help and call 911.

- Encourage residents who live alone to seek out a "buddy" in the facility who will check on and help care for them and safely make sure they are getting basic necessities, including food and household essentials.

*Note: Surgical masks and N-95 respirators are critical supplies that must continue to be reserved for healthcare workers and other medical first responders, as recommended by current CDC guidance. All staff and residents should wear a* <u>*mask covering*</u> *when in shared areas of the facility and maintain social distancing to slow the spread of the virus.*

# Communicate to staff and residents

Identify platforms such as email, websites, hotlines, automated text messaging, newsletters, and flyers to help communicate information on:

- Guidance and directives from state and local officials and <u>state</u> and <u>local</u> ☐ health departments.
- How your facility is helping to prevent the spread of COVID-19.
- How additional information will be shared, and where to direct questions.
- How to stay healthy, including <u>videos, fact sheets, and posters</u> with information on <u>COVID-19 symptoms</u> and how to stop the spread of germs, <u>how to wash your hands,</u> and what to do <u>if you are sick.</u>
- How staff and residents can <u>cope and manage stress</u> and protect others from <u>stigma and discrimination.</u>
- Identify and address potential language, cultural, and disability barriers associated with communicating COVID-19 information. Communications may need to be framed or adapted so they are culturally appropriate for your audience and easy to understand. For example, there are resources on the CDC website that are in many <u>languages.</u>

# Considerations for common spaces in your facility, to prevent the spread of COVID-19

- Consider how you can use multiple strategies to maintain <u>social (physical) distance</u> between everyone in common spaces of the facility.
- Consider cancelling all public or non-essential group activities and events.
- Offer alternative methods for activities and social interaction such as participation by phone, online, or through recorded sessions.
- Arrange seating of chairs and tables to be least 6 feet (2 meters) apart during shared meals or other events.

- Alter schedules to reduce mixing and close contact, such as staggering meal and activity times and forming small groups that regularly participate at the same times and do not mix.

- Minimize traffic in enclosed spaces, such as elevators and stairwells. Consider limiting the number of individuals in an elevator at one time and designating one directional stairwells, if possible.

- Ensure that social distancing can be maintained in shared rooms, such as television, game, or exercise rooms.

- Make sure that shared rooms in the facility have good air flow from an air conditioner or an opened window.

- Consider working with building maintenance staff to determine if the building ventilation system can be modified to increase ventilation rates or the percentage of outdoor air that circulates into the system.

- Clean shared areas (such as, laundry facilities, elevators, shared kitchens, exercise rooms, dining rooms) and high touched surfaces (for example, daily or as needed).

# Considerations for specific communal rooms in your facility

## Shared kitchens and dining rooms

- Restrict the number of people allowed in the kitchen and dining room at one time so that everyone can stay at least 6 feet (2 meters) apart from one another.
  - People who are sick, their roommates, and those who have higher risk of severe illness from COVID-19 should eat or be fed in their room, if possible.

- Do not share dishes, drinking glasses, cups, or eating utensils. Non-disposable food service items used should be handled with gloves and washed with dish soap and hot water or in a dishwasher. Wash hands after handling used food service items.

- Use gloves when removing garbage bags and handling and disposing of trash. Wash hands

## Laundry rooms

- Maintain access and adequate supplies to laundry facilities to help prevent spread of COVID-19.

- Restrict the number of people allowed in laundry rooms at one time to ensure everyone can stay at least 6 feet (2 meters) apart.

- Provide disposable gloves, soap for washing hands, and household cleaners for residents and staff to clean buttons, knobs, and handles of laundry machines, laundry baskets, and shared laundry items.

- Post guidelines for doing laundry such as washing instructions and handling of dirty laundry.

## Recreational areas such as activity rooms and exercise rooms

- Consider closing activity rooms or restricting the number of people allowed in at one time to ensure everyone can stay at least 6 feet (2 meters) apart.
- Consider closing exercise rooms.
- Activities and sports (e.g., ping pong, basketball, chess) that require close contact are not recommended.

## Pools and hot tubs

- Consider closing pools and hot tubs or limiting access to pools for essential activities only, such as water therapy.
  - While proper operation, maintenance, and disinfection (with chlorine or bromine) should kill COVID-19 in pools and hot tubs, they may become crowded and could easily exceed recommended guidance for gatherings. It can also be challenging to keep surfaces clean.
  - Considerations for shared spaces (maintaining physical distance and cleaning and disinfecting surfaces) should be addressed for the pool and hot tub area and in locker rooms if they remain open.

## Shared bathrooms

- Shared bathrooms should be cleaned regularly (e.g., in the morning and evening or after times of heavy use).
- Make sure bathrooms are continuously stocked with soap and paper towels or automated hand dryers. Hand sanitizer could also be made available.
- Make sure trash cans are emptied regularly.
- Provide information on how to wash hands properly. Hang signs ☐ in bathrooms.
- Residents should be instructed that sinks could be an infection source and should avoid placing toothbrushes directly on counter surfaces. Totes could also be used for personal items to limit their contact with other surfaces in the bathroom.

# If a resident in your facility has COVID-19 (suspected or confirmed)

- Have the resident seek advice by telephone from a healthcare provider to determine whether medical evaluation is needed.
- Residents are not required to notify administrators if they think they may or have a confirmed case of COVID-19. If you do receive information that someone in your facility has COVID-19, you should work with the local health department ☐ to notify anyone in the building who may have been exposed (had close contact with the sick person) while maintaining the confidentiality of the sick person as required by the Americans with Disabilities Act (ADA) and, if applicable, the Health Insurance Portability

and Accountability Act (HIPAA).

- Provide the ill person with information on <u>how to care for themselves</u> and <u>when to seek medical attention.</u>

- Encourage residents with <u>COVID-19 symptoms</u> and their roommates and close contacts to self-isolate – limit their use of shared spaces as much as possible.

  - If possible, designate a separate bathroom for residents with COVID-19 symptoms.
  - Consider reducing cleaning frequency in bedrooms and bathrooms dedicated to persons with COVID-19 symptoms to as-needed cleaning (e.g., soiled items and surfaces) to avoid unnecessary contact with the ill persons.
  - Follow guidance on <u>when to stop isolation.</u>

- Minimize the number of staff members who have face-to-face interactions with residents who have suspected or confirmed COVID-19.

- Encourage staff, other residents, caregivers such as outreach workers, and others who visit persons with COVID-19 symptoms to follow <u>recommended precautions</u> to prevent the spread.

- Staff at <u>higher risk</u> of severe illness from COVID-19 should not have close contact with residents who have suspected or confirmed COVID-19, if possible.

- Those who have been in close contact (i.e., less than 6 feet (2 meters) with a resident who has confirmed or suspected COVID-19 should monitor their health and call their healthcare provider if they develop <u>symptoms suggestive of COVID-19.</u>

- Be prepared for the potential need to transport persons with suspected or confirmed COVID-19 for testing or non-urgent medical care. Avoid using public transportation, ride-sharing, or taxis. Follow guidelines for cleaning and disinfecting any transport vehicles.

# Accepting new residents at facilities that offer support services

First, review and follow the guidance and directives from your state and local officials.

If your situation is not restricted by their guidance and directives, then consider the following guidance:

  - At check-in, provide any new or potential resident with a clean <u>mask</u> and keep them isolated from others. Shelters can use <u>this tool</u> to screen for symptoms at entry.
  - Medical evaluation may be necessary depending on the symptoms.

- If your facility is full, your facility space is inadequate to maintain physical distancing (such as is recommended in the <u>guidance for homeless shelters),</u> or you do not have the resources (staff, prevention supplies) to accept additional residents, reach out to community- or faith-based organizations to help meet individuals' needs, including:

- A safe place to stay
- Ability to obtain basic necessities, such as food, personal hygiene products, and medicine
- Access to any needed medical or behavioral health services
- Access to a phone or a device with internet access to seek out resources and virtual services and support

# Additional CDC resources to help prevent spread of COVID-19 in shared or congregate housing settings

More detailed guidance is available for specific types of facilities. Some of the information in these guidance documents is applicable to that specific type of facility only, and some of the information would be applicable to other congregate housing facilities.

- How to Protect Yourself & Others
- Assisted living facilities
- Retirement communities and independent living
- Homeless shelters
- Community- and faith-based organizations
- Colleges and universities
- Households with suspected or confirmed COVID

☐  ☐  ☐  ☐

Last Updated Dec. 31, 2020

☐ Community, Work, & School

Vaccination

Health Equity – Promoting Fair Access to Health

Cleaning, Disinfecting, & Ventilation

Workplaces & Businesses

Schools & Child Care

Colleges & Universities

Parks, Sports, & Recreation

Community Organizations & Gatherings

Retirement & Shared Housing

Homeless Populations

Correctional & Detention Facilities

Tribal Communities

Guidance for COVID-19

Communication Resources

What's New

**Archive**                                                                                    collapse

**COVID-19 Guidance for Shared or Congregate Housing**

**HAVE QUESTIONS?**

☐
Visit CDC-INFO

☐
Call 800-232-4636

☐
Email CDC-INFO

☐
Open 24/7

**CDC INFORMATION**
About CDC
Jobs
Funding
Policies

File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

**CONNECT WITH CDC**

☐ ☐ ☐ ☐
☐

☐ ☐ ☐ ☐
☐

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer
☐

**LANGUAGE ASSISTANCE**

Español

中文

Tiếng Việt

한국어

Tagalog

Русский

العربية

Kreyòl Ayisyen

Français

Polski

Português

Italiano

Deutsch

中文

فارسی

English



# Ned Lamont
GOVERNOR
STATE OF CONNECTICUT

March 10, 2020

The Honorable Denise Merrill
Secretary of the State
State Capitol Hartford, CT 06106

Frederick J. Jortner
Clerk of the State House of Representatives
State Capitol
Hartford, CT 06016

Michael Jefferson
Clerk of the State Senate
State Capitol
Hartford, CT 06016

**RE: Declaration of Public Health and Civil Preparedness Emergencies**

Dear Secretary Merrill and Clerks of the General Assembly:

In response to the global pandemic of COVID 19 disease associated with a novel coronavirus that is currently affecting multiple countries and states and has resulted in the spread of infections in Connecticut and surrounding states, as well as resulting shortages of personal protective equipment and other supplies that could jeopardize public safety and civil preparedness, and in order to provide me and other appropriate officials with all authorities necessary to limit the spread of the COVID 19 coronavirus and protect public safety within the State of Connecticut, I hereby declare a public health emergency and civil preparedness emergency throughout the State, pursuant to Sections 19a-131a and 28-9 of the Connecticut General Statutes. Such public health emergency and civil preparedness emergency shall remain in effect through September 9th, 2020, unless terminated earlier by me.

Specifically, in accordance with Connecticut General Statutes Section 19a-131a (f), I hereby authorize and direct the Commissioner of Public Health to delegate the powers regarding isolation or quarantine to municipal and district directors of public health. Municipalities, local

210 CAPITOL AVENUE, HARTFORD, CONNECTICUT 06106
TEL (860) 566-4840 • www.governor.ct.gov
Governor.Lamont@ct.gov

health officials, and local education officials are directed to follow previously issued guidance and apply relevant principles of risk management to decisions about whether to cancel, modify, or postpone large gatherings, public events, or travel.

Orders regarding additional measures to protect public health and safety, including suspension or modification of specific statutes, will follow as I determine to be necessary.

I am filing this declaration with you under my hand and seal on this 10th day of March 2020.

N Lamont

Ned Lamont
Governor

2:25 p.m.
TIME

# COVID-19

## UPDATE

Getting vaccinated prevents severe illness, hospitalizations, and death. Unvaccinated people should get vaccinated and continue masking until they are fully vaccinated. With the Delta variant, this is more urgent than ever. CDC has updated <u>guidance for fully vaccinated people</u> based on new evidence on the Delta variant.

▢ Back to COVID-19 Home

# Vaccines Work

Updated May 20, 2021

[ Languages ]

Print

## What You Need to Know

- Research shows that all COVID-19 vaccines authorized for use in the United States provide protection against COVID-19.
- CDC and other experts are continuing to assess how COVID-19 vaccines work in real-world conditions. These types of studies are called "vaccine effectiveness" studies.

# What We Know about How Well COVID-19 Vaccines

# Are Working

COVID-19 vaccination reduces the risk of COVID-19 and its potentially severe complications. All COVID-19 vaccines currently authorized for use in the United States helped protect people against COVID-19, including severe illness, in clinical trial settings. So far, studies that have looked at how COVID-19 vaccines work in real-world conditions (vaccine effectiveness studies) have shown that these vaccines are working well.

Most vaccine effectiveness data now available are related to mRNA vaccines (Pfizer-BioNTech and Moderna) because these vaccines have been available longer. CDC and other experts continue to study the effectiveness of both mRNA vaccines and the Johnson & Johnson's Janssen (J&J/Janssen) COVID-19 vaccine in real-world conditions.

# So Far, Research on mRNA COVID-19 Vaccine Effectiveness in Real-World Conditions Is Reassuring

Vaccine effectiveness studies provide a growing body of evidence that mRNA COVID-19 vaccines offer similar protection in real-world conditions as they have in clinical trial settings, reducing the risk of COVID-19, including severe illness, among people who are fully vaccinated by 90 percent or more. Most vaccine effectiveness data now available are related to mRNA vaccines. Data related to the J&J/Janssen vaccine will be shared when available.

In addition to providing protection against COVID-19, there is increasing evidence that COVID-19 vaccines also provide protection against COVID-19 infections without symptoms (asymptomatic infections). COVID-19 vaccination can reduce the spread of disease overall, helping protect people around you.

# Research Suggests That for mRNA COVID-19 Vaccines, Two Doses Are Better than One

Real-world data from vaccine effectiveness studies have shown that receiving only one dose of these mRNA COVID-19 vaccines provides some protection against COVID-19, at least in the short term. These studies have also shown that for mRNA vaccines, two doses provide better protection than one dose. To receive the most benefit from vaccination, people should get the recommended number of doses of vaccine.

# COVID-19 Vaccines Help Protect against Severe Illness

# with COVID-19 Vaccine Breakthrough Cases

While COVID-19 vaccines are working well, some people who are fully vaccinated against COVID-19 will still get sick, because no vaccines are 100% effective. These are called <u>vaccine breakthrough cases.</u> However, there are some data to suggest that vaccination may make symptoms less severe in people who are vaccinated but still get COVID-19. mRNA COVID-19 vaccines have been shown to provide protection against severe illness and <u>hospitalization among people of all ages eligible to receive them.</u> This includes people 65 years and older who are at higher risk of severe outcomes from COVID-19.

It typically takes about 2 weeks for the body to build protection after vaccination. You are fully vaccinated two weeks after your second dose of Pfizer or Moderna vaccine and two weeks after your single dose of J&J/Janssen vaccine.  It is possible you could still get COVID-19 soon after vaccination because your body has not had enough time to build full protection. Keep taking <u>precautions</u> until you are fully vaccinated.

## CDC Recommends

- Get a COVID-19 vaccine as soon as you can.
- To get the most protection, get all recommended doses of a COVID-19 vaccine.

# COVID-19 Vaccines and New Variants of the Virus

## What we know

New variants of the virus that causes COVID-19 are spreading in the United States and in other parts of the world. Current data suggest that COVID-19 vaccines authorized for use in the United States offer protection against most variants currently spreading in the United States. However, some variants might cause illness in some people even after they are fully vaccinated.

## What we do not know

Evidence is limited on how the new COVID-19 variants will affect how COVID-19 vaccines work in real-world conditions. CDC will continue to monitor how vaccines are working to see if variants have any impact on how well COVID-19 vaccines work in real-world conditions.

**More details**: Learn more about <u>COVID-19 variants.</u>

☐  ☐  ☐  ☐

Last Updated May 20, 2021

☐ Vaccines

Getting Your Vaccine

Types of Vaccines Available

Possible Side Effects

After You're Fully Vaccinated

Safety & Monitoring

**Effectiveness**

   **Vaccines Work**

   Why CDC Measures Vaccine Effectiveness

   How CDC Monitors COVID-19 Vaccine Effectiveness

Myths & Facts

Frequently Asked Questions

About COVID-19 Vaccines

Communication Resources

☐ Get Email Updates

To receive email updates about COVID-19, enter your email address:

Email Address

What's this?

Submit

**HAVE QUESTIONS?**

Visit CDC-INFO

Call 800-232-4636

Email CDC-INFO

Open 24/7

**CDC INFORMATION**
About CDC
Jobs
Funding
Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

**CONNECT WITH CDC**

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer

☐

**LANGUAGE ASSISTANCE**

Español

☐☐☐☐

Tiếng Việt

☐☐☐

Tagalog

Русский

العربية

Kreyòl Ayisyen

Français

Polski

Português

Italiano

Deutsch

☐☐☐

فارسی

English



<u>Advanced Search</u>

## CDC Newsroom

# Study involved health care personnel, first responders, and essential workers in six states

## Press Release

Embargoed until: 11 a.m. ET, Monday, March 29, 2021
**Contact:** <u>Media Relations</u>
(404) 639-3286

A new CDC study provides strong evidence that mRNA COVID-19 vaccines are highly effective in preventing SARS-CoV-2 infections in real-world conditions among health care personnel, first responders, and other essential workers.  These groups are more likely than the general population to be exposed to the virus because of their occupations.

The study looked at the effectiveness of Pfizer-BioNTech and Moderna mRNA vaccines in preventing SARS-CoV-2 infections among 3,950 study participants in six states over a 13-week period from December 14, 2020 to March 13, 2021.

Results showed that following the second dose of vaccine (the recommended number of doses), risk of infection was reduced by 90 percent two or more weeks after vaccination. Following a single dose of either vaccine, the participants' risk of infection with SARS-CoV-2 was reduced by 80 percent two or more weeks after vaccination.



vaccine effectiveness findings are consistent with those from Phase 3 clinical trials conducted with the vaccines before they received Emergency Use Authorizations from the Food and Drug Administration. Those clinical trials evaluated vaccine efficacy against COVID-19 disease, while this study evaluated vaccine effectiveness against infection, including infections that did not result in symptoms.

"This study shows that our national vaccination efforts are working. The authorized mRNA COVID-19 vaccines provided early, substantial real-world protection against infection for our nation's health care personnel, first responders, and other frontline essential workers," said CDC Director Rochelle P. Walensky, MD, MPH. "These findings should offer hope to the millions of Americans receiving COVID-19 vaccines each day and to those who will have the opportunity to roll up their sleeves and get vaccinated in the weeks ahead. The authorized vaccines are the key tool that will help bring an end to this devastating pandemic."

One of this study's strengths is its design: participants self-collected nasal swabs each week for RT-PCR laboratory testing, regardless of whether they had developed symptoms of illness.  Researchers were able to look for evidence of SARS-CoV-2 infection irrespective of symptoms. A small number (10.7 percent) of infections in this study were asymptomatic (i.e., did not result in symptoms). However, the majority of infections (58 percent) occurred among people whose infections were identified by testing before they developed symptoms or knew they were infected. The study demonstrates that these two mRNA vaccines can reduce the risk of all SARS-CoV-2 infections, not just symptomatic infections.

This is important because preventing both asymptomatic and pre-symptomatic infections among health care workers and other essential workers through vaccination can help prevent the spread of SARS-CoV-2 to those they care for or serve. Findings from this study complement earlier reports that these two mRNA COVID-19 vaccines can reduce both asymptomatic and symptomatic SARS-CoV-2 infections.

This study also provided positive news about partial (one-dose) vaccination. The one-dose VE estimate of this study (80 percent) is consistent with other recent VE studies following the first dose of Pfizer-BioNTech vaccine among health care providers.  Studies conducted in the United Kingdom and Israel showed that one dose was about 70 percent and 60 percent effective, respectively, against SARS-CoV-2 infection.  The current results provide reassurance that people start to develop protection from the vaccine two weeks after their first dose. The greatest protection was seen among those who had received both recommended doses of the vaccine.

This CDC study was conducted through the HEROES-RECOVER network, a network of prospective cohorts that share a common protocol and methods. This network is part of a vaccine effectiveness surveillance system made possible by federal pandemic flu preparedness funding.

This study is the first of many planned COVID-19 vaccine effectiveness studies CDC is conducting to

evaluate the benefits of COVID-19 vaccines in various populations and across different outcomes, such as preventing infections, doctor's visits, hospitalizations, or deaths. Results from these studies assist the medical and public health experts on the Advisory Committee on Immunization Practices and CDC to make important vaccine policy decisions aimed at saving lives.

###

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ☐

*CDC works 24/7 protecting America's health, safety and security. Whether disease start at home or abroad, are curable or preventable, chronic or acute, or from human activity or deliberate attack, CDC responds to America's most pressing health threats. CDC is headquartered in Atlanta and has experts located throughout the United States and the world.*

Page last reviewed: March 29, 2021

☐ Newsroom Home

**Press Materials**

**CDC Newsroom Releases**

2021 News Releases

2020 News Releases

2019 News Releases

2018 News Releases

Historical News Releases

**CDC Real-World Study Confirms Protective Benefits of mRNA COVID-19 Vaccines**

Digital Press Kit

Journal Summaries

Digital Media

CDC Spokesperson

Contact Media Relations

## ☐ Get Email Updates

To receive email updates about this page, enter your email address:

Email Address

What's this?

Submit

## Connect with CDC Media

- ☐ Subscribe to RSS Feeds
- ☐ Subscribe to email
- ☐ Syndicate on Your Site

## CDC Quick Links

Data & Statistics

Freedom of Information Act Office

Public Health Image Library (PHIL)



## HAVE QUESTIONS?

Visit CDC-INFO

Call 800-232-4636

Email CDC-INFO

Open 24/7

## CDC INFORMATION

About CDC
Jobs
Funding
Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

## CONNECT WITH CDC

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer

  

## COVID-19

**UPDATE**

Getting vaccinated prevents severe illness, hospitalizations, and death. Unvaccinated people should get vaccinated and continue masking until they are fully vaccinated. With the Delta variant, this is more urgent than ever. CDC has updated <u>guidance for fully vaccinated people</u> based on new evidence on the Delta variant.

☐  Back to COVID-19 Home

# Benefits of Getting Vaccinated

Updated June 15, 2021

Languages

Print

# COVID-19 vaccines are safe

- COVID-19 vaccines were developed using science that has been around for decades.
- COVID-19 vaccines are not experimental. They went through all the required stages of clinical trials. Extensive testing and monitoring have shown that these vaccines are safe and effective.
- COVID-19 vaccines have received and continue to undergo the most intensive safety monitoring in U.S. history. <u>Learn more about how federal partners are ensuring COVID-19 vaccines work.</u>

# COVID-19 vaccines are effective

- COVID 19-vaccines are effective. They can keep you from getting and spreading the virus that causes COVID-19. Learn more about the different COVID-19 vaccines.
- COVID-19 vaccines also help keep you from getting seriously ill even if you do get COVID-19.
- Getting vaccinated yourself may also protect people around you, particularly people at increased risk for severe illness from COVID-19.

# Once you are fully vaccinated, you can start doing more

- After you are fully vaccinated for COVID-19, you can resume many activities that you did before the pandemic. You can resume activities without wearing a mask or staying 6 feet apart, except where required by federal, state, local, tribal, or territorial laws, rules, and regulations, including local business and workplace guidance.
- People are not considered fully vaccinated until 2 weeks after their second dose of the Pfizer-BioNTech or Moderna COVID-19 vaccine, or 2 weeks after a single-dose of Johnson & Johnson's Janssen COVID-19 vaccine. You should keep using all the tools available to protect yourself and others until you are fully vaccinated.
- Learn more about COVID-19 vaccination for people with underlying medical conditions or weakened immune systems.

# COVID-19 vaccination is a safer way to help build protection

- Get vaccinated regardless of whether you already had COVID-19. Studies have shown that vaccination provides a strong boost in protection in people who have recovered from COVID-19,.
- Learn more about the clinical considerations for people were treated for COVID-19 with monoclonal antibodies or convalescent plasma, or history of multisystem inflammatory syndrome in adults or children (MIS-A or MIS-C).
- COVID-19 is still a threat to people who are unvaccinated. Some people who get COVID-19 can become severely ill, which could result in hospitalization, and some people have ongoing health problems several weeks or even longer after getting infected. Even people who did not have symptoms when they were infected can have these ongoing health problems.

# Immunity after COVID-19 vaccination

- There is still a lot we are learning about COVID-19 vaccines and CDC is constantly reviewing evidence

and updating guidance. We don't know how long protection lasts for those who are vaccinated.

- What we do know is that COVID-19 has caused very serious illness and death for a lot of people.
- If you get COVID-19, you also risk giving it to loved ones who may get very sick. Getting a COVID-19 vaccine is a safer choice.
- At this time, there are limited data on vaccine effectiveness in people who are immunocompromised, including those taking immunosuppressive medications. Learn more about the <u>considerations</u> for fully vaccinated people who are immunocompromised.

# None of the COVID-19 vaccines can make you sick with COVID-19

None of the COVID-19 vaccines contain the live virus that causes COVID-19 so a COVID-19 vaccine cannot make you sick with COVID-19. Learn more <u>Facts about COVID-19 Vaccines</u>

## Related Pages

› Frequently Asked Questions about COVID-19 Vaccination

› Ensuring the Safety of COVID-19 Vaccines in the United States

□    □    □    □

Last Updated June 15, 2021

□ Vaccines

Getting Your Vaccine

Types of Vaccines Available

Possible Side Effects

After You're Fully Vaccinated

Safety & Monitoring

Effectiveness

Myths & Facts

Frequently Asked Questions

**About COVID-19 Vaccines**

Key Things to Know

**Benefits of Getting Vaccinated**

Vaccine Data

How Vaccines Get to You

Communication Resources

☐ Get Email Updates

To receive email updates about COVID-19, enter your email address:

Email Address

What's this?

Submit

**HAVE QUESTIONS?**

☐
Visit CDC-INFO

☐
Call 800-232-4636

Email CDC-INFO

Open 24/7

**CDC INFORMATION**
About CDC
Jobs
Funding
Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

**CONNECT WITH CDC**

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer

**LANGUAGE ASSISTANCE**

Español

中文

Tiếng Việt

한국어

Tagalog

Русский

العربية

Kreyòl Ayisyen

Français

Polski

Português

Italiano

Deutsch

日本語

فارسی

English

# COVID-19

☐ Back to COVID-19 Home

# Guidance for Fully Vaccinated People

Updated July 28, 2021

Languages 

Print

# Summary of Recent Changes

☐

- Updated information for fully vaccinated people given new evidence on the B.1.617.2 (Delta) variant currently circulating in the United States.
- Added a recommendation for fully vaccinated people to wear a mask in public indoor settings in areas of <u>substantial or high transmission.</u>
- Added information that fully vaccinated people might choose to wear a mask regardless of the level of transmission, particularly if they are immunocompromised or at <u>increased risk for severe disease</u> from COVID-19, or if they have someone in their household who is immunocompromised, at increased risk of severe disease or not fully vaccinated.
- Added a recommendation for fully vaccinated people who have a known exposure to someone with suspected or confirmed COVID-19 to be tested 3-5 days after exposure, and to wear a mask in public indoor settings for 14 days or until they receive a negative test result.
- CDC recommends universal indoor masking for all teachers, staff, students, and visitors to schools, regardless of vaccination status.

View Previous Updates

# Key Points

The following recommendations apply to non-healthcare settings. For related information for healthcare settings, visit Updated Healthcare Infection Prevention and Control Recommendations in Response to COVID-19 Vaccination.

Fully vaccinated people can:

- Participate in many of the activities that they did before the pandemic; for some of these activities, they may choose to wear a mask.
- Resume domestic travel and refrain from testing before or after travel and from self-quarantine after travel.
- Refrain from testing before leaving the United States for international travel (unless required by the destination) and refrain from self-quarantine after arriving back in the United States.
- Refrain from routine screening testing if feasible.

Infections happen in only a small proportion of people who are fully vaccinated, even with the Delta variant. However, preliminary evidence suggests that fully vaccinated people who do become infected with the Delta variant can spread the virus to others. To reduce their risk of becoming infected with the Delta variant and potentially spreading it to others: CDC recommends that fully vaccinated people:

- Wear a mask in public indoor settings if they are in an area of substantial or high transmission.
  - Fully vaccinated people might choose to mask regardless of the level of transmission, particularly if they or someone in their household is immunocompromised or at increased risk for severe disease, or if someone in their household is unvaccinated. People who are at increased risk for severe disease include older adults and those who have certain medical conditions, such as diabetes, overweight or obesity, and heart conditions.
- Get tested if experiencing COVID-19 symptoms.
- Get tested 3-5 days following a known exposure to someone with suspected or confirmed COVID-19 and wear a mask in public indoor settings for 14 days after exposure or until a negative test result.
- Isolate if they have tested positive for COVID-19 in the prior 10 days or are experiencing COVID-19 symptoms.
- Follow any applicable federal, state, local, tribal, or territorial laws, rules, and regulations.

People who are immunocompromised should be counseled about the potential for reduced immune

responses to COVID-19 vaccines and to follow current prevention measures (including wearing a mask, staying 6 feet apart from others they don't live with, and avoiding crowds and poorly ventilated indoor spaces) regardless of their vaccination status to protect themselves against COVID-19 until advised otherwise by their healthcare provider.

## On This Page

Overview

Guiding Principles for Fully Vaccinated People

Recommendations for Indoor Settings

Recommendations for Outdoor Settings

Recommendations for Travel

Recommendations for Isolation, Quarantine and Testing

# Overview

Currently authorized vaccines in the United States are highly effective at protecting vaccinated people against symptomatic and severe COVID-19. Fully vaccinated people are less likely to become infected and, if infected, to develop symptoms of COVID-19. They are at substantially reduced risk of severe illness and death from COVID-19 compared with unvaccinated people.

Infections in fully vaccinated people (breakthrough infections) happen in only a small proportion of people who are fully vaccinated, even with the Delta variant. Moreover, when these infections occur among vaccinated people, they tend to be mild. However, preliminary evidence suggests that fully vaccinated people who do become infected with the Delta variant can be infectious and can spread the virus to others.

For the purposes of this guidance, people are considered fully vaccinated for COVID-19 ≥2 weeks after they have received the second dose in a 2-dose series (Pfizer-BioNTech or Moderna), or ≥2 weeks after they have received a single-dose vaccine (Johnson & Johnson [J&J]/Janssen)[†]. There is currently no post-vaccination time limit on fully vaccinated status. People are considered not fully vaccinated if they have not completed a two-dose vaccination series or have not received a single-dose vaccine, regardless of age, including children under the age of 12.

Data suggest immune response to COVID-19 vaccination might be reduced in some immunocompromised people including, but not limited to, people receiving chemotherapy for cancer, people with hematologic cancers such as chronic lymphocytic leukemia, people receiving stem cells or organ transplants, people receiving hemodialysis, and people using certain medications that might blunt the immune response to vaccination (e.g., mycophenolate, rituximab, azathioprine, anti-CD20 monoclonal antibodies, Bruton

tyrosine kinase inhibitors).

People who are immunocompromised should be counseled about the potential for reduced immune responses to COVID-19 vaccines and the need to continue to follow current prevention measures (including wearing a mask, staying 6 feet apart from others they don't live with, and avoiding crowds and poorly ventilated indoor spaces) to protect themselves against COVID-19 until advised otherwise by their healthcare provider. Close contacts of immunocompromised people should also be encouraged to be vaccinated against COVID-19.

This guidance provides recommendations for fully vaccinated people, including:

- How fully vaccinated people can safely resume many activities while protecting others.
- How fully vaccinated people should approach domestic and international travel.
- How fully vaccinated people should approach isolation, quarantine, and testing.

CDC will continue to evaluate and update public health recommendations for fully vaccinated people as more information, including on Delta and other new variants, becomes available. Further information on evidence and considerations related to these recommendations is available in the Science Brief.

# Guiding Principles for Fully Vaccinated People

- Outdoor activities pose minimal risk to fully vaccinated people.
- Most indoor activities pose low risk to fully vaccinated people, especially in areas with low or moderate transmission.
- Infections happen in only a small proportion of people who are fully vaccinated, even with the Delta variant.
- Fully vaccinated people who become infected with the Delta variant can transmit it to others.

To reduce their risk of becoming infected with the Delta variant and potentially spreading it to others, CDC recommends that fully vaccinated people:

- Wear a mask in public indoor settings if they are in an area of substantial or high transmission.
  - Fully vaccinated people might choose to mask regardless of the level of transmission, particularly if they or someone in their household is immunocompromised or at increased risk for severe disease, or if someone in their household is unvaccinated.
- Get tested if experiencing COVID-19 symptoms.
- Isolate if they have tested positive for COVID-19 in the prior 10 days or are experiencing COVID-19 symptoms.

- Get tested 3-5 days after exposure to someone with suspected or confirmed COVID-19 and wear a mask in public indoor settings for 14 days after exposure or until they receive a negative test result.
- Continue to follow any applicable federal, state, local, tribal, or territorial laws, rules, and regulations.

# Recommendations for Indoor Settings

Risk of SARS-CoV-2 infection, severe disease, and death is reduced for fully vaccinated people. Though they happen in only a small proportion of people who are fully vaccinated, some infections do occur among fully vaccinated people. Fully vaccinated people who do become infected with the Delta variant can transmit it to others. Therefore, fully vaccinated people can further reduce their risk of becoming infected with the Delta variant and transmitting it to others by wearing a mask in public indoor settings in areas of substantial or high community transmission. Wearing a mask in public is most important for people who are immunocompromised. Fully vaccinated people might choose to mask regardless of the level of transmission, particularly if they or someone in their household is immunocompromised or at increased risk for severe disease, or if someone in their household is unvaccinated. People at increased risk for severe disease includes older adults and those who have certain medical conditions, such as diabetes, overweight or obesity, and heart conditions. Members of the household who are unvaccinated include: any persons who have not completed vaccination, who cannot be vaccinated, and those who are not eligible for vaccines, including children less than 12 years of age. Fully vaccinated people should also continue to wear a mask where required by federal, state, local, tribal, or territorial laws, rules, and regulations, including local business and workplace guidance, and in correctional facilities and homeless shelters. Prevention measures are still recommended for unvaccinated people.

CDC recommends universal indoor masking for all teachers, staff, students, and visitors to schools, regardless of vaccination status. Children should return to full-time in-person learning in the fall with proper prevention strategies in place.

# Recommendations for Outdoor Settings

Current data suggest the risk of transmission of SARS-CoV-2 in outdoor settings is minimal. In general, fully vaccinated people do not need to wear a mask outdoors. Fully vaccinated people might choose to wear a mask in crowded outdoor settings if they or someone in their household is immunocompromised.

# Travel

Fully vaccinated travelers are less likely to get and spread SARS-CoV-2 and can now travel at low risk to themselves within the United States. International travelers need to pay close attention to the situation at

their international destinations before traveling due to the spread of new variants and because the burden of COVID-19 varies globally.

Wearing a mask over your nose and mouth is required on planes, buses, trains, and other forms of public transportation traveling into, within, or out of the United States and while indoors at U.S. transportation hubs such as airports and stations. Travelers are not required to wear a mask in outdoor areas of a conveyance (like on open deck areas of a ferry or the uncovered top deck of a bus).

# Domestic travel (within the United States or to a U.S. territory)

- Fully vaccinated travelers do not need to get a SARS-CoV-2 viral test before or after domestic travel, unless testing is required by local, state, or territorial health authorities.
- Fully vaccinated travelers do not need to self-quarantine following domestic travel.
- For more information, see Domestic Travel During COVID-19.

# International travel

- Fully vaccinated travelers do not need to get tested before leaving the United States unless required by their destination.
- Fully vaccinated air travelers coming to the United States from abroad, including U.S. citizens, are still required to have a negative SARS-CoV-2 viral test result or documentation of recovery from COVID-19 before they board a flight to the United States.
- International travelers arriving in the United States are still recommended to get a SARS-CoV-2 viral test 3-5 days after travel regardless of vaccination status.
- Fully vaccinated travelers do not need to self-quarantine in the United States following international travel.
- For more information, see International Travel During COVID-19.

Top of Page

# Recommendations for Isolation, Quarantine and Testing

The following recommendations apply to non-healthcare settings. Guidance for residents and staff of healthcare settings can be found in the Updated Healthcare Infection Prevention Control Recommendations in Response to COVID-19 Vaccination.

# Fully vaccinated people with COVID-19 symptoms

Although the risk that fully vaccinated people could become infected with COVID-19 is low, any fully vaccinated person who experiences symptoms consistent with COVID-19 should isolate themselves from others, be clinically evaluated for COVID-19, and tested for SARS-CoV-2 if indicated. The symptomatic fully vaccinated person should inform their healthcare provider of their vaccination status at the time of presentation to care.

# Fully vaccinated people with no COVID-like symptoms following an exposure to someone with suspected or confirmed COVID-19

Fully vaccinated people should be tested 3-5 days following a known exposure to someone with suspected or confirmed COVID-19 and wear a mask in public indoor settings for 14 days or until they receive a negative test result. They should isolate if they test positive. Fully vaccinated people who live in a household with someone who is immunosuppressed, at increased risk of severe disease, or unvaccinated (including children <12 years of age) could also consider masking at home for 14 days following a known exposure or until they receive a negative test result. Most fully vaccinated people with no COVID-like symptoms do not need to quarantine or be restricted from work following an exposure to someone with suspected or confirmed COVID-19, if they follow the testing and masking recommendation above.

Fully vaccinated people should monitor for symptoms of COVID-19 for 14 days following an exposure.

# Fully vaccinated people with no COVID-19-like symptoms and no known exposure to someone with suspected or confirmed COVID-19

It is recommended that fully vaccinated people with no COVID-19-like symptoms and no known exposure should be exempted from routine screening testing programs, if feasible.

Top of Page

For Healthcare Professionals

COVID-19 Clinical Resources

†This guidance applies to COVID-19 vaccines currently authorized for emergency use by the U.S. Food and Drug Administration: Pfizer-BioNTech, Moderna, and Johnson & Johnson (J&J)/Janssen COVID-19 vaccines. This guidance can also be applied to COVID-19 vaccines that have been authorized for emergency use by the World Health Organization (e.g. AstraZeneca/Oxford).

# Previous Updates

**As of July 27, 2021**

- Added a recommendation for fully vaccinated people to wear a mask in public indoor settings in areas of substantial or high transmission.

**As of July 16, 2021**

- Updated considerations for people who are immunocompromised

**As of July 12, 2021**

- Updated Choosing Safer Activities infographic with new considerations for the example activity for outdoor gatherings with fully vaccinated and unvaccinated people.

Last Updated July 28, 2021

☐ Vaccines

Getting Your Vaccine

Types of Vaccines Available

Possible Side Effects

## After You're Fully Vaccinated

### Guidance for Fully Vaccinated People

Safety & Monitoring

Effectiveness

Myths & Facts

Frequently Asked Questions

About COVID-19 Vaccines

Communication Resources

## Get Email Updates

To receive email updates about COVID-19, enter your email address:

Email Address

What's this?

Submit

**HAVE QUESTIONS?**

Visit CDC-INFO

Call 800-232-4636

Email CDC-INFO

Open 24/7

**CDC INFORMATION**
About CDC
Jobs
Funding
Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

**CONNECT WITH CDC**

☐ ☐ ☐ ☐
☐

☐ ☐ ☐ ☐
☐

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer
☐

**LANGUAGE ASSISTANCE**

Español

☐☐☐☐

Tiếng Việt

☐☐☐

Tagalog

Русский

العربية

Kreyòl Ayisyen

Français

Polski

Português

Italiano

Deutsch

□□□

فارسی

English

# COVID-19



☐ Back to COVID-19 Home

# Reported Adverse Events

Updated July 26, 2021

| Languages |

Print

## Safety of COVID-19 Vaccines

Some people have no side effects. Many people have reported side effects that may affect their ability to do daily activities, but they should go away within a few days.

Are the Vaccines Safe?

# What You Need to Know

- COVID-19 vaccines are **safe and effective**.

- Millions of people in the United States have received COVID-19 vaccines under the most intense safety monitoring in U.S. history.

- CDC recommends everyone 12 years and older get vaccinated as soon as possible to help protect against COVID-19 and the related, potentially severe complications that can occur.

- CDC, the U.S. Food and Drug Administration (FDA), and other federal agencies are monitoring the safety of COVID-19 vaccines.

- Adverse events described on this page have been reported to the <u>Vaccine Adverse Event Reporting</u>

System (VAERS) ☐ .

- VAERS accepts reports of any adverse event following any vaccination.
- Reports of adverse events to VAERS following vaccination, including deaths, do not necessarily mean that a vaccine caused a health problem.

Serious adverse events after COVID-19 vaccination are rare but may occur.

For public awareness and in the interest of transparency, CDC is providing timely updates on the following serious adverse events of interest:

- **Anaphylaxis after COVID-19 vaccination is rare** and has occurred in approximately 2 to 5 people per million vaccinated in the United States. Severe allergic reactions, including anaphylaxis, can occur after any vaccination. If this occurs, vaccination providers can effectively and immediately treat the reaction. Learn more about COVID-19 vaccines and allergic reactions, including anaphylaxis.

- **Thrombosis with thrombocytopenia syndrome (TTS) after Johnson & Johnson's Janssen (J&J/Janssen) COVID-19 vaccination is rare.** As of July 26, 2021, more than 13 million doses of the J&J/Janssen COVID-19 Vaccine have been given in the United States. CDC and FDA identified 39 confirmed reports of people who got the J&J/Janssen COVID-19 Vaccine and later developed TTS. Women younger than 50 years old especially should be aware of the rare but increased risk of this adverse event. There are other COVID-19 vaccine options available for which this risk has not been seen. Learn more about J&J/Janssen COVID-19 Vaccine and TTS.
    - To date, two confirmed cases of TTS following mRNA COVID-19 vaccination (Moderna) have been reported to VAERS after more than 328 million doses of mRNA COVID-19 vaccines administered in the United States. Based on available data, there is not an increased risk for TTS after mRNA COVID-19 vaccination.

- CDC and FDA are monitoring reports of Guillain-Barré Syndrome (GBS) in people who have received the J&J/Janssen COVID-19 Vaccine. GBS is a rare disorder where the body's immune system damages nerve cells, causing muscle weakness and sometimes paralysis. Most people fully recover from GBS, but some have permanent nerve damage. After more than 13 million J&J/Janssen COVID-19 Vaccine doses administered, there have been around 137 preliminary reports of GBS identified in VAERS as of July 22. These cases have largely been reported about 2 weeks after vaccination and mostly in men, many 50 years and older. CDC will continue to monitor for and evaluate reports of GBS occurring after COVID-19 vaccination and will share more information as it becomes available.

- **Myocarditis and pericarditis after COVID-19 vaccination are rare.** As of July 26, 2021, VAERS has received 1,194 reports of myocarditis or pericarditis among people ages 30 and younger who received COVID-19 vaccine. Most cases have been reported after mRNA COVID-19 vaccination

(Pfizer-BioNTech or Moderna), particularly in male adolescents and young adults. Through follow-up, including medical record reviews, CDC and FDA have confirmed 699 reports of myocarditis or pericarditis. CDC and its partners are investigating these reports to assess whether there is a relationship to COVID-19 vaccination. Learn more about COVID-19 vaccines and myocarditis.

- **Reports of death after COVID-19 vaccination are rare**. More than 342 million doses of COVID-19 vaccines were administered in the United States from December 14, 2020, through July 26, 2021. During this time, VAERS received 6,340 reports of death (0.0019%) among people who received a COVID-19 vaccine. FDA requires healthcare providers to report any death after COVID-19 vaccination to VAERS, even if it's unclear whether the vaccine was the cause. **Reports of adverse events to VAERS following vaccination, including deaths, do not necessarily mean that a vaccine caused a health problem.** A review of available clinical information, including death certificates, autopsy, and medical records, has not established a causal link to COVID-19 vaccines. However, recent reports indicate a plausible causal relationship between the J&J/Janssen COVID-19 Vaccine and TTS, a rare and serious adverse event—blood clots with low platelets—which has caused deaths.

## Related Pages

> Safety of COVID-19 Vaccines

> Vaccine Adverse Event Reporting System (VAERS): What Reports Mean and How VAERS Works

☐    ☐    ☐    ☐

Last Updated July 26, 2021

☐ Vaccines

Getting Your Vaccine

Types of Vaccines Available

Possible Side Effects

After You're Fully Vaccinated

# Safety & Monitoring

V-safe

Allergic Reactions

## Safety of COVID-19 Vaccines

J&J/Janssen Update

Myocarditis and Pericarditis

**Reported Adverse Events**

Vaccine Reporting Systems

Effectiveness

Myths & Facts

Frequently Asked Questions

About COVID-19 Vaccines

Communication Resources

☐ Get Email Updates

To receive email updates about COVID-19, enter your email address:

Email Address

What's this?

Submit

**HAVE QUESTIONS?**

☐
Visit CDC-INFO

☐
Call 800-232-4636

☐
Email CDC-INFO

☐
Open 24/7

**CDC INFORMATION**
About CDC
Jobs
Funding
Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

**CONNECT WITH CDC**

☐ ☐ ☐ ☐
☐

☐ ☐ ☐ ☐
☐

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer
☐

**LANGUAGE ASSISTANCE**

Español

☐☐☐☐

Tiếng Việt

□□□

Tagalog

Русский

العربية

Kreyòl Ayisyen

Français

Polski

Português

Italiano

Deutsch

□□□

فارسی

English

EXHIBIT N

California Implements First-in-the-Nation Measures to Encourage State Employees and Health Care Workers to Get Vaccinated | California Governor



Office of Governor
**GAVIN NEWSOM**

Home     Newsroom

☐ Translate

# the-Nation Measures to Encourage State Employees and Health Care Workers to Get Vaccinated

Published: Jul 26, 2021

*State employees and health care workers must show proof of vaccination or get tested regularly*

*State encourages all local governments and businesses to adopt similar measures*

SACRAMENTO – Today, the State of California is taking decisive action to combat the spread of COVID-19 and protect vulnerable communities – implementing a first-in-the-nation standard to require all state workers and workers in health care and high-risk congregate settings to either show proof of full vaccination or be tested at least once per week, and encourage all local government and other employers to adopt a similar protocol.

"We are now dealing with a pandemic of the unvaccinated, and it's going to take renewed efforts to protect Californians from the dangerous Delta variant," said Governor Gavin Newsom. "As the state's largest employer, we are leading by example and requiring all state and health care workers to show proof of vaccination or be tested regularly, and we are encouraging local governments and businesses to do the same. Vaccines are safe

## Recent News

[Governor Newsom Announces Appointments 7.30.21](#)

[Governor Newsom Signs Emergency Proclamation to Expedite Clean Energy Projects and Relieve Demand on the Electrical Grid During Extreme Weather Events This Summer as Climate Crisis Threatens Western](#)

– they protect our family, those who truly can't get vaccinated, our children and our economy. Vaccines are the way we end this pandemic."

California will also be requiring health care settings to verify that workers are fully vaccinated or tested regularly. Unvaccinated workers will be subject to at least weekly COVID-19 testing and will be required to wear appropriate PPE. This requirement also applies to high-risk congregate settings like adult and senior residential facilities, homeless shelters and jails. These steps will help protect vulnerable patients and residents.

The new policy for state workers will take effect August 2 and testing will be phased in over the next few weeks. The new policy for health care workers and congregate facilities will take effect on August 9, and health care facilities will have until August 23 to come into full compliance.

Despite California leading the nation in vaccinations, with more than 44 million doses administered and 75 percent of the eligible population having received at least one dose, the state is seeing increasing numbers of people who refused to get the vaccine being admitted to the ICU and dying. This increase is heavily due to the Delta variant, which is more contagious and kills people faster:

- As of last week, California's statewide case rate more than quadrupled from a low in May of 1.9 cases/100,000/day to at least 9.5 cases/100,000.
- Our testing positivity was at a low of 0.7 percent in June, now it has risen to 5.2 percent.
- Our hospitalizations were at a low in June of under 900, and we are now approaching 3,000.
- The vast majority of new cases are among the unvaccinated, with 600 percent higher case rates among the unvaccinated than for those who are vaccinated.

"California has administered more vaccines than any other state, with 75 percent of those eligible having gotten at least

States Following Governor Newsom's First-in-the-Nation Vaccination Measures, California Employers Follow Suit

California Governor Newsom Surveys Tamarack Fire Damage with Nevada Governor Sisolak, Meets with Fire and Emergency Officials at Incident Command Center

Governor Newsom Signs Legislation to Make

one dose, and we were weeks ahead of meeting President Biden's 70 percent goal. But we must do more to fight disinformation and encourage vaccine-hesitant communities and individuals," said Health and Human Services Secretary Dr. Mark Ghaly. "The Delta variant is up to 60 percent more infectious than the Alpha strain but many times more infectious than the original COVID-19 strain. If you have been waiting to get vaccinated, now is the time."

The State of California remains committed to keeping the state's economy open while ensuring that employees feel safe in the workplace. To that end, the state is encouraging employers to ensure that their employees are vaccinated, and will lead by example by implementing new vaccination measures for state and health care workers.

In addition to these new measures, the state continues its efforts to vaccinate Californians. Last week, California surpassed 2 million newly vaccinated individuals since launching its incentive program, Vax for the Win. The program increased HPI Q1 vaccinations, and increased doses administered to the Latinx population by 10 percent. It also successfully slowed the rate of decline that California was experiencing in vaccination rates. The program's peak showed a 33 percent increase in vaccinations, "outpacing the inoculation trends in much of the country," including more recently a 4.4 percent increase for the week ending July 14 – a promising sign in California, as vaccination rates declined nationwide.

In the preliminary data for the week ending July 25th, we've seen an increase of 16 percent in the number of people getting their first doses of the Johnson and Johnson vaccine, from 220,294 two weeks ago to 254,807 this past week. We are seeing this trend very broadly, representing 51 out of 58 counties.

Other Vaccine Outreach and Equity Efforts. California has proactively engaged in a multi-pronged outreach and incentives

College More Affordable and Accessible in California

### Archives

July 2021

June 2021

May 2021

April 2021

March 2021

February 2021

January 2021

December 2020

November 2020

October 2020

September 2020

August 2020

July 2020

June 2020

strategy to reach holdouts, especially in communities hardest hit by the pandemic and those who have been particularly reticent (e.g., homebound, limited transportation and flexibility, higher vaccine hesitancy and/or living in a more remote area). Efforts have become more surgical and continue to be data driven: transitioning from mass sites to smaller, more targeted efforts, and continuing to intensify our outreach and education efforts by deploying mobile capacity, and to otherwise make it easier for people to access vaccines. Such outreach/incentive efforts to achieve greater equity have included:

*Multimedia and Multicultural Public Education Campaigns.* The Let's Get to Immunity Campaign is now accompanied by a youth 12+ campaign reaching families. Efforts are leveraging partnerships with over 400 ethnic media outlets that cover over 25 languages, including indigenous languages.

*'Get Out the Vaccine' Phone Bank and Door-Knocking Campaign.* Modeled after successful ground-level campaigns, the state "Get Out the Vaccine" effort coordinates with 70 community-based organizations. As of July 13, the "Get Out the Vaccine" campaign has resulted in 1.3 million conversations to promote vaccination via personal phone calls and door-to-door canvassing in less advantaged neighborhoods in California.

*Supporting Community Organizations for Outreach, Direct Appointment Assistance and Referrals.* California's investment and public-private partnerships total $127.7 million in support of approximately 500 community-based organizations for outreach to underserved communities. A subset of these organizations have already facilitated approximately 184,986 vaccine appointments and 710,429 referrals to appointment platforms or providers.

*Health Care Provider-Based Efforts.* A new community provider grant program called the CalVaxGrant, (beginning July 12 through August 13), is intended to reimburse practices up to $55,000 to set up their offices as small, community-based

May 2020

April 2020

March 2020

February 2020

January 2020

December 2019

November 2019

October 2019

September 2019

August 2019

July 2019

June 2019

May 2019

April 2019

March 2019

February 2019

January 2019

Categories

COVID-19 vaccination sites. As trusted messengers, doctors, pediatricians and providers can proactively reach community members as well as answer questions when patients come into their offices. The Department of Health Care Services is also working to increase the vaccination rates of Medi-Cal recipients including: engaging managed care plans in weekly calls, encouraging their outreach to patients, sharing weekly beneficiary vaccination data and disseminating a Quality Improvement Postcard with strategies and techniques to address vaccine hesitancy.

*Community/Business Partnerships*

- **Barbershops:** "Helping Communities Help Themselves" is a partnership with the Black Beauty and Wellness Foundation that has established 100 statewide barber shops, beauty shops and beauty supply stores as community-based COVID-19 resource centers. Shops and stylists are promoting information about vaccines and masking up until you are vaccinated.
- **Higher Educational Institutions:** The campaign has engaged the CCC, CSU, and UC systems, as well as the AICCU (Association of Independent California Colleges and Universities) to share information about the Vaccinate ALL 58 campaign and opportunities to partner and encourage more students to get vaccinated so they can safely return to campus. Each of these groups was provided a customizable toolkit.
- **School-Based Organizations:** School based organizations are assisting with a back-to-school push through a toolkit and earned media opportunities.
- **Faith-Based Outreach:** Faith-based organizations and leaders are trusted messengers in their communities. Through these networks, the campaign is able to provide clear, factual and accurate information about vaccines to faith leaders and their communities. Many of these partnerships have led to co-hosting vaccine clinics in the

"On the Record" Column

All Executive Orders

FAQs

Media Advisories

OFP Press Releases

Press Releases

Proclamations

Top Story

faith communities.

- **McDonald's:** McDonald's is hosting over 150 vaccination pop-up clinics at more than 80 restaurant locations in 11 different LHJs across the state. 107 have already been completed.
- **Six Flags:** More than 42,000 of 50,000 available Six Flag tickets have been distributed at 100 participating vaccine locations throughout the state, mainly in low-income and high-need areas. Nearly every participating provider reported that the ticket incentive helped improve patient turnout, with one provider saying tickets helped encourage patients' family members to get vaccinated. Another provider reported seeing a large uptick in teens deciding to get vaccinated to get a ticket.

### ###

Back to Top    Contact    Conditions of Use    Privacy Policy    Accessibility
Amber Alert    Register to Vote    Organizational Chart
Clemency – Commutations and Pardons    Archive

☐ ☐ ☐

Copyright © 2021 State of California        Powered by: CAWeb Publishing Service



VA » Office of Public and Intergovernmental Affairs » News Releases

# Office of Public and Intergovernmental Affairs

## VA mandates COVID-19 vaccines among its medical employees including VHA facilities staff

July 26, 2021, 02:19:00 PM

Printable Version
**Need Viewer Software?**

## VA mandates COVID-19 vaccines among its medical employees including VHA facilities staff

**WASHINGTON** — July 26 Department of Veterans Affairs Secretary Denis McDonough announced he will make COVID-19 vaccines mandatory for Title 38 VA health care personnel — including physicians, dentists, podiatrists, optometrists, registered nurses, physician assistants, expanded-function dental auxiliaries and chiropractors — who work in Veterans Health Administration facilities, visit VHA facilities or provide direct care to those VA serves.

VA is taking this necessary step to keep the Veterans it serves safe.

Each employee will have eight weeks to be fully vaccinated.

"We're mandating vaccines for Title 38 employees because it's the best way to keep Veterans safe, especially as the Delta variant spreads across the country," McDonough said. "Whenever a Veteran or VA employee sets foot in a VA facility, they deserve to know that we have done everything in our power to protect them from COVID-19. With this mandate, we can once again make — and keep — that fundamental promise."

The department's decision is supported by numerous medical organizations including the American Hospital Association, America's Essential Hospitals and a Multisociety group of the leading Infectious Disease Societies. The American Medical Association, American Nurses Association, American College of Physicians, American Academy of Pediatrics, Association of American Medical Colleges, and National Association for Home Care and Hospice also endorsed mandating COVID-19 vaccination for health care workers.

In recent weeks, VA has lost four employees to COVID-19 — all of whom were unvaccinated. At least three of those employees died because of the increasingly prevalent Delta variant. There has also been an outbreak among unvaccinated employees and trainees at a VA Law Enforcement Training Center, the third such outbreak during the pandemic.

All VA employees are eligible to be vaccinated at no personal expense at any of our facilities. Employees will also receive four hours of paid administrative leave after demonstrating they have been vaccinated. Information in these FAQs or clinician and Veteran videos has details about the vaccine, its safety and effectiveness.

The safety and wellbeing of our Veterans and personnel is paramount.

### 

## Disclaimer of Hyperlinks

The appearance of external hyperlinks does not constitute endorsement by the Department of Veterans Affairs of the linked web sites, or the information, products or services contained therein. For other than authorized VA activities, the Department does not exercise any editorial control over the information you may find at these locations. All links are provided with the intent of meeting the mission of the Department and the VA website. Please let us know about existing external links which you believe are inappropriate and about specific additional external links which you believe ought to be included by emailing newmedia@va.gov.

People wishing to receive e-mail from VA with the latest news releases and updated fact sheets can subscribe to the VA Office of Public Affairs Distribution List.

Back to News Releases Index

## Search VA News Releases

**Search for *(Required)*:** [                                    ]

VA mandates COVID-19 vaccines among its medical employees including VHA facilities staff

| | |
|---|---|
| **Search in:** | Select One |
| **Sort by:** | Select One |
| **Begin Date *(Required)*:** | (mm/dd/yyyy) |
| **End Date:** | (mm/dd/yyyy) |

Search

Last updated: Jul 26, 2021

## Veteran programs and services

Homeless Veterans

Women Veterans

Minority Veterans

LGBTQ+ Veterans

PTSD

Mental health

Adaptive sports and special events

VA outreach events

National Resource Directory

## More VA resources

VA forms

VA health care providers

Accredited claims representatives

VA mobile apps

Veterans Service Organizations (VSOs)

State Veterans Affairs offices

Doing business with VA

Careers at VA

VA outreach materials

Your VA welcome kit

## Get VA updates

VAntage Point blog

Email updates

Facebook

Instagram

Twitter

Flickr

YouTube

All VA social media

## In crisis? Talk to someone now

## Get answers

Resources and support

Contact us

## Call us

800-698-2411

TTY: 711

## Visit a medical center or regional office

Find a VA location

## Language assistance

Español | Tagalog | Other languages

VA | U.S. Department
of Veterans Affairs

VA mandates COVID-19 vaccines among its medical employees including VHA facilities staff

Accessibility | No FEAR Act Data | Office of Inspector General | Plain language |

Privacy, policies, and legal information | VA Privacy Service | Freedom of Information Act (FOIA) |

USA.gov | VA performance dashboard | Veterans Portrait Project

(Slip Opinion)

# Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization

Section 564(e)(1)(A)(ii)(III) of the Food, Drug, and Cosmetic Act concerns only the provision of information to potential vaccine recipients and does not prohibit public or private entities from imposing vaccination requirements for a vaccine that is subject to an emergency use authorization.

July 6, 2021

## MEMORANDUM OPINION FOR THE DEPUTY COUNSEL TO THE PRESIDENT

Section 564 of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3,[1] authorizes the Food and Drug Administration ("FDA") to issue an "emergency use authorization" ("EUA") for a medical product, such as a vaccine, under certain emergency circumstances. This authorization permits the product to be introduced into interstate commerce and administered to individuals even when FDA has not approved the product for more general distribution pursuant to its standard review process. Section 564 directs FDA—"to the extent practicable" given the emergency circumstances and "as the [agency] finds necessary or appropriate to protect the public health"—to impose "[a]ppropriate" conditions on each EUA. FDCA § 564(e)(1)(A). Some of these conditions are designed to ensure that recipients of the product "are informed" of certain things, including "the option to accept or refuse administration of the product." *Id.* § 564(e)(1)(A)(ii)(III).

Since December 2020, FDA has granted EUAs for three vaccines to prevent coronavirus disease 2019 ("COVID-19"). In each of these authorizations, FDA imposed the "option to accept or refuse" condition by requiring the distribution to potential vaccine recipients of a Fact Sheet that states: "It is your choice to receive or not receive [the vaccine]. Should you decide not to receive it, it will not change your standard medical care." *E.g.*, FDA, Fact Sheet for Recipients and Caregivers at 5 (revised June 25, 2021), https://www.fda.gov/media/144414/download

---

[1] Because it is commonly referred to by its FDCA section number, and for the sake of simplicity, we will refer to this provision as section 564, rather than by its United States Code citation.

("Pfizer Fact Sheet"). In recent months, many public and private entities have announced that they will require individuals to be vaccinated against COVID-19—for instance, in order to attend school or events in person, or to return to work or be hired into a new job. We will refer to such policies as "vaccination requirements," though we note that these policies typically are conditions on employment, education, receipt of services, and the like rather than more direct legal requirements.[2]

In light of these developments, you have asked whether the "option to accept or refuse" condition in section 564 prohibits entities from imposing such vaccination requirements while the only available vaccines for COVID-19 remain subject to EUAs. We conclude, consistent with FDA's interpretation, that it does not. This language in section 564 specifies only that certain information be provided to potential vaccine recipients and does not prohibit entities from imposing vaccination requirements.[3]

## I.

### A.

Federal law generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" unless and until FDA has approved the drug or product as safe and effective for its intended uses. *See, e.g.*, FDCA §§ 301(a), 505(a), 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C § 262(a). A vaccine is both a drug and a biological product. *See* FDCA § 201(g), 21 U.S.C § 321(g); 42 U.S.C. § 262(i)(1). Consistent with section 564, we will generally refer to it here as a "product." *See* FDCA § 564(a)(4)(C) (defining "product" to mean "a drug, device, or biological product").

---

[2] For an example of the latter, see our discussion in Part II.B of a hypothetical military order to service members.

[3] We do not address whether other federal, state, or local laws or regulations, such as the Americans with Disabilities Act ("ADA"), might restrict the ability of public or private entities to adopt particular vaccination policies. *See, e.g.*, Equal Employment Opportunity Commission, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (updated June 28, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (discussing the ADA).

In 2003, Congress addressed a problem raised in emergency situations where "the American people may be placed at risk of exposure to biological, chemical, radiological, or nuclear agents, and the diseases caused by such agents," but where, "[u]nfortunately, there may not be approved or available countermeasures to treat diseases or conditions caused by such agents," even though "a drug, biologic, or device is highly promising in treating [such] a disease or condition." H.R. Rep. No. 108-147, pt. 1, at 2 (2003). President George W. Bush had flagged this problem in his 2003 State of the Union Address, in which he proposed Project BioShield, a legislative initiative "to quickly make available effective vaccines and treatments against agents like anthrax, botulinum toxin, Ebola, and plague." *Address Before a Joint Session of the Congress on the State of the Union* (Jan. 28, 2003), 1 Pub. Papers of Pres. George W. Bush 82, 86 (2003). Among the principal components of the proposed Project BioShield legislation were provisions to enable FDA to authorize medical products for use during emergencies even before they are proven to be safe and effective under ordinary FDA review. *See, e.g.*, H.R. 2122, 108th Cong. § 4 (2003). At that time, the only alternative to ordinary FDA approval was 21 U.S.C. § 355(i), which authorizes FDA to exempt drugs from the ordinary approval requirements where the drug is "intended solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of drugs." Such a cabined investigational new drug ("IND") exemption does not, however, allow the widespread dissemination of a drug for general public use in response to an emergency. *See* H.R. Rep. No. 108-147, pt. 1, at 2.

Congress enacted a version of the Project BioShield legislation's EUA provision in the National Defense Authorization Act for Fiscal Year 2004 as section 564 of the FDCA. *See* Pub. L. No. 108-136, § 1603(a), 117 Stat. 1392, 1684 (2003) (codified at 21 U.S.C. § 360bbb-3).[4] Section 564 authorizes the Secretary of Health and Human Services ("HHS")—who has delegated to FDA the authorities under the statute at issue here—to authorize the introduction into interstate commerce of a drug, device, or biological product intended for use in an actual or potential emergency even though the product has not yet been generally approved as safe and

---

[4] The statute has been amended since, including when Congress enacted the Project BioShield Act the following year. *See* Pub. L. No. 108-276, § 4(a), 118 Stat. 835, 853 (2004).

effective for its intended use. FDCA § 564(a)(1)–(2); *see also* FDA, *Emergency Use Authorization of Medical Products and Related Authorities: Guidance for Industry and Other Stakeholders* at 3 n.6 (Jan. 2017) ("EUA Guidance") (noting delegation of most of the Secretary's authorities under section 564 to FDA).[5]

The most pertinent part of section 564 for purposes of your question has remained materially the same since Congress first enacted the statute in 2003. Subsection (e)(1)(A),[6] titled "Required conditions," provides:

> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable [emergency] circumstances . . . , shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including [certain specified conditions].

---

[5] The current version of section 564(a)(1) provides in full:

> Notwithstanding any provision of this chapter and section 351 of the Public Health Service Act, and subject to the provisions of this section, the Secretary may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use").

The "declaration under subsection (b)" refers to a declaration by the Secretary "that the circumstances exist justifying" an EUA, which must be made "on the basis" of one or more types of emergencies or threats. FDCA § 564(b)(1). FDA can grant an EUA where, "based on the totality of scientific evidence available to the Secretary, including data from adequate and well-controlled clinical trials, if available," FDA finds that "it is reasonable to believe," among other things, that "the product may be effective in diagnosing, treating, or preventing" a "serious or life-threatening disease or condition" caused by a "biological, chemical, radiological, or nuclear agent or agents" (a standard less onerous than for final approval of the product); that "the known and potential benefits of the product, when used to diagnose, prevent, or treat such disease or condition, outweigh the known and potential risks of the product"; and that "there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition." FDCA § 564(c).

[6] Subsection (e)(1) applies to a product that FDA has not approved as safe and effective for any intended use, whereas subsection (e)(2) applies to an unapproved use of an otherwise approved product. The COVID-19 vaccines fall under the former category, but the statute applies the condition at issue here to the latter category as well. *See* FDCA § 564(e)(2)(A).

The statute then lists a number of such conditions, including "[a]p-propriate conditions designed to ensure that individuals to whom the product is administered are informed" of certain information. FDCA § 564(e)(1)(A)(ii). This information includes the fact that FDA "has authorized the emergency use of the product," "the significant known and potential benefits and risks of such use," and "the extent to which such benefits and risks are unknown." *Id.* § 564(e)(1)(A)(ii)(I)–(II). Most relevant here, section 564(e)(1)(A)(ii)(III) directs FDA to impose conditions on an EUA "designed to ensure that individuals to whom the product is administered are informed . . . of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks."

In the same section of the 2004 National Defense Authorization Act, Congress also enacted another provision, codified as 10 U.S.C. § 1107a, which is specific to the U.S. military and which expressly refers to the "option to accept or refuse" condition described in section 564(e)(1)(A)(ii)(III). Pub. L. No. 108-136, sec. 1603(b)(1), § 1107a, 117 Stat. at 1690. Subsection (a) of this law provides that when an EUA product is administered to members of the armed forces, "the condition described in section 564(e)(1)(A)(ii)(III) . . . and required under paragraph (1)(A) or (2)(A) of such section 564(e), designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President" and "only if the President determines, in writing, that complying with such requirement is not in the interests of national security." 10 U.S.C. § 1107a(a)(1).

## B.

In the years after Congress enacted section 564, FDA issued dozens of EUAs in response to various public-health emergencies. *See, e.g.*, Authorization of Emergency Use of the Antiviral Product Peramivir Accompanied by Emergency Use Information; Availability, 74 Fed. Reg. 56,644 (Nov. 2, 2009) (antiviral drug to treat swine flu). The agency's use of EUAs increased dramatically with the onset of the COVID-19 pandemic in 2020. As of January 2021, the agency had issued more than 600 EUAs for products to combat COVID-19, including drugs, tests, personal protective equipment, and ventilators. *See* FDA, *FDA COVID-19 Pandemic*

*Recovery and Preparedness Plan (PREPP) Initiative: Summary Report* at 6 (Jan. 2021); *cf. id.* at 24 (noting that FDA issued 65 EUAs prior to COVID-19). More importantly for present purposes, the agency has granted EUAs for three COVID-19 vaccines manufactured by Pfizer, Moderna, and Janssen, respectively. *See* Authorizations of Emergency Use of Certain Biological Products During the COVID-19 Pandemic; Availability, 86 Fed. Reg. 28,608 (May 27, 2021) (Janssen); Authorizations of Emergency Use of Two Biological Products During the COVID-19 Pandemic; Availability, 86 Fed. Reg. 5200 (Jan. 19, 2021) (Pfizer and Moderna).

As we have explained, section 564 of the FDCA contemplates that each EUA will be subject to various conditions. For the three COVID-19 vaccines, FDA implemented the "option to accept or refuse" condition described in section 564(e)(1)(A)(ii)(III) in the following manner: In each letter granting the EUA, FDA established as a "condition[] of authorization" that FDA's "Fact Sheet for Recipients and Caregivers" be made available to potential vaccine recipients. *See, e.g.*, Letter for Pfizer Inc. from RADM Denise M. Hinton, Chief Scientist, FDA at 6, 9 (updated June 25, 2021), https://www.fda.gov/media/150386/download ("Pfizer EUA Letter"). The Fact Sheet in question states (to take the Pfizer vaccine as an example): "It is your choice to receive or not receive the Pfizer-BioNTech COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care." Pfizer Fact Sheet at 5. We understand that this approach is consistent with FDA's general practice for EUAs. *See* EUA Guidance at 24–25 (discussing the use of fact sheets to inform recipients of EUA products "[t]hat they have the option to accept or refuse the EUA product and of any consequences of refusing administration of the product").

As access to the COVID-19 vaccines has become widespread, numerous educational institutions, employers, and other entities across the United States have announced that they will require individuals to be vaccinated against COVID-19 as a condition of employment, enrollment, participation, or some other benefit, service, relationship, or access.[7] For

---

[7] *See, e.g.*, Rukmini Callimachi, *For Colleges, Vaccine Mandates Often Depend on Which Party Is in Power*, N.Y. Times (May 22, 2021), https://www.nytimes.com/2021/05/22/us/college-vaccine-universities.html; Tracy Rucinski, *Delta will require COVID-19*

instance, certain schools will require vaccination in order for students to attend class in person, and certain employers will require vaccination as a condition of employment.

Some have questioned whether such entities can lawfully impose such requirements in light of the fact that section 564 instructs that potential vaccine recipients are to be informed that they have the "option to accept or refuse" receipt of the vaccine.[8] In the past few months, several lawsuits have also been filed challenging various entities' vaccination requirements on the same theory.[9] The only judicial decision to have addressed this issue so far summarily rejected the challenge. *See Bridges v. Houston Methodist Hosp.*, No. 4:21-cv-01774, 2021 WL 2399994, at *1–2 (S.D. Tex. June 12, 2021), *appeal docketed*, No. 21-20311 (5th Cir. June 14, 2021).

## II.

### A.

We conclude that section 564(e)(1)(A)(ii)(III) concerns only the provision of information to potential vaccine recipients and does not prohibit public or private entities from imposing vaccination requirements for vaccines that are subject to EUAs. By its terms, the provision directs only that potential vaccine recipients be "informed" of certain information, including "the option to accept or refuse administration of the product."

---

*vaccine for new employees*, Reuters (May 14, 2021, 9:16 AM), https://www.reuters.com/world/us/delta-will-require-covid-19-vaccine-new-employees-2021-05-14/.

[8] *See, e.g.*, Letter for Thomas C. Galligan Jr., Interim President, Louisiana State University, from Jeff Landry, Attorney General of Louisiana (May 28, 2021); *see also* Advisory Committee on Immunization Practices, Summary Report at 56 (Aug. 26, 2020), https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-2020-08-508.pdf (reporting a CDC official as saying that EUA vaccines are not allowed to be mandatory).

[9] *See, e.g.*, Defendant's Notice of Removal, *Bridges v. Methodist Hosp.*, No. 4:21-cv-01774 (S.D. Tex. June 1, 2021), 2021 WL 2221293 (referencing complaint); Complaint, *Neve v. Birkhead*, No. 1:21-cv-00308 (M.D.N.C. Apr. 16, 2021), 2021 WL 1902937; Complaint, *Cal. Educators for Med. Freedom v. L.A. Unified Sch. Dist.*, No. 21-cv-2388 (C.D. Cal. Mar. 17, 2021), 2021 WL 1034618; Complaint, *Legaretta v. Macias*, No. 2:21-cv-00179 (D.N.M. Feb. 28, 2021), 2021 WL 909707; *see also* Complaint, *Health Freedom Defense Fund v. City of Hailey*, No. 1:21-cv-00212-DCN (D. Idaho May 14, 2021), 2021 WL 1944543 (making a similar argument about a face-mask requirement).

FDCA § 564(e)(1)(A)(ii)(III). In the sense used here, the word "inform" simply means to "give (someone) facts or information; tell." *New Oxford American Dictionary* 891 (3d ed. 2010); *see also, e.g.*, *Webster's Third New International Dictionary* 1160 (2002) (similar). Consistent with this understanding, the conditions of authorization that FDA imposed for the COVID-19 vaccines require that potential vaccine recipients receive FDA's Fact Sheet, *see, e.g.*, Pfizer EUA Letter at 6, 9, which states that recipients have a "choice to receive or not receive" the vaccine, *see, e.g.*, Pfizer Fact Sheet at 5. Neither the statutory conditions of authorization nor the Fact Sheet itself purports to restrict public or private entities from insisting upon vaccination in any context. *Cf. Bridges*, 2021 WL 2399994, at *2 (explaining that section 564 "confers certain powers and responsibilities to the Secretary of [HHS] in an emergency" but that it "neither expands nor restricts the responsibilities of private employers"). [10]

The language of another provision of section 564 reflects the limited scope of operation of section 564(e)(1)(A)(ii)(III). Section 564(*l*) provides that "this section [i.e., section 564] only has legal effect on a person who carries out an activity for which an authorization under this section is issued." This provision expressly forecloses any limitation on the activities of the vast majority of entities who would insist upon vaccination requirements, because most do not carry out any activity for which an EUA is issued.

To be sure, the EUA conditions effectively require parties administering the products to do so in particular ways—including that they only administer the products to individuals after providing them the informational Fact Sheets that FDA prescribes—and some of those entities,

---

[10] Earlier-introduced versions of section 564(e)(1)(A)(ii)(III) in 2003 referred to "*any* option to accept or refuse administration of the product" (as opposed to "the" option), a formulation that might have even more clearly conveyed the informational nature of the condition. *See, e.g.*, S. 15, 108th Cong. § 204 (Mar. 11, 2003) (emphasis added). We have not found any explanation for why Congress revised the provision to refer to "the option," so we ascribe little significance to the change—either for or against our reading of the statute. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989); *Trainmobile Co. v. Whirls*, 331 U.S. 40, 61 (1947) ("The interpretation of statutes cannot safely be made to rest upon mute intermediate legislative maneuvers."). In 10 U.S.C. § 1107a(a), moreover, Congress used the alternative formulation "*an* option to accept or refuse" in referring to the condition in section 564(e)(1)(A)(ii)(III) as it relates to the armed forces. (Emphasis added.) This discrepancy counsels further against assigning interpretive weight to the change from "any" to "the" in the legislative development of section 564.

such as universities, might also impose vaccination requirements (e.g., on their students and employees). There is no indication, however, that Congress intended to regulate such entities except with respect to the circumstances of their administration of the product itself. *See, e.g.,* FDCA § 564(e)(1)(B)(ii) (authorizing FDA to establish "[a]ppropriate conditions on who may administer the product with respect to the emergency use of the product, and on the categories of individuals to whom, *and the circumstances under which, the product may be administered with respect to such use*" (emphasis added)). And it would have been odd for Congress to have done so, for in that case the entities choosing to administer EUA products would be limited in their relations with third parties (e.g., students, employees) in ways that analogous entities that did not administer the products were not.

This reading of the "option to accept or refuse" condition to be informational follows not only from the plain text of the provision, but also from the surrounding requirements in section 564(e)(1)(A)(ii). *See, e.g., Lagos v. United States*, 138 S. Ct. 1684, 1688–89 (2018) (relying on the canon of "*noscitur a sociis*, the well-worn Latin phrase that tells us that statutory words are often known by the company they keep"). In addition to requiring that potential recipients be informed of "the option to accept or refuse administration of the product," the statute also requires that they be informed of "the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." FDCA § 564(e)(1)(A)(ii)(III). Similarly, the two other provisions in subsection (e)(1)(A)(ii) require that individuals be informed of the fact that FDA "has authorized the emergency use of the product" and of "the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown." *Id.* § 564(e)(1)(A)(ii)(I)–(II). These provisions all appear to require only that certain factual information be conveyed to those who might use the product.

Indeed, if Congress had intended to restrict entities from imposing EUA vaccination requirements, it chose a strangely oblique way to do so, embedding the restriction in a provision that on its face requires only that individuals be provided with certain information (and grouping that requirement with other conditions that are likewise informational in nature). Congress could have created such a restriction by simply stating that persons (or certain categories of persons) may not require others to

9

use an EUA product. *See Kloeckner v. Solis*, 568 U.S. 41, 52 (2012) (rejecting a statutory interpretation positing that Congress took a "roundabout way" and an "obscure path" to reach "a simple result"); *cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

Our reading of section 564(e)(1)(A)(ii)(III) does not fully explain why Congress created a scheme in which potential users of the product would be informed that they have "the option to accept or refuse" the product. The legislative history of the 2003 statute does not appear to offer any clear explanation. Perhaps Congress viewed section 564(e)(1)(A)(ii)(III) as a variation on the "informed consent" requirement that applies to human subjects in "investigational drug" settings,[11] the only other context in which FDA may (in a limited fashion) authorize the introduction of unapproved drugs into interstate commerce. Or perhaps Congress included this condition to ensure that potential users of an EUA product would not misunderstand what the likely impact of declining to use that product would be.

The information conveyed pursuant to the "option" clause continues to be a true statement about a material fact of importance to potential vac-

---

[11] Section 355(i)(4) of title 21 provides that an IND exemption to the premarket approval requirement may only apply if the manufacturer or sponsor of an expert investigation requires the experts in question to certify

that they will inform any human beings to whom such drugs, or any controls used in connection therewith, are being administered, or their representatives, that such drugs are being used for investigational purposes and will obtain the consent of such human beings or their representatives, except where it is not feasible, it is contrary to the best interests of such human beings, or the proposed clinical testing poses no more than minimal risk to such human beings and includes appropriate safeguards.

Congress did not include this same "informed consent" requirement as part of the EUA provision in 2003, perhaps out of concern that it would not be practicable in emergency situations. *See Project BioShield: Contracting for the Health and Security of the American Public: Hearing Before the H. Comm. on Gov't Reform*, 108th Cong. 33 (Apr. 4, 2003) (statement of Mark B. McClellan, Commissioner, FDA, and Anthony S. Fauci, Director, National Institute of Allergy and Infectious Diseases) ("Because urgent situations may require mass inoculations and/or drug treatments, such informed consent requirements may prove impossible to implement within the necessary time frame when trying to achieve the public health goal of protecting Americans from the imminent danger."); *see also infra* note 15 (explaining that the informed consent requirements contained in 21 U.S.C. § 355(i)(4) do not apply to EUA products).

cine recipients—virtually all such persons continue to have the "option" of refusing the vaccine in the sense that there is no direct legal requirement that they receive it. *See Bridges*, 2021 WL 2399994, at *2 (noting that an employer's vaccination policy was not "coercive" because an employee "can freely choose to accept or refuse a COVID-19 vaccine; however, if she refuses, she will simply need to work somewhere else"); Wen W. Shen, Cong. Research Serv., R46745, *State and Federal Authority to Mandate COVID-19 Vaccination* at 4 (Apr. 2, 2021) ("[E]xisting vaccination mandates—as they are typically structured—generally do not interfere with . . . an individual's right to refuse in that context. Rather, they impose secondary consequences—often in the form of exclusion from certain desirable activities, such as schools or employment—in the event of refusal." (footnote omitted)); *Black's Law Dictionary* 1121 (7th ed. 1999) (defining "option" as relevant here as "[t]he right or power to choose; something that may be chosen"); *The American Heritage Dictionary of the English Language* 1235 (4th ed. 2000) (similar); *cf.* FDCA § 564(e)(1)(A)(ii)(III) (directing that potential vaccine recipients be informed not only of "the option to accept or refuse administration of the product" but also of "the *consequences*, if any, of refusing administration of the product" (emphasis added)).

Importantly, however, and consistent with FDA's views, we also read section 564 as giving FDA some discretion to modify or omit "the option to accept or refuse" notification, or to supplement it with additional information, if and when circumstances change. As noted above, the statute directs FDA to establish the section 564(e)(1)(A) conditions "to the extent practicable given the applicable [emergency] circumstances" and "as the [agency] finds necessary or appropriate to protect the public health." FDCA § 564(e)(1)(A). Both of these phrases—"to the extent practicable" and "as the [agency] finds necessary or appropriate"—are generally understood to confer discretion on an agency. *See, e.g., Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012) (per curiam) ("to the extent practicable"); *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1128 (6th Cir. 1996) (collecting cases on "necessary" and "appropriate"). Moreover, the portion of section 564 that deals specifically with informational conditions provides that FDA should establish "[a]ppropriate" conditions designed to ensure that potential vaccine recipients are informed of the "option to accept or refuse" an EUA product. FDCA § 564(e)(1)(A)(ii). These qualifiers indicate that FDA's responsibility to

impose the "option to accept or refuse" condition is not absolute and that the agency has some discretion to modify or omit the condition when the agency finds the notification would not be "practicable" given the emergency circumstances, or to determine that changes to the notification are "necessary or appropriate to protect the public health." *See* EUA Guidance at 24 n.46 (noting circumstances in which the "option to accept or refuse" notification might not be practicable).[12] In addition, section 564 gives FDA the authority to supplement the information that is conveyed to potential vaccine recipients, including information about "the consequences, if any, of refusing administration of the product." FDCA § 564(e)(1)(A)(ii)(III); *see also id.* § 564(e)(1)(B) (noting that FDA has the authority to impose additional conditions as the agency "finds necessary or appropriate to protect the public health"); EUA Guidance at 22 n.40, 26–27 (noting this point). Together, then, these provisions of section 564 give FDA the authority to adapt to changing circumstances and to ensure that the information conveyed to potential users of EUA products is accurate.[13]

Although many entities' vaccination requirements preserve an individual's ultimate "option" to refuse an EUA vaccine, they nevertheless impose sometimes-severe adverse consequences for exercising that option (such as not being able to enroll at a university). Under such circumstances, FDA could theoretically choose to supplement the conditions of authorization to notify potential vaccine recipients of the possibility of such consequences (or to make it even clearer that the consequences described

---

[12] Indeed, FDA has recently exercised its discretion not to require certain of the statutorily specified conditions with respect to the current COVID-19 pandemic. We understand that FDA has amended or plans to amend the EUAs for the COVID-19 vaccines so as not to require compliance with several of the conditions—including the "option to accept or refuse" notification—when the vaccines are exported to other countries. *See, e.g.*, Pfizer EUA Letter at 10.

[13] Congress's use of the phrase "Required conditions" in the title of subsection (e)(1)(A) and its specification of certain conditions in the statute suggest that Congress may have presumed that FDA would generally find that the specified conditions are "necessary or appropriate" and thus impose them. As we discuss above, however, the operative text of section 564 indicates that FDA has some discretion to modify, omit, or supplement the conditions in some circumstances. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021) ("[A] title or heading should never be allowed to override the plain words of a text." (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 222 (2012)) (alteration in original)).

in the Fact Sheets are limited to consequences related to medical care). As we have noted, however, section 564 does not limit the ability of entities to impose vaccination requirements, and FDA would not be required to change the Fact Sheets in order to allow them to impose such requirements.[14]

\* \* \* \* \*

As noted above, FDA agrees with our interpretation of section 564. On a few occasions, however, FDA has made statements that could be understood as saying that the condition described in section 564(e)(1)(A)(ii)(III) prohibits entities (particularly the U.S. military) from requiring the use of EUA products. In 2005, for instance, FDA issued an EUA that permitted the use of a vaccine for the prevention of inhalation anthrax by individuals between 18 and 65 years of age who were deemed by the Department of Defense ("DOD") to be at heightened risk of exposure due to an attack with anthrax. As a condition of that authorization, the agency required DOD to inform potential vaccine recipients "of the option to accept or refuse administration of [the vaccine]." Authorization of Emergency Use of Anthrax Vaccine Adsorbed for Prevention of Inhalation Anthrax by Individuals at Heightened Risk of Exposure Due to Attack With Anthrax; Availability, 70 Fed. Reg. 5452, 5455 (Feb. 2, 2005). That EUA continued:

> With respect to [the] condition . . . relating to the option to accept or refuse administration of [the vaccine], the [immunization program] will be revised to give personnel the option to refuse vaccination. Individuals who refuse anthrax vaccination will not be punished. Refusal may not be grounds for any disciplinary action under the Uniform Code of Military Justice. Refusal may not be grounds for any adverse personnel action. Nor would either military or civilian personnel be considered non-deployable or processed for separation

---

[14] FDA further informs us that, wholly apart from FDA's own authority to change the Fact Sheet, nothing in the FDCA would prohibit an administrator of the vaccine who also has a relationship with the individuals to whom the vaccine is offered (e.g., students in a university that offers the vaccine) from supplementing the FDA Fact Sheet at the point of administration with factually accurate information about the possible nonmedical consequences of the person choosing not to use the product (e.g., that she might not be permitted to enroll).

> based on refusal of anthrax vaccination. There may be no penalty or
> loss of entitlement for refusing anthrax vaccination.

*Id.*; *see also id.* (allowing DOD to inform recipients that "military and
civilian leaders strongly recommend anthrax vaccination, but . . . individ-
uals [subject to the vaccination program] may not be forced to be vac-
cinated" and that "the issue of mandatory vaccination will be reconsidered
by [DOD] after FDA completes its administrative process."). FDA includ-
ed the same information in its later extension of that EUA. *See* Authoriza-
tion of Emergency Use of Anthrax Vaccine Adsorbed for Prevention of
Inhalation Anthrax by Individuals at Heightened Risk of Exposure Due
to Attack With Anthrax; Extension; Availability, 70 Fed. Reg. 44,657,
44,659–60 (Aug. 3, 2005).

In addition, although it is less than clear, certain FDA guidance could
be read as saying that section 564 confers an affirmative "option" or
"opportunity" to refuse EUA products. *See* EUA Guidance at 24 n.46
(implying that the condition in section 564(e)(1)(A)(ii)(III)—which is
subject to waiver for the armed forces under 10 U.S.C. § 1107a—protects
"the option for members of the armed forces to accept or refuse admin-
istration of an EUA product"); *Guidance Emergency Use Authorization of
Medical Products*, 2007 WL 2319112, at \*15 (July 1, 2007) (stating that
"[r]ecipients must have an opportunity to accept or refuse the EUA prod-
uct").

These statements do not affect our conclusion. Neither the 2005 anthrax
vaccine EUA nor the later FDA guidance articulated a legal interpretation
of section 564(e)(1)(A)(ii)(III)'s text. And FDA appears to have insisted
upon the voluntariness requirement for DOD in the anthrax vaccine EUA
because of then-recent litigation in which a court enjoined DOD from
implementing a mandatory vaccination program based upon a different
statutory provision that is inapplicable to EUAs. *See Doe v. Rumsfeld*, 341
F. Supp. 2d 1 (D.D.C. 2004) (relying on 10 U.S.C. § 1107); *Doe v.
Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003) (same); *see also* 70 Fed.
Reg. at 44,660 (requiring DOD to tell vaccine recipients the following:
"On October 27, 2004, the U.S. District Court for the District of Columbia
issued an Order declaring unlawful and prohibiting mandatory anthrax
vaccinations to protect against inhalation anthrax, pending further FDA
action. The *Court's injunction* means you have the right to refuse to take
the vaccine without fear of retaliation." (emphasis added)); 70 Fed. Reg.

at 5454 (discussing litigation); *see also infra* note 15 (explaining that 10 U.S.C. § 1107(f) is inapplicable to EUAs).

## B.

Section 564(e)(1)(A)(ii)(III) also raises a question about how to understand its cognate provision regarding the use of EUA products by the armed forces. As we noted above, in the same 2003 legislation that first created section 564, Congress also added the following provision to title 10 of the United States Code:

> In the case of the administration of [an EUA] product . . . to members of the armed forces, the condition described in section 564(e)(1)(A)(ii)(III) . . . and required under paragraph (1)(A) or (2)(A) of such section 564(e), designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security.

10 U.S.C. § 1107a(a)(1).[15] On its own terms, this provision appears to be consistent with—and even to support—our reading of section 564, as it likewise describes the "option to accept or refuse" condition in purely informational terms. The language refers to the President's authority to

---

[15] Section 1107(f) of title 10—an earlier-enacted provision—contains a similar, but importantly different, waiver authority. Specifically, that provision authorizes the President, "[i]n the case of the administration of an [IND] or a drug unapproved for its applied use to a member of the armed forces in connection with the member's participation in a particular military operation," to waive "the prior consent requirement imposed under [21 U.S.C. § 355(i)(4)]." 10 U.S.C. § 1107(f)(1). That "prior consent requirement," which is imposed for purposes of the human clinical trials for which FDA authorizes "investigational" use of unapproved drugs, *see* 21 U.S.C. § 355(i)(4), does not apply to EUA products, which typically are more widely available, *see* FDCA § 564(k); EUA Guidance at 24 ("informed consent as generally required under FDA regulations is not required for administration or use of an EUA product" (footnote omitted)). Thus, the waiver provision in section 1107(f) is inapplicable to EUA products. *See* 10 U.S.C. § 1107(f)(2) (explaining that this waiver authority applies only in cases in which "prior consent for administration of a particular drug is required" because the Secretary of HHS determines that the drug "is subject to the [IND] requirements of [21 U.S.C. § 355(i)]"); *see also id.* § 1107(f)(4) (defining the relevant consent requirements as those in 21 U.S.C. § 355(i)).

waive a requirement to provide certain information, not to waive any right or affirmative "option" to refuse administration of the product itself.

On the other hand, the conference report on the legislation that created both section 564 of the FDCA and section 1107a of title 10 described the latter provision in the following way:

> [This provision] would authorize the President to waive *the right of service members to refuse administration of a product* if the President determines, in writing, that affording service members the right to refuse the product is not feasible, is contrary to the best interests of the members affected, or is not in the interests of national security.

H.R. Rep. No. 108-354, at 782 (2003) (Conf. Rep.) (emphasis added). This language indicates that the conferees may have believed that section 1107a concerns some "right" of members of the armed forces to refuse the use of EUA products. And that belief may help to explain why section 1107a allows only the President to exercise the waiver authority.

Consistent with this legislative history and the vesting of the waiver authority in the President, DOD informs us that it has understood section 1107a to mean that DOD may not require service members to take an EUA product that is subject to the condition regarding the option to refuse, unless the President exercises the waiver authority contained in section 1107a. *See* DOD Instruction 6200.02, § E3.4 (Feb. 27, 2008) ("In the event that an EUA granted by the Commissioner of Food and Drugs includes a condition that potential recipients *are provided an option* to refuse administration of the product, the President may . . . waive *the option* to refuse for administration of the medical product to members of the armed forces." (emphasis added)). Moreover, we understand that DOD's position reflects the concern that service members, unlike civilian employees, could face serious criminal penalties if they refused a superior officer's order to take an EUA product. *See* 10 U.S.C. § 890; *see also United States v. Kisala,* 64 M.J. 50 (C.A.A.F. 2006) (upholding a soldier's punishment for refusing to take a vaccine). In this way, service members do not have the same "option" to refuse to comply with a vaccination requirement as other members of the public.

As noted above, it does appear that certain members of Congress thought that section 1107a concerned a prohibition against requiring service members to take an EUA product—perhaps on the view that the

16

waiver authority in section 1107a paralleled the one in 10 U.S.C. § 1107(f), which does effectively prohibit the administration of an IND product in a clinical trial without first obtaining the individual's affirmative, informed *consent. See supra* note 15 (distinguishing these waiver authorities).[16] As explained, however, that intent or expectation is not realized in the text of section 564(e)(1)(A)(ii)(III), which section 1107a expressly cross-references. *Cf. Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1164 n.11 (9th Cir. 2019) ("[T]he plain and unambiguous statutory text simply does not accomplish what the Conference Report says it was designed to accomplish."); *Goldring v. Dist. of Columbia*, 416 F.3d 70, 75 (D.C. Cir. 2005) ("A sentence in a conference report cannot rewrite unambiguous statutory text[.]").[17] We therefore conclude that section 1107a does not change our interpretation of section 564 of the FDCA.

As for DOD's concern about service members who would lack a meaningful option to refuse EUA products because of the prospect of sanction, including possibly prosecution, we note that any difference between our view and the assumption reflected in the conference report should have limited practical significance. Given that FDA has imposed the "option to accept or refuse" condition for the COVID-19 vaccines by requiring

---

[16] It is possible the conferees assumed that the new EUA legislation would, in effect, carry over from the earlier IND provision of the FDCA, *see supra* Part I.A and note 11, the condition that a covered product may not be administered to an individual without that person's express, informed consent—a condition that applies to the military when it undertakes the sort of clinical trial with an IND that 21 U.S.C. § 355(i) governs, *see supra* note 11. Congress did not include such a consent requirement in section 564, however, perhaps because EUA products are not limited, as INDs are, to use in human clinical trials, but are instead authorized for more widespread use in the case of a declared emergency. *See supra* Part I.A and notes 11 & 15.

[17] Moreover, the legislative history as a whole is not uniform on this point. The earlier House report, for instance, described the condition in purely informational terms. *See* H.R. Rep. No. 108-147, pt. 3, at 33 (2003) ("New section 564(k) [an earlier but similarly worded version of what became 10 U.S.C. § 1107a] pertains to members of the Armed Forces and, among other things, it specifies that the President may waive requirements designed to ensure that such members are *informed* of the option to accept or refuse administration of an emergency use product, upon certain findings[.]" (emphasis added)); *see also Milner v. Dep't of the Navy*, 562 U.S. 562, 574 (2011) (noting that "[l]egislative history, for those who take it into account, is meant to clear up ambiguity, not create it," and thus, "[w]hen presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language").

distribution of its Fact Sheet containing the "[i]t is your choice to receive or not receive" language, DOD is required to provide service members with the specified notification unless the President waives the condition pursuant to 10 U.S.C. § 1107a. And because DOD has informed us that it understandably does not want to convey inaccurate or confusing information to service members—that is, telling them that they have the "option" to refuse the COVID-19 vaccine if they effectively lack such an option because of a military order—DOD should seek a presidential waiver before it imposes a vaccination requirement.

### III.

For the reasons set forth above, we conclude that section 564 of the FDCA does not prohibit public or private entities from imposing vaccination requirements, even when the only vaccines available are those authorized under EUAs.

DAWN JOHNSEN
*Acting Assistant Attorney General*
*Office of Legal Counsel*

## Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization

Section 564(e)(1)(A)(ii)(III) of the Food, Drug, and Cosmetic Act concerns only the provision of information to potential vaccine recipients and does not prohibit public or private entities from imposing vaccination requirements for a vaccine that is subject to an emergency use authorization.

July 6, 2021

MEMORANDUM OPINION FOR THE
DEPUTY COUNSEL TO THE PRESIDENT

Section 564 of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3,[1] authorizes the Food and Drug Administration ("FDA") to issue an "emergency use authorization" ("EUA") for a medical product, such as a vaccine, under certain emergency circumstances. This authorization permits the product to be introduced into interstate commerce and administered to individuals even when FDA has not approved the product for more general distribution pursuant to its standard review process. Section 564 directs FDA—"to the extent practicable" given the emergency circumstances and "as the [agency] finds necessary or appropriate to protect the public health"—to impose "[a]ppropriate" conditions on each EUA. FDCA § 564(e)(1)(A). Some of these conditions are designed to ensure that recipients of the product "are informed" of certain things, including "the option to accept or refuse administration of the product." *Id.* § 564(e)(1)(A)(ii)(III).

Since December 2020, FDA has granted EUAs for three vaccines to prevent coronavirus disease 2019 ("COVID-19"). In each of these authorizations, FDA imposed the "option to accept or refuse" condition by requiring the distribution to potential vaccine recipients of a Fact Sheet that states: "It is your choice to receive or not receive [the vaccine]. Should you decide not to receive it, it will not change your standard medical care." *E.g.*, FDA, Fact Sheet for Recipients and Caregivers at 5 (revised June 25, 2021), https://www.fda.gov/media/144414/download

---

[1] Because it is commonly referred to by its FDCA section number, and for the sake of simplicity, we will refer to this provision as section 564, rather than by its United States Code citation.

1

("Pfizer Fact Sheet"). In recent months, many public and private entities have announced that they will require individuals to be vaccinated against COVID-19—for instance, in order to attend school or events in person, or to return to work or be hired into a new job. We will refer to such policies as "vaccination requirements," though we note that these policies typically are conditions on employment, education, receipt of services, and the like rather than more direct legal requirements.[2]

In light of these developments, you have asked whether the "option to accept or refuse" condition in section 564 prohibits entities from imposing such vaccination requirements while the only available vaccines for COVID-19 remain subject to EUAs. We conclude, consistent with FDA's interpretation, that it does not. This language in section 564 specifies only that certain information be provided to potential vaccine recipients and does not prohibit entities from imposing vaccination requirements.[3]

## I.

### A.

Federal law generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" unless and until FDA has approved the drug or product as safe and effective for its intended uses. *See, e.g.*, FDCA §§ 301(a), 505(a), 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C § 262(a). A vaccine is both a drug and a biological product. *See* FDCA § 201(g), 21 U.S.C § 321(g); 42 U.S.C. § 262(i)(1). Consistent with section 564, we will generally refer to it here as a "product." *See* FDCA § 564(a)(4)(C) (defining "product" to mean "a drug, device, or biological product").

---

[2] For an example of the latter, see our discussion in Part II.B of a hypothetical military order to service members.

[3] We do not address whether other federal, state, or local laws or regulations, such as the Americans with Disabilities Act ("ADA"), might restrict the ability of public or private entities to adopt particular vaccination policies. *See, e.g.*, Equal Employment Opportunity Commission, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (updated June 28, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (discussing the ADA).

In 2003, Congress addressed a problem raised in emergency situations where "the American people may be placed at risk of exposure to biological, chemical, radiological, or nuclear agents, and the diseases caused by such agents," but where, "[u]nfortunately, there may not be approved or available countermeasures to treat diseases or conditions caused by such agents," even though "a drug, biologic, or device is highly promising in treating [such] a disease or condition." H.R. Rep. No. 108-147, pt. 1, at 2 (2003). President George W. Bush had flagged this problem in his 2003 State of the Union Address, in which he proposed Project BioShield, a legislative initiative "to quickly make available effective vaccines and treatments against agents like anthrax, botulinum toxin, Ebola, and plague." *Address Before a Joint Session of the Congress on the State of the Union* (Jan. 28, 2003), 1 Pub. Papers of Pres. George W. Bush 82, 86 (2003). Among the principal components of the proposed Project BioShield legislation were provisions to enable FDA to authorize medical products for use during emergencies even before they are proven to be safe and effective under ordinary FDA review. *See, e.g.*, H.R. 2122, 108th Cong. § 4 (2003). At that time, the only alternative to ordinary FDA approval was 21 U.S.C. § 355(i), which authorizes FDA to exempt drugs from the ordinary approval requirements where the drug is "intended solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of drugs." Such a cabined investigational new drug ("IND") exemption does not, however, allow the widespread dissemination of a drug for general public use in response to an emergency. *See* H.R. Rep. No. 108-147, pt. 1, at 2.

Congress enacted a version of the Project BioShield legislation's EUA provision in the National Defense Authorization Act for Fiscal Year 2004 as section 564 of the FDCA. *See* Pub. L. No. 108-136, § 1603(a), 117 Stat. 1392, 1684 (2003) (codified at 21 U.S.C. § 360bbb-3).[4] Section 564 authorizes the Secretary of Health and Human Services ("HHS")—who has delegated to FDA the authorities under the statute at issue here—to authorize the introduction into interstate commerce of a drug, device, or biological product intended for use in an actual or potential emergency even though the product has not yet been generally approved as safe and

---

[4] The statute has been amended since, including when Congress enacted the Project BioShield Act the following year. *See* Pub. L. No. 108-276, § 4(a), 118 Stat. 835, 853 (2004).

effective for its intended use. FDCA § 564(a)(1)–(2); *see also* FDA, *Emergency Use Authorization of Medical Products and Related Authorities: Guidance for Industry and Other Stakeholders* at 3 n.6 (Jan. 2017) ("EUA Guidance") (noting delegation of most of the Secretary's authorities under section 564 to FDA).[5]

The most pertinent part of section 564 for purposes of your question has remained materially the same since Congress first enacted the statute in 2003. Subsection (e)(1)(A),[6] titled "Required conditions," provides:

> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable [emergency] circumstances . . . , shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including [certain specified conditions].

---

[5] The current version of section 564(a)(1) provides in full:

> Notwithstanding any provision of this chapter and section 351 of the Public Health Service Act, and subject to the provisions of this section, the Secretary may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use").

The "declaration under subsection (b)" refers to a declaration by the Secretary "that the circumstances exist justifying" an EUA, which must be made "on the basis" of one or more types of emergencies or threats. FDCA § 564(b)(1). FDA can grant an EUA where, "based on the totality of scientific evidence available to the Secretary, including data from adequate and well-controlled clinical trials, if available," FDA finds that "it is reasonable to believe," among other things, that "the product may be effective in diagnosing, treating, or preventing" a "serious or life-threatening disease or condition" caused by a "biological, chemical, radiological, or nuclear agent or agents" (a standard less onerous than for final approval of the product); that "the known and potential benefits of the product, when used to diagnose, prevent, or treat such disease or condition, outweigh the known and potential risks of the product"; and that "there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition." FDCA § 564(c).

[6] Subsection (e)(1) applies to a product that FDA has not approved as safe and effective for any intended use, whereas subsection (e)(2) applies to an unapproved use of an otherwise approved product. The COVID-19 vaccines fall under the former category, but the statute applies the condition at issue here to the latter category as well. *See* FDCA § 564(e)(2)(A).

The statute then lists a number of such conditions, including "[a]p-propriate conditions designed to ensure that individuals to whom the product is administered are informed" of certain information. FDCA § 564(e)(1)(A)(ii). This information includes the fact that FDA "has authorized the emergency use of the product," "the significant known and potential benefits and risks of such use," and "the extent to which such benefits and risks are unknown." *Id.* § 564(e)(1)(A)(ii)(I)–(II). Most relevant here, section 564(e)(1)(A)(ii)(III) directs FDA to impose conditions on an EUA "designed to ensure that individuals to whom the product is administered are informed . . . of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks."

In the same section of the 2004 National Defense Authorization Act, Congress also enacted another provision, codified as 10 U.S.C. § 1107a, which is specific to the U.S. military and which expressly refers to the "option to accept or refuse" condition described in section 564(e)(1)(A)(ii)(III). Pub. L. No. 108-136, sec. 1603(b)(1), § 1107a, 117 Stat. at 1690. Subsection (a) of this law provides that when an EUA product is administered to members of the armed forces, "the condition described in section 564(e)(1)(A)(ii)(III) . . . and required under para-graph (1)(A) or (2)(A) of such section 564(e), designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President" and "only if the President determines, in writing, that complying with such requirement is not in the interests of national security." 10 U.S.C. § 1107a(a)(1).

### B.

In the years after Congress enacted section 564, FDA issued dozens of EUAs in response to various public-health emergencies. *See, e.g.*, Author-ization of Emergency Use of the Antiviral Product Peramivir Accompa-nied by Emergency Use Information; Availability, 74 Fed. Reg. 56,644 (Nov. 2, 2009) (antiviral drug to treat swine flu). The agency's use of EUAs increased dramatically with the onset of the COVID-19 pandemic in 2020. As of January 2021, the agency had issued more than 600 EUAs for products to combat COVID-19, including drugs, tests, personal protec-tive equipment, and ventilators. *See* FDA, *FDA COVID-19 Pandemic*

*Recovery and Preparedness Plan (PREPP) Initiative: Summary Report* at 6 (Jan. 2021); *cf. id.* at 24 (noting that FDA issued 65 EUAs prior to COVID-19). More importantly for present purposes, the agency has granted EUAs for three COVID-19 vaccines manufactured by Pfizer, Moderna, and Janssen, respectively. *See* Authorizations of Emergency Use of Certain Biological Products During the COVID-19 Pandemic; Availability, 86 Fed. Reg. 28,608 (May 27, 2021) (Janssen); Authorizations of Emergency Use of Two Biological Products During the COVID-19 Pandemic; Availability, 86 Fed. Reg. 5200 (Jan. 19, 2021) (Pfizer and Moderna).

As we have explained, section 564 of the FDCA contemplates that each EUA will be subject to various conditions. For the three COVID-19 vaccines, FDA implemented the "option to accept or refuse" condition described in section 564(e)(1)(A)(ii)(III) in the following manner: In each letter granting the EUA, FDA established as a "condition[] of author-ization" that FDA's "Fact Sheet for Recipients and Caregivers" be made available to potential vaccine recipients. *See, e.g.*, Letter for Pfizer Inc. from RADM Denise M. Hinton, Chief Scientist, FDA at 6, 9 (updated June 25, 2021), https://www.fda.gov/media/150386/download ("Pfizer EUA Letter"). The Fact Sheet in question states (to take the Pfizer vaccine as an example): "It is your choice to receive or not receive the Pfizer-BioNTech COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care." Pfizer Fact Sheet at 5. We under-stand that this approach is consistent with FDA's general practice for EUAs. *See* EUA Guidance at 24–25 (discussing the use of fact sheets to inform recipients of EUA products "[t]hat they have the option to accept or refuse the EUA product and of any consequences of refusing admin-istration of the product").

As access to the COVID-19 vaccines has become widespread, numer-ous educational institutions, employers, and other entities across the United States have announced that they will require individuals to be vaccinated against COVID-19 as a condition of employment, enrollment, participation, or some other benefit, service, relationship, or access.[7] For

---

[7] *See, e.g.*, Rukmini Callimachi, *For Colleges, Vaccine Mandates Often Depend on Which Party Is in Power*, N.Y. Times (May 22, 2021), https://www.nytimes.com/2021/05/22/us/college-vaccine-universities.html; Tracy Rucinski, *Delta will require COVID-19*

instance, certain schools will require vaccination in order for students to attend class in person, and certain employers will require vaccination as a condition of employment.

Some have questioned whether such entities can lawfully impose such requirements in light of the fact that section 564 instructs that potential vaccine recipients are to be informed that they have the "option to accept or refuse" receipt of the vaccine.[8] In the past few months, several lawsuits have also been filed challenging various entities' vaccination requirements on the same theory.[9] The only judicial decision to have addressed this issue so far summarily rejected the challenge. *See Bridges v. Houston Methodist Hosp.*, No. 4:21-cv-01774, 2021 WL 2399994, at *1–2 (S.D. Tex. June 12, 2021), *appeal docketed*, No. 21-20311 (5th Cir. June 14, 2021).

## II.

### A.

We conclude that section 564(e)(1)(A)(ii)(III) concerns only the provision of information to potential vaccine recipients and does not prohibit public or private entities from imposing vaccination requirements for vaccines that are subject to EUAs. By its terms, the provision directs only that potential vaccine recipients be "informed" of certain information, including "the option to accept or refuse administration of the product."

---

*vaccine for new employees*, Reuters (May 14, 2021, 9:16 AM), https://www.reuters.com/world/us/delta-will-require-covid-19-vaccine-new-employees-2021-05-14/.

[8] *See, e.g.*, Letter for Thomas C. Galligan Jr., Interim President, Louisiana State University, from Jeff Landry, Attorney General of Louisiana (May 28, 2021); *see also* Advisory Committee on Immunization Practices, Summary Report at 56 (Aug. 26, 2020), https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-2020-08-508.pdf (reporting a CDC official as saying that EUA vaccines are not allowed to be mandatory).

[9] *See, e.g.*, Defendant's Notice of Removal, *Bridges v. Methodist Hosp.*, No. 4:21-cv-01774 (S.D. Tex. June 1, 2021), 2021 WL 2221293 (referencing complaint); Complaint, *Neve v. Birkhead*, No. 1:21-cv-00308 (M.D.N.C. Apr. 16, 2021), 2021 WL 1902937; Complaint, *Cal. Educators for Med. Freedom v. L.A. Unified Sch. Dist.*, No. 21-cv-2388 (C.D. Cal. Mar. 17, 2021), 2021 WL 1034618; Complaint, *Legaretta v. Macias*, No. 2:21-cv-00179 (D.N.M. Feb. 28, 2021), 2021 WL 909707; *see also* Complaint, *Health Freedom Defense Fund v. City of Hailey*, No. 1:21-cv-00212-DCN (D. Idaho May 14, 2021), 2021 WL 1944543 (making a similar argument about a face-mask requirement).

FDCA § 564(e)(1)(A)(ii)(III). In the sense used here, the word "inform" simply means to "give (someone) facts or information; tell." *New Oxford American Dictionary* 891 (3d ed. 2010); *see also, e.g., Webster's Third New International Dictionary* 1160 (2002) (similar). Consistent with this understanding, the conditions of authorization that FDA imposed for the COVID-19 vaccines require that potential vaccine recipients receive FDA's Fact Sheet, *see, e.g.*, Pfizer EUA Letter at 6, 9, which states that recipients have a "choice to receive or not receive" the vaccine, *see, e.g.*, Pfizer Fact Sheet at 5. Neither the statutory conditions of authorization nor the Fact Sheet itself purports to restrict public or private entities from insisting upon vaccination in any context. *Cf. Bridges*, 2021 WL 2399994, at *2 (explaining that section 564 "confers certain powers and responsibilities to the Secretary of [HHS] in an emergency" but that it "neither expands nor restricts the responsibilities of private employers").[10]

The language of another provision of section 564 reflects the limited scope of operation of section 564(e)(1)(A)(ii)(III). Section 564(*l*) provides that "this section [i.e., section 564] only has legal effect on a person who carries out an activity for which an authorization under this section is issued." This provision expressly forecloses any limitation on the activities of the vast majority of entities who would insist upon vaccination requirements, because most do not carry out any activity for which an EUA is issued.

To be sure, the EUA conditions effectively require parties administering the products to do so in particular ways—including that they only administer the products to individuals after providing them the informational Fact Sheets that FDA prescribes—and some of those entities,

---

[10] Earlier-introduced versions of section 564(e)(1)(A)(ii)(III) in 2003 referred to "*any* option to accept or refuse administration of the product" (as opposed to "the" option), a formulation that might have even more clearly conveyed the informational nature of the condition. *See, e.g.*, S. 15, 108th Cong. § 204 (Mar. 11, 2003) (emphasis added). We have not found any explanation for why Congress revised the provision to refer to "the option," so we ascribe little significance to the change—either for or against our reading of the statute. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989); *Trainmobile Co. v. Whirls*, 331 U.S. 40, 61 (1947) ("The interpretation of statutes cannot safely be made to rest upon mute intermediate legislative maneuvers."). In 10 U.S.C. § 1107a(a), moreover, Congress used the alternative formulation "*an* option to accept or refuse" in referring to the condition in section 564(e)(1)(A)(ii)(III) as it relates to the armed forces. (Emphasis added.) This discrepancy counsels further against assigning interpretive weight to the change from "any" to "the" in the legislative development of section 564.

such as universities, might also impose vaccination requirements (e.g., on their students and employees). There is no indication, however, that Congress intended to regulate such entities except with respect to the circumstances of their administration of the product itself. *See, e.g.*, FDCA § 564(e)(1)(B)(ii) (authorizing FDA to establish "[a]ppropriate conditions on who may administer the product with respect to the emergency use of the product, and on the categories of individuals to whom, *and the circumstances under which, the product may be administered with respect to such use*" (emphasis added)). And it would have been odd for Congress to have done so, for in that case the entities choosing to administer EUA products would be limited in their relations with third parties (e.g., students, employees) in ways that analogous entities that did not administer the products were not.

This reading of the "option to accept or refuse" condition to be informational follows not only from the plain text of the provision, but also from the surrounding requirements in section 564(e)(1)(A)(ii). *See, e.g.*, *Lagos v. United States*, 138 S. Ct. 1684, 1688–89 (2018) (relying on the canon of "*noscitur a sociis*, the well-worn Latin phrase that tells us that statutory words are often known by the company they keep"). In addition to requiring that potential recipients be informed of "the option to accept or refuse administration of the product," the statute also requires that they be informed of "the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." FDCA § 564(e)(1)(A)(ii)(III). Similarly, the two other provisions in subsection (e)(1)(A)(ii) require that individuals be informed of the fact that FDA "has authorized the emergency use of the product" and of "the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown." *Id.* § 564(e)(1)(A)(ii)(I)–(II). These provisions all appear to require only that certain factual information be conveyed to those who might use the product.

Indeed, if Congress had intended to restrict entities from imposing EUA vaccination requirements, it chose a strangely oblique way to do so, embedding the restriction in a provision that on its face requires only that individuals be provided with certain information (and grouping that requirement with other conditions that are likewise informational in nature). Congress could have created such a restriction by simply stating that persons (or certain categories of persons) may not require others to

use an EUA product. *See Kloeckner v. Solis*, 568 U.S. 41, 52 (2012) (rejecting a statutory interpretation positing that Congress took a "roundabout way" and an "obscure path" to reach "a simple result"); *cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

Our reading of section 564(e)(1)(A)(ii)(III) does not fully explain why Congress created a scheme in which potential users of the product would be informed that they have "the option to accept or refuse" the product. The legislative history of the 2003 statute does not appear to offer any clear explanation. Perhaps Congress viewed section 564(e)(1)(A)(ii)(III) as a variation on the "informed consent" requirement that applies to human subjects in "investigational drug" settings,[11] the only other context in which FDA may (in a limited fashion) authorize the introduction of unapproved drugs into interstate commerce. Or perhaps Congress included this condition to ensure that potential users of an EUA product would not misunderstand what the likely impact of declining to use that product would be.

The information conveyed pursuant to the "option" clause continues to be a true statement about a material fact of importance to potential vac-

---

[11] Section 355(i)(4) of title 21 provides that an IND exemption to the premarket approval requirement may only apply if the manufacturer or sponsor of an expert investigation requires the experts in question to certify

> that they will inform any human beings to whom such drugs, or any controls used in connection therewith, are being administered, or their representatives, that such drugs are being used for investigational purposes and will obtain the consent of such human beings or their representatives, except where it is not feasible, it is contrary to the best interests of such human beings, or the proposed clinical testing poses no more than minimal risk to such human beings and includes appropriate safeguards.

Congress did not include this same "informed consent" requirement as part of the EUA provision in 2003, perhaps out of concern that it would not be practicable in emergency situations. *See Project BioShield: Contracting for the Health and Security of the American Public: Hearing Before the H. Comm. on Gov't Reform*, 108th Cong. 33 (Apr. 4, 2003) (statement of Mark B. McClellan, Commissioner, FDA, and Anthony S. Fauci, Director, National Institute of Allergy and Infectious Diseases) ("Because urgent situations may require mass inoculations and/or drug treatments, such informed consent requirements may prove impossible to implement within the necessary time frame when trying to achieve the public health goal of protecting Americans from the imminent danger."); *see also infra* note 15 (explaining that the informed consent requirements contained in 21 U.S.C. § 355(i)(4) do not apply to EUA products).

cine recipients—virtually all such persons continue to have the "option" of refusing the vaccine in the sense that there is no direct legal requirement that they receive it. *See Bridges*, 2021 WL 2399994, at *2 (noting that an employer's vaccination policy was not "coercive" because an employee "can freely choose to accept or refuse a COVID-19 vaccine; however, if she refuses, she will simply need to work somewhere else"); Wen W. Shen, Cong. Research Serv., R46745, *State and Federal Authority to Mandate COVID-19 Vaccination* at 4 (Apr. 2, 2021) ("[E]xisting vaccination mandates—as they are typically structured—generally do not interfere with . . . an individual's right to refuse in that context. Rather, they impose secondary consequences—often in the form of exclusion from certain desirable activities, such as schools or employment—in the event of refusal." (footnote omitted)); *Black's Law Dictionary* 1121 (7th ed. 1999) (defining "option" as relevant here as "[t]he right or power to choose; something that may be chosen"); *The American Heritage Dictionary of the English Language* 1235 (4th ed. 2000) (similar); *cf.* FDCA § 564(e)(1)(A)(ii)(III) (directing that potential vaccine recipients be informed not only of "the option to accept or refuse administration of the product" but also of "the *consequences*, if any, of refusing administration of the product" (emphasis added)).

Importantly, however, and consistent with FDA's views, we also read section 564 as giving FDA some discretion to modify or omit "the option to accept or refuse" notification, or to supplement it with additional information, if and when circumstances change. As noted above, the statute directs FDA to establish the section 564(e)(1)(A) conditions "to the extent practicable given the applicable [emergency] circumstances" and "as the [agency] finds necessary or appropriate to protect the public health." FDCA § 564(e)(1)(A). Both of these phrases—"to the extent practicable" and "as the [agency] finds necessary or appropriate"—are generally understood to confer discretion on an agency. *See, e.g.*, *Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012) (per curiam) ("to the extent practicable"); *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1128 (6th Cir. 1996) (collecting cases on "necessary" and "appropriate"). Moreover, the portion of section 564 that deals specifically with informational conditions provides that FDA should establish "[a]ppropriate" conditions designed to ensure that potential vaccine recipients are informed of the "option to accept or refuse" an EUA product. FDCA § 564(e)(1)(A)(ii). These qualifiers indicate that FDA's responsibility to

11

impose the "option to accept or refuse" condition is not absolute and that the agency has some discretion to modify or omit the condition when the agency finds the notification would not be "practicable" given the emergency circumstances, or to determine that changes to the notification are "necessary or appropriate to protect the public health." *See* EUA Guidance at 24 n.46 (noting circumstances in which the "option to accept or refuse" notification might not be practicable).[12] In addition, section 564 gives FDA the authority to supplement the information that is conveyed to potential vaccine recipients, including information about "the consequences, if any, of refusing administration of the product." FDCA § 564(e)(1)(A)(ii)(III); *see also id.* § 564(e)(1)(B) (noting that FDA has the authority to impose additional conditions as the agency "finds necessary or appropriate to protect the public health"); EUA Guidance at 22 n.40, 26–27 (noting this point). Together, then, these provisions of section 564 give FDA the authority to adapt to changing circumstances and to ensure that the information conveyed to potential users of EUA products is accurate.[13]

Although many entities' vaccination requirements preserve an individual's ultimate "option" to refuse an EUA vaccine, they nevertheless impose sometimes-severe adverse consequences for exercising that option (such as not being able to enroll at a university). Under such circumstances, FDA could theoretically choose to supplement the conditions of authorization to notify potential vaccine recipients of the possibility of such consequences (or to make it even clearer that the consequences described

---

[12] Indeed, FDA has recently exercised its discretion not to require certain of the statutorily specified conditions with respect to the current COVID-19 pandemic. We understand that FDA has amended or plans to amend the EUAs for the COVID-19 vaccines so as not to require compliance with several of the conditions—including the "option to accept or refuse" notification—when the vaccines are exported to other countries. *See, e.g.*, Pfizer EUA Letter at 10.

[13] Congress's use of the phrase "Required conditions" in the title of subsection (e)(1)(A) and its specification of certain conditions in the statute suggest that Congress may have presumed that FDA would generally find that the specified conditions are "necessary or appropriate" and thus impose them. As we discuss above, however, the operative text of section 564 indicates that FDA has some discretion to modify, omit, or supplement the conditions in some circumstances. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021) ("[A] title or heading should never be allowed to override the plain words of a text." (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 222 (2012)) (alteration in original)).

in the Fact Sheets are limited to consequences related to medical care). As we have noted, however, section 564 does not limit the ability of entities to impose vaccination requirements, and FDA would not be required to change the Fact Sheets in order to allow them to impose such requirements.[14]

\* \* \* \* \*

As noted above, FDA agrees with our interpretation of section 564. On a few occasions, however, FDA has made statements that could be understood as saying that the condition described in section 564(e)(1)(A)(ii)(III) prohibits entities (particularly the U.S. military) from requiring the use of EUA products. In 2005, for instance, FDA issued an EUA that permitted the use of a vaccine for the prevention of inhalation anthrax by individuals between 18 and 65 years of age who were deemed by the Department of Defense ("DOD") to be at heightened risk of exposure due to an attack with anthrax. As a condition of that authorization, the agency required DOD to inform potential vaccine recipients "of the option to accept or refuse administration of [the vaccine]." Authorization of Emergency Use of Anthrax Vaccine Adsorbed for Prevention of Inhalation Anthrax by Individuals at Heightened Risk of Exposure Due to Attack With Anthrax; Availability, 70 Fed. Reg. 5452, 5455 (Feb. 2, 2005). That EUA continued:

> With respect to [the] condition . . . relating to the option to accept or refuse administration of [the vaccine], the [immunization program] will be revised to give personnel the option to refuse vaccination. Individuals who refuse anthrax vaccination will not be punished. Refusal may not be grounds for any disciplinary action under the Uniform Code of Military Justice. Refusal may not be grounds for any adverse personnel action. Nor would either military or civilian personnel be considered non-deployable or processed for separation

---

[14] FDA further informs us that, wholly apart from FDA's own authority to change the Fact Sheet, nothing in the FDCA would prohibit an administrator of the vaccine who also has a relationship with the individuals to whom the vaccine is offered (e.g., students in a university that offers the vaccine) from supplementing the FDA Fact Sheet at the point of administration with factually accurate information about the possible nonmedical consequences of the person choosing not to use the product (e.g., that she might not be permitted to enroll).

based on refusal of anthrax vaccination. There may be no penalty or loss of entitlement for refusing anthrax vaccination.

*Id.*; *see also id.* (allowing DOD to inform recipients that "military and civilian leaders strongly recommend anthrax vaccination, but . . . individuals [subject to the vaccination program] may not be forced to be vaccinated" and that "the issue of mandatory vaccination will be reconsidered by [DOD] after FDA completes its administrative process."). FDA included the same information in its later extension of that EUA. *See* Authorization of Emergency Use of Anthrax Vaccine Adsorbed for Prevention of Inhalation Anthrax by Individuals at Heightened Risk of Exposure Due to Attack With Anthrax; Extension; Availability, 70 Fed. Reg. 44,657, 44,659–60 (Aug. 3, 2005).

In addition, although it is less than clear, certain FDA guidance could be read as saying that section 564 confers an affirmative "option" or "opportunity" to refuse EUA products. *See* EUA Guidance at 24 n.46 (implying that the condition in section 564(e)(1)(A)(ii)(III)—which is subject to waiver for the armed forces under 10 U.S.C. § 1107a—protects "the option for members of the armed forces to accept or refuse administration of an EUA product"); *Guidance Emergency Use Authorization of Medical Products*, 2007 WL 2319112, at *15 (July 1, 2007) (stating that "[r]ecipients must have an opportunity to accept or refuse the EUA product").

These statements do not affect our conclusion. Neither the 2005 anthrax vaccine EUA nor the later FDA guidance articulated a legal interpretation of section 564(e)(1)(A)(ii)(III)'s text. And FDA appears to have insisted upon the voluntariness requirement for DOD in the anthrax vaccine EUA because of then-recent litigation in which a court enjoined DOD from implementing a mandatory vaccination program based upon a different statutory provision that is inapplicable to EUAs. *See Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004) (relying on 10 U.S.C. § 1107); *Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003) (same); *see also* 70 Fed. Reg. at 44,660 (requiring DOD to tell vaccine recipients the following: "On October 27, 2004, the U.S. District Court for the District of Columbia issued an Order declaring unlawful and prohibiting mandatory anthrax vaccinations to protect against inhalation anthrax, pending further FDA action. The *Court's injunction* means you have the right to refuse to take the vaccine without fear of retaliation." (emphasis added)); 70 Fed. Reg.

at 5454 (discussing litigation); *see also infra* note 15 (explaining that 10 U.S.C. § 1107(f) is inapplicable to EUAs).

## B.

Section 564(e)(1)(A)(ii)(III) also raises a question about how to understand its cognate provision regarding the use of EUA products by the armed forces. As we noted above, in the same 2003 legislation that first created section 564, Congress also added the following provision to title 10 of the United States Code:

> In the case of the administration of [an EUA] product . . . to members of the armed forces, the condition described in section 564(e)(1)(A)(ii)(III) . . . and required under paragraph (1)(A) or (2)(A) of such section 564(e), designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security.

10 U.S.C. § 1107a(a)(1).[15] On its own terms, this provision appears to be consistent with—and even to support—our reading of section 564, as it likewise describes the "option to accept or refuse" condition in purely informational terms. The language refers to the President's authority to

---

[15] Section 1107(f) of title 10—an earlier-enacted provision—contains a similar, but importantly different, waiver authority. Specifically, that provision authorizes the President, "[i]n the case of the administration of an [IND] or a drug unapproved for its applied use to a member of the armed forces in connection with the member's participation in a particular military operation," to waive "the prior consent requirement imposed under [21 U.S.C. § 355(i)(4)]." 10 U.S.C. § 1107(f)(1). That "prior consent requirement," which is imposed for purposes of the human clinical trials for which FDA authorizes "investigational" use of unapproved drugs, *see* 21 U.S.C. § 355(i)(4), does not apply to EUA products, which typically are more widely available, *see* FDCA § 564(k); EUA Guidance at 24 ("informed consent as generally required under FDA regulations is not required for administration or use of an EUA product" (footnote omitted)). Thus, the waiver provision in section 1107(f) is inapplicable to EUA products. *See* 10 U.S.C. § 1107(f)(2) (explaining that this waiver authority applies only in cases in which "prior consent for administration of a particular drug is required" because the Secretary of HHS determines that the drug "is subject to the [IND] requirements of [21 U.S.C. § 355(i)]"); *see also id.* § 1107(f)(4) (defining the relevant consent requirements as those in 21 U.S.C. § 355(i)).

waive a requirement to provide certain information, not to waive any right or affirmative "option" to refuse administration of the product itself.

On the other hand, the conference report on the legislation that created both section 564 of the FDCA and section 1107a of title 10 described the latter provision in the following way:

> [This provision] would authorize the President to waive *the right of service members to refuse administration of a product* if the President determines, in writing, that affording service members the right to refuse the product is not feasible, is contrary to the best interests of the members affected, or is not in the interests of national security.

H.R. Rep. No. 108-354, at 782 (2003) (Conf. Rep.) (emphasis added). This language indicates that the conferees may have believed that section 1107a concerns some "right" of members of the armed forces to refuse the use of EUA products. And that belief may help to explain why section 1107a allows only the President to exercise the waiver authority.

Consistent with this legislative history and the vesting of the waiver authority in the President, DOD informs us that it has understood section 1107a to mean that DOD may not require service members to take an EUA product that is subject to the condition regarding the option to refuse, unless the President exercises the waiver authority contained in section 1107a. *See* DOD Instruction 6200.02, § E3.4 (Feb. 27, 2008) ("In the event that an EUA granted by the Commissioner of Food and Drugs includes a condition that potential recipients *are provided an option* to refuse administration of the product, the President may . . . waive *the option* to refuse for administration of the medical product to members of the armed forces." (emphasis added)). Moreover, we understand that DOD's position reflects the concern that service members, unlike civilian employees, could face serious criminal penalties if they refused a superior officer's order to take an EUA product. *See* 10 U.S.C. § 890; *see also United States v. Kisala,* 64 M.J. 50 (C.A.A.F. 2006) (upholding a soldier's punishment for refusing to take a vaccine). In this way, service members do not have the same "option" to refuse to comply with a vaccination requirement as other members of the public.

As noted above, it does appear that certain members of Congress thought that section 1107a concerned a prohibition against requiring service members to take an EUA product—perhaps on the view that the

16

waiver authority in section 1107a paralleled the one in 10 U.S.C. § 1107(f), which does effectively prohibit the administration of an IND product in a clinical trial without first obtaining the individual's affirmative, informed *consent. See supra* note 15 (distinguishing these waiver authorities).[16] As explained, however, that intent or expectation is not realized in the text of section 564(e)(1)(A)(ii)(III), which section 1107a expressly cross-references. *Cf. Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1164 n.11 (9th Cir. 2019) ("[T]he plain and unambiguous statutory text simply does not accomplish what the Conference Report says it was designed to accomplish."); *Goldring v. Dist. of Columbia*, 416 F.3d 70, 75 (D.C. Cir. 2005) ("A sentence in a conference report cannot rewrite unambiguous statutory text[.]").[17] We therefore conclude that section 1107a does not change our interpretation of section 564 of the FDCA.

As for DOD's concern about service members who would lack a meaningful option to refuse EUA products because of the prospect of sanction, including possibly prosecution, we note that any difference between our view and the assumption reflected in the conference report should have limited practical significance. Given that FDA has imposed the "option to accept or refuse" condition for the COVID-19 vaccines by requiring

---

[16] It is possible the conferees assumed that the new EUA legislation would, in effect, carry over from the earlier IND provision of the FDCA, *see supra* Part I.A and note 11, the condition that a covered product may not be administered to an individual without that person's express, informed consent—a condition that applies to the military when it undertakes the sort of clinical trial with an IND that 21 U.S.C. § 355(i) governs, *see supra* note 11. Congress did not include such a consent requirement in section 564, however, perhaps because EUA products are not limited, as INDs are, to use in human clinical trials, but are instead authorized for more widespread use in the case of a declared emergency. *See supra* Part I.A and notes 11 & 15.

[17] Moreover, the legislative history as a whole is not uniform on this point. The earlier House report, for instance, described the condition in purely informational terms. *See* H.R. Rep. No. 108-147, pt. 3, at 33 (2003) ("New section 564(k) [an earlier but similarly worded version of what became 10 U.S.C. § 1107a] pertains to members of the Armed Forces and, among other things, it specifies that the President may waive requirements designed to ensure that such members are *informed* of the option to accept or refuse administration of an emergency use product, upon certain findings[.]" (emphasis added)); *see also Milner v. Dep't of the Navy*, 562 U.S. 562, 574 (2011) (noting that "[l]egislative history, for those who take it into account, is meant to clear up ambiguity, not create it," and thus, "[w]hen presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language").

distribution of its Fact Sheet containing the "[i]t is your choice to receive or not receive" language, DOD is required to provide service members with the specified notification unless the President waives the condition pursuant to 10 U.S.C. § 1107a. And because DOD has informed us that it understandably does not want to convey inaccurate or confusing information to service members—that is, telling them that they have the "option" to refuse the COVID-19 vaccine if they effectively lack such an option because of a military order—DOD should seek a presidential waiver before it imposes a vaccination requirement.

## III.

For the reasons set forth above, we conclude that section 564 of the FDCA does not prohibit public or private entities from imposing vaccination requirements, even when the only vaccines available are those authorized under EUAs.

DAWN JOHNSEN
*Acting Assistant Attorney General*
*Office of Legal Counsel*

# COVID-19

## UPDATE

Getting vaccinated prevents severe illness, hospitalizations, and death. Unvaccinated people should get vaccinated and continue masking until they are fully vaccinated. With the Delta variant, this is more urgent than ever. CDC has updated guidance for fully vaccinated people based on new evidence on the Delta variant.

☐   Back to COVID-19 Home

# Considerations for Institutions of Higher Education

Updated July 23, 2021

Languages

Print

# Summary of Recent Changes

☐

- Removed the consideration to cohort by vaccination status

View Previous Updates

## Key Points

This guidance supplements and does not replace any federal, state, tribal, local, or territorial health and safety laws, rules, and regulations with which IHEs must comply.

- This guidance provides resources that IHE administrators can use to prevent the spread of COVID-19 among students, faculty, and staff during the COVID-19 pandemic.
- IHE administrators can help protect students, faculty, and staff and slow the spread of COVID-19, by encouraging vaccinations and using CDC's Guidance for IHEs.
- IHEs can help increase vaccine uptake among students, faculty, and staff by providing information about COVID-19 vaccination, promoting vaccine trust and confidence, and establishing supportive policies and practices that make getting vaccinated as easy and convenient as possible.
- IHEs where all students, faculty, and staff are **fully** vaccinated prior to the start of the semester can return to full capacity in-person learning, without requiring or recommending masking or physical distancing for people who are fully vaccinated in accordance with CDC's Interim Public Health Recommendations for Fully Vaccinated People.
- IHEs where not everyone is fully vaccinated will have a mixed population of both people who are fully vaccinated and people who are not fully vaccinated on campus which requires decision making to protect the people who are not fully vaccinated.

## On This Page

Introduction                                            Section 4: General Considerations for All IHEs

# Introduction

This guidance is intended for any institution of higher education (IHE) that offers education or instruction beyond the high school level, such as colleges and universities, including community and technical colleges.

To determine your level of community transmission, please see CDC's COVID Tracker.

This guidance is split into four sections to support IHEs in their decision making:

Section 1: Offer and Promote COVID-19 Vaccination

Section 2: Guidance for IHEs Where Everyone is Fully Vaccinated

Section 3: Guidance for IHEs Where Not Everyone is Fully Vaccinated

Section 4: General Considerations for All IHEs

IHE administrators can determine, in collaboration with tribal, state, local, and territorial public health officials and in accordance with applicable law, how to implement CDC guidance while considering the needs and circumstances of the IHE within the context of their local community. IHE administrators should take into account health equity considerations for promoting fair access to health. This guidance does not replace any applicable federal, state, tribal, local, or territorial health and safety laws, rules, and regulations with which IHEs must comply.

The Department of Education has a complementary handbook to this guidance *ED COVID-19 Handbook Volume 3: Strategies for Safe Operation and Addressing the Impact of COVID-19 on Higher Education Students, Faculty, and Staff* found here: https://www2.ed.gov/documents/coronavirus/reopening-3.pdf ☐  ☐

# Section 1: Offer and Promote COVID-19 Vaccination

IHEs can play a critical role in offering and promoting vaccination to help increase the proportion of students, faculty and staff that are vaccinated to help slow the spread of COVID-19 and prevent interruptions to in-person learning.

Vaccination is the leading prevention strategy to protect individuals from COVID-19 disease and end the COVID-19 pandemic. Current COVID-19 vaccines authorized for use in the United States are safe and effective, widely accessible in the U.S., and available at no cost to all people living in the U.S. Learn more about the Benefits of Getting a COVID-19 Vaccine.

IHEs can help increase vaccine uptake among students, faculty, and staff by providing information about and offering COVID-19 vaccination, promoting vaccine trust and confidence, and establishing supportive policies and practices that make getting vaccinated as easy and convenient as possible. IHE

administrators may refer to CDC's Workplace Vaccination Program as instructive to help prepare for campus vaccination.

To increase access to vaccines, IHEs can

- Provide on-site vaccination in IHE facilities or local vaccination sites through partnerships (e.g., existing occupational and student health clinics, IHE-run temporary vaccination clinics, mobile vaccination clinics brought to the IHE, etc.).
- Consider hosting a mass vaccination clinic or setting up smaller vaccine venues on campus to promote vaccination.
- Connect with your local or state health department or health system to learn what might be possible.
  - If you are not already working with your local or state health department, consider reaching out for assistance with promoting and implementing vaccinations within the IHE community. The local or state health department can assist with coordination of vaccination clinics and offer local vaccine expertise.
  - Refer to CDC guidance for help planning vaccination clinics held at satellite, temporary, or off-site locations.
  - Refer to the American College Health Association's website □ for a compilation of guidance and resources for hosting a mass vaccination clinic and other best practices.
- Use trusted messengers to promote vaccination, including current and former students.
- Consider offering multiple locations and vaccination times to accommodate student work and academic schedules.
- Facilitate access to off-site vaccination services in the community (e.g., pharmacies, mobile vaccination clinic set up in community locations, partnerships with local health departments, healthcare centers and other community clinics, partnerships with student organizations).
  - Visit vaccines.gov to find out where students can get vaccinated in your community and identify locations near to campus.
  - Offer free transportation to off-site vaccination sites for students who need assistance.
- Offer flexible, supportive sick leave options (e.g., paid sick leave), in accordance with applicable laws and IHE policies, for employees with side effects after vaccination. See CDC's post-vaccination Considerations for Workplaces.
- Offer flexible excused absence options for students receiving vaccination and those with side effects after vaccination.

To promote vaccination, IHEs can

- Develop educational messaging for vaccination campaigns to build vaccine confidence and consider utilizing student leaders and athletes as spokespersons.
- Ask student and other organizations who are respected in IHE communities to help build confidence in COVID-19 vaccines and promote the benefits of getting vaccinated.
- Ask students, faculty, and staff to promote vaccination efforts in their social groups and their communities.

Certain communities and groups have been disproportionately affected by COVID-19 illness and severe outcomes, and some communities might have had previous experiences that affect their trust and confidence in the healthcare system. Vaccine confidence may be different among students, faculty, and staff. IHE administrators should tailor communications and involve trusted community messengers, including those on social media, to promote vaccinations among those who may be hesitant to receive COVID-19 vaccination.

IHEs can consider verifying the vaccination status of their students, faculty, and staff. Administrators can determine vaccine record verification protocols, in accordance with state and local laws.

See COVID-19 Vaccine Toolkit for Institutions of Higher Education (IHE), Community Colleges, and Technical Schools for more information.

Top of Page

# Section 2: Guidance for IHEs Where Everyone is Fully Vaccinated

This section is intended for IHEs that have a fully vaccinated campus. People who are fully vaccinated are at low risk of symptomatic or severe infection, and a growing body of evidence suggests that people who are fully vaccinated are less likely to have asymptomatic infection or transmit the virus that causes COVID-19 to others. IHEs with fully vaccinated students, faculty, and staff can refer to CDC's Interim Public Health Recommendations for Fully Vaccinated People. As new information become available, CDC guidance will be updated accordingly.

IHEs should comprehensively engage their IHE networks to establish and promote a vaccination environment that is safe and equitable for all students, faculty, and staff.

Some students, faculty, or staff might not be able to get the COVID-19 vaccine due to medical or other conditions. IHEs will need to determine prevention strategies, accommodations, and policies for any students, faculty, or staff who cannot be vaccinated.

IHEs where all students, faculty, and staff are **fully** vaccinated prior to the start of the semester can return to full capacity in-person learning, without requiring or recommending masking or physical distancing for people who are fully vaccinated in accordance with <u>CDC's Interim Public Health Recommendations for Fully Vaccinated People.</u> General public health considerations such as handwashing, cleaning/disinfection and respiratory etiquette should continue to be encouraged regardless of vaccination status (see <u>Section 4).</u> When holding gatherings and events that include individuals who are not fully vaccinated such as campus visitors or others from outside of the IHE, IHEs should utilize appropriate prevention strategies to protect people who are not fully vaccinated.

## Wearing a Mask

Students, faculty, and staff who are fully vaccinated do not need to wear masks, except where required by federal, state, local, tribal, or territorial laws, rules and regulations, including local business and workplace guidance. Although fully vaccinated persons do not generally need to wear masks, CDC recommends continued masking and physical distancing for people with weakened immune systems. IHEs can be supportive of students, faculty, or staff who choose to continue to wear a mask for any reason.

## Physical Distancing

Physical distancing is not necessary for fully vaccinated students, faculty, and staff on campus for IHEs where everyone is fully vaccinated except indicated in <u>CDC's Interim Public Health Recommendations for Fully Vaccinated People.</u>

## Housing and Communal Spaces

Shared housing includes a broad range of settings, such as apartments, condominiums, student or faculty/staff housing, and fraternity and sorority housing. People who are fully vaccinated in shared housing should follow <u>CDC's Interim Public Health Recommendations for Fully Vaccinated People.</u>

We are still learning how well the COVID-19 vaccines protect people with weakened immune systems, including people who take immunosuppressive medications. Administrators should advise students, faculty, and staff with weakened immune systems on the importance of talking to their healthcare providers to discuss their activities and <u>precautions</u> they may need to keep taking to prevent COVID-19. Currently, CDC recommends continued masking and physical distancing for people with weakened immune systems.

## Hand Hygiene and Respiratory Etiquette

IHEs should continue to facilitate health-promoting behaviors such as <u>hand hygiene</u> and <u>respiratory etiquette</u> to reduce the spread of infectious disease in general.

## Cleaning, Improving Ventilation, and Maintaining Healthy

## Facilities

IHEs should continue to follow cleaning, disinfecting, and ventilation recommendations, including routine cleaning of high touch surfaces and shared objects as well as maintaining improved ventilation.

## Testing

People who are fully vaccinated do not need to undergo routine COVID-19 screening testing. If a fully vaccinated person is exposed to someone with COVID-19 they do not need to be tested unless they are experiencing COVID-19 symptoms. Any person who experiences COVID-19 symptoms should get a COVID-19 test. Refer to CDC's Interim Public Health Recommendations for Fully Vaccinated People for more information.

## Symptom Screening

Encourage students, faculty, and staff to perform daily health screenings for infectious illnesses, including COVID-19. Encourage students, faculty, and staff with signs or symptoms of infectious illness to stay home when sick and/or seek medical care. A COVID-19 self-checker may be used to help decide when to seek COVID-19 testing or medical care. If symptom screening is conducted, ensure that symptom screening is done safely, respectfully, and in accordance with any applicable federal or state privacy and confidentiality laws.

## Contact Tracing in Combination with Isolation and Quarantine

Prompt collaboration between IHEs and health departments to implement case investigation ▯ and contact tracing ▯ can effectively break the chain of transmission and prevent further spread of the virus in the IHE setting and the community. All COVID-19 case investigation and contact tracing should be done in coordination with state, local, tribal and territorial public health authorities and in accordance with local requirements and guidance. IHEs should continue to support investigation and contact tracing detailed in CDC's Guidance for Case Investigation and Contact Tracing in IHEs. People who are fully vaccinated with no COVID-like symptoms do not need to quarantine or be restricted from work following an exposure to someone with suspected or confirmed COVID-19, except where required by federal, state, local, tribal, or territorial laws, rules, and regulations, including local business and workplace guidance.

## Variants

Variants of the virus that causes COVID-19 are spreading in the United States. Current data suggest that COVID-19 vaccines authorized for use in the United States offer protection against known variants. CDC has systems in place to monitor how common these variants are and to look for the emergence of new variants. CDC will continue to monitor variants to see if they have any impact on how COVID-19 vaccines work in real-world conditions. For more information see CDC's COVID-19

Vaccines Work page.

If IHEs experience increases in COVID-19 cases among fully vaccinated persons, administrators should promptly contact their local or state public health department and determine whether they need to re-institute, intensify or implement certain prevention strategies.

Top of Page

# Section 3: Guidance for IHEs Where not Everyone is Fully Vaccinated

IHEs where not everyone is fully vaccinated will have a mixed population of both people who are fully vaccinated and people who are not fully vaccinated on campus which requires decision making to protect the people who are not fully vaccinated.

## General Considerations

Multiple factors should inform the optimal implementation of layered prevention strategies by IHEs. Ideally, consideration would be given to both the direct campus population as well as the surrounding community. The primary factors to consider include: 1) level of community transmission of COVID-19 ; 2) COVID-19 vaccination coverage, including among students, faculty, and staff; 3) implementation of a robust, frequent SARS-CoV-2 screening testing program with high participation from the unvaccinated campus population; and 4) any local COVID-19 outbreaks or increasing trends. Discussion of these factors should occur in collaboration with local or state public health partners.

## Prevention Strategies that Reduce Spread

IHE administrators should create programs and policies that facilitate the adoption and implementation of prevention strategies to slow the spread of COVID-19 at the IHE and in the local community. Evidence-based prevention strategies, including vaccination, should be implemented, and layered in IHE settings. Key prevention strategies include

- Offering and promoting vaccination
- Consistent and correct use of masks
- Physical distancing
- Handwashing and respiratory etiquette
- Contact tracing in combination with isolation and quarantine
- Testing for COVID-19
- Maintaining healthy environments (increased ventilation and cleaning)

- Maintaining healthy operations (communications, supportive policies and health equity)

These prevention strategies remain critical in IHE and community settings with mixed populations of both people who are fully vaccinated and people who are not fully vaccinated.

Particularly in areas of substantial to high transmission, IHEs in collaboration with their local or state health department may consider maintaining or implementing additional prevention strategies including physical distancing and mask use indoors by all students, faculty, staff, and other people such as visitors, including those who are fully vaccinated.

## Wearing a Mask

When people who are not fully vaccinated correctly wear a mask, they protect others as well as themselves. Consistent and correct mask use by people who are not fully vaccinated is especially important indoors and in crowded settings, when physical distancing cannot be maintained. Given evidence of limited transmission of COVID-19 outdoors,[1,2,3,4,5,6] CDC has updated its guidance for outdoor mask use among people who are not fully vaccinated.

Administrators should encourage people who are not fully vaccinated and those who might need to take extra precautions to wear a mask consistently and correctly:

- **Indoors.** Mask use is recommended for people who are not fully vaccinated including children. Children under the age of 2 should not wear a mask.
- **Outdoors.** In general, people do not need to wear masks when outdoors. However, particularly in areas of substantial to high transmission, CDC recommends that people who are not fully vaccinated wear a mask in crowded outdoor settings or during activities that involve sustained close contact with other people who are not fully vaccinated.

Although people who are fully vaccinated do not need to wear masks, IHEs should be supportive of vaccinated people who choose to wear a mask.

IHEs that continue to require universal mask policies should make exceptions for the following categories of people:

- A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of a disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).
- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

## Physical Distancing

Physical distancing means keeping space of at least 6 feet (about 2 arm lengths) between people who are not from your household in both indoor and outdoor spaces. People who are not fully vaccinated

should continue to practice physical distancing.

Promote physical distancing by

- Hosting virtual-only activities, events, and gatherings (of all sizes).
- Holding activities, events, and gatherings outdoors in areas that can accommodate physical distancing, when possible.
- Spacing out or blocking off rows, chairs, and/or table seating positions in communal use shared spaces (such as classrooms, dining halls, locker rooms, laboratory facilities, libraries, student centers, and lecture rooms).
- Limiting occupancy and requiring mask use by people who are not fully vaccinated, including drivers, and on campus buses/shuttles or other vehicles. Alternate or block off rows and increase ventilation (i.e., open windows if possible).

## Hand Hygiene and Respiratory Etiquette

IHEs should facilitate health-promoting behaviors such as hand washing and respiratory etiquette to reduce the spread of infectious illnesses including COVID-19.

IHEs can place visual cues such as handwashing posters, stickers, and other materials in highly visible areas. They can download and print handwashing materials or order handwashing materials from CDC for free using CDC-INFO on Demand.

## Housing and Communal Spaces

Shared housing includes a broad range of settings, such as apartments, condominiums, student or faculty/staff housing, and fraternity and sorority housing. IHE administrators should refer to CDC's Guidance for Shared and Congregate Housing.

Additionally consider:

- If the IHE designates fully vaccinated dorms, floors or complexes, those areas should follow CDC's Interim Public Health Recommendations for Fully Vaccinated People.
- Housing students who are not fully vaccinated in single rooms instead of shared rooms when feasible.[7]
- Establishing cohorts, such as groups of dorm rooms or dorm floors that do not mix with other cohorts to minimize transmission across cohorts and facilitate contact tracing. All units that share a bathroom should be included in a cohort. Roommates/suite-mates can be considered a household and do not need to use masks or physically distance within the household "unit" (e.g., dorm room or suite) unless someone in the household is ill.
- Close or limit the capacity of communal use shared spaces such as dining areas, game rooms,

exercise rooms, and lounges, if possible, to decrease mixing among non-cohort people who are not fully vaccinated. Consider limiting use of communal use shared space to people who are fully vaccinated.

- Limit building access by non-residents, including outside guests and non-essential visitors, to dorms and residence halls.

# Contact Tracing in Combination with Isolation and Quarantine
## Case Investigation and Contact Tracing
All COVID-19 case investigation and contact tracing should be done in coordination with state, local, tribal and territorial public health authorities and in accordance with local requirements and guidance. IHEs should continue to support investigation and contact tracing detailed in CDC's Guidance for Case Investigation and Contact Tracing in IHEs. IHE administrators should take a proactive role in preparing for COVID-19 case investigation and contact tracing detailed in CDC's Guidance for Case Investigation and Contact Tracing in IHEs. It is important that case investigations and contact tracing are conducted in a culturally appropriate manner consistent with applicable privacy, public health, healthcare, and workplace laws and regulations.

- Case investigation and contact tracing are essential interventions in a successful, multipronged response to COVID-19, and should be implemented along with other prevention strategies such as offering and promoting vaccination, consistent and correct use of masks and physical distancing among people who are not fully vaccinated.[8]
- Contact tracing with students, faculty, and staff associated with the campus should be anticipated as a crucial strategy to reduce further transmission once a case is identified consistent with applicable privacy, public health, healthcare, and workplace laws and regulations.

Consistent with applicable privacy laws, IHE officials should plan to provide information and records to aid in the identification of exposures, and notify close contacts, as appropriate, of exposure as soon as possible after the IHE is notified that someone in the IHE has tested positive or been diagnosed with COVID-19.

## Quarantine and Isolation
Some students, faculty, and staff might develop symptoms of COVID-19 while on campus. IHE administrators should be prepared for this possibility and should clearly communicate to students, faculty, and staff actions to take when responding to someone who is sick with COVID-19. IHE administrators should collaborate with local public health authorities to create a plan for quarantine and isolation to protect persons by preventing exposure to people who have or might have COVID-19. IHEs should facilitate isolation of students, staff, educators, contractors, or volunteers with

suspected or confirmed COVID-19 and prompt reporting to the health department and follow Considerations for Case Investigation and Contact Tracing in K-12 Schools and Institutions of Higher Education.

# Testing for COVID-19

Testing can slow and stop the spread of COVID-19. Testing must be carried out in a way that protects individuals' privacy and confidentiality, is consistent with applicable laws and regulations, and integrates with state, local, and tribal public health systems.

IHEs should conduct diagnostic or screening testing of students, faculty, and staff for purposes of surveillance or in the context of an outbreak; however, the recommendations vary based on whether or not a person is fully vaccinated.

- Diagnostic testing is intended to identify current infection in individuals and is performed when a person has signs or symptoms consistent with COVID-19, or when a person who is not fully vaccinated is asymptomatic but has recent known or suspected exposure to SARS-CoV-2.
  - Students, faculty, and staff who are fully vaccinated can refrain from testing following a known exposure if they are asymptomatic. People who are fully vaccinated should continue to get tested if experiencing COVID-19 symptoms.
- Screening testing is intended to identify infected people who are asymptomatic and do not have known, suspected, or reported exposure to SARS-CoV-2. Screening helps to identify unknown cases so that measures can be taken to prevent further transmission.
  - Students, faculty, and staff who are fully vaccinated can refrain from routine screening testing, if feasible.

IHE officials should determine in collaboration with local health department officials the nature of any testing strategy to be implemented for purposes of diagnosis, screening, or outbreak response, and if so, how to best do so. Testing strategies implemented should be done as part of a larger COVID-19 prevention plan. IHE testing guidance can be found at CDC's Interim Guidance for SARS-CoV-2 Testing and Screening at Institutions of Higher Education (IHEs).

IHEs may consider maintaining documentation of individuals' vaccination status to inform testing, contact tracing efforts, and quarantine/isolation practices. It is recommended that fully vaccinated people with no COVID-19-like symptoms and no known exposure should be exempted from routine screening testing programs. Vaccination information should be obtained with appropriate safeguards to protect personally identifiable information and HIPAA-sensitive information from unlawful release.

## Symptom Screening

Symptom screening will fail to identify some people who have the virus that causes COVID-19.

Symptom screening cannot identify people with COVID-19 who are asymptomatic (i.e., do not have symptoms) or pre-symptomatic (have not developed signs or symptoms yet but will later). Others might have symptoms that are so mild that they might not notice them.

- Encourage students, faculty, and staff to perform daily health screenings at home for infectious illnesses, including COVID-19. Encourage students, faculty, and staff with signs or symptoms of infectious illness, including COVID-19, to stay home when sick and/or seek medical care. A COVID-19 self-checker may be used to help decide when to seek COVID-19 testing or medical care.

- If symptom screening is conducted, ensure that symptom screening is done safely, respectfully, and in accordance with any applicable federal or state privacy and confidentiality laws.

# Communicating Prevention Strategies

- Designate staff member(s) or a specific office to be officially responsible for replying to COVID-19 concerns. When students, faculty, or staff develop symptoms of COVID-19, test positive for COVID-19, or are exposed to someone with COVID-19, they should report to the IHE designated staff or office.

- Post signs in highly visible locations (such as building entrances, restrooms, and dining areas) and communicate with students, faculty, and staff via email and social media about prevention strategies, such as getting a COVID-19 vaccine, consistent and correct use of masks, physical distancing, handwashing (or use of hand sanitizer), covering their mouths and noses with a tissue or use the inside of their elbow or mask if they cough or sneeze. Signs should include visual cues. Use CDC's print communication materials developed to support COVID-19 recommendations. Materials are available in multiple languages and free for download and may be printed on a standard office printer.

- Use simple, clear, and effective language (for example, in videos) about behaviors that reduce the spread of COVID-19 when communicating with students, faculty, and staff (such as on IHE websites, in emails, and on IHE social media accounts).

- Students, faculty, and staff should attend a virtual training on all campus prevention strategies, policies, and procedures. This type of training can be useful for incoming students who were not in attendance during the previous academic year.

- Use communication methods that are accessible for all students, faculty, staff, and other essential visitors (such as parents or guardians). Ensure materials can accommodate diverse audiences, such as people who have limited English proficiency (LEP) and people with

disabilities. Partnerships to provide public service announcements (PSA) might be useful, such as The Corporation for Public Broadcasting (CPB) PSA to Houston-based tribal and Historically Black Colleges and Universities.  ☐  The CPB  ☐  campaign is expected to provide trusted, life-saving information to populations that have been disproportionately affected by the pandemic.[9]

Top of Page

# Section 4: General Considerations for All IHEs

This section is intended for all IHEs regardless of policy on COVID-19 vaccination. The considerations included here will help IHEs to prevent any infectious illness transmission among students, faculty, staff, and visitors.

## Cleaning, Improving Ventilation, and Maintaining Healthy Facilities

### When to Clean

Cleaning with products containing soap or detergent reduces germs on surfaces and objects by removing contaminants and may weaken or damage some of the virus particles, which decreases risk of infection from surfaces.

Cleaning high touch surfaces and shared objects once a day is usually enough to sufficiently remove virus that may be on surfaces unless someone with confirmed or suspected COVID-19 has been in your facility. Disinfecting (using disinfectants on U.S. Environmental Protection Agency (EPA)'s List ☐ ) removes any remaining germs on surfaces, which further reduces any risk of spreading infection.  For more information on cleaning your facility regularly and cleaning your facility when someone is sick, see Cleaning and Disinfecting Your Facility.

### When to Disinfect

You may want to either clean more frequently or choose to disinfect (in addition to cleaning) in shared spaces if certain conditions apply that can increase the risk of infection from touching surfaces, such as:

- High transmission of COVID-19 in your community
- Infrequent hand hygiene
- The space is occupied by people at increased risk for severe illness from COVID-19

If there has been a sick person or someone who tested positive for COVID-19 in your facility within the

last 24 hours, you should clean AND disinfect the space.

## Use Disinfectants Safely

**Always read and <u>follow the directions</u> on** how to use and store cleaning and disinfecting products. <u>Ventilate</u> the space when using these products.

Always follow standard practices and appropriate regulations specific to your facility for minimum standards for cleaning and disinfection. For more information on cleaning and disinfecting, see <u>Cleaning and Disinfecting Your Facility.</u>

## Improving Ventilation

Improving ventilation is an important COVID-19 prevention strategy for IHEs. Along with <u>other preventive strategies,</u> protective ventilation practices and interventions can reduce the airborne concentration of viral particles and reduce the overall viral dose to occupants. For more specific information about maintenance and use of ventilation equipment and other ventilation considerations, refer to CDC's <u>Ventilation in Buildings webpage</u>. CDC's <u>Ventilation FAQs</u> and <u>Improving Ventilation in Your Home</u> webpage further describe actions to improve ventilation. Additional ventilation recommendations for different types of IHE buildings can be found in the <u>American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) schools and universities guidance document</u> ☐  ☐ .

## Food Service and Communal Dining

Currently, there is <u>no evidence</u> to suggest that COVID-19 is spread by <u>handling</u> or eating food. However, consuming refreshments, snacks, and meals with persons not from the same household may increase the risk of getting and spreading COVID-19 among people who are not fully vaccinated because masks are removed when eating or drinking.

- **Promote prevention measures.** Require staff and volunteers to <u>wash their hands</u> and encourage diners to wash their hand or use an alcohol-based hand sanitizer (before and after serving or eating). In indoor dining areas, people who are not fully vaccinated should wear a mask when not actively eating or drinking and physically distance.

- **Increase airflow and ventilation.** Prioritize outdoor dining and improved ventilation in indoor dining spaces.

- **Avoid crowding.** Particularly in areas with substantial to high levels of community transmission, reduce seating capacity, use markers and guides to ensure that people remain at least 6 feet apart in a mixed campus when waiting in line to order or pick up. Stagger use of dining areas.

- **Consider offering to-go options** and serve individually plated meals. If traditional self-serve stations are offered, CDC provides <u>recommendations</u> to reduce the risk of getting and

spreading COVID-19.

- **Clean regularly.** For food contact surfaces, continue following all routine requirements for cleaning and sanitization. Non-food contact surfaces should be cleaned at least daily. If someone with COVID-19 has been in the facility in the previous 24 hours, non-food contact surfaces should be disinfected. See CDC's Food and COVID-19 for more detailed information. Food service operators can find more detailed recommendations relevant to food service establishments in Considerations for Restaurant and Bar Operators and FAQs for Institutional Food Service Operators. For more information on COVID-19 adapted community food serving and distribution models, visit Safely Distributing School Meals during COVID-19.

IHE administrators can also refer to CDC's Guidance for School Nutrition Professionals and Volunteers for safe operations of food service and communal dining.

## Water Systems
The temporary shutdown or reduced operation of IHEs and reductions in normal water use can create hazards for returning students, faculty, and staff. Check for hazards such as mold, *Legionella* (the bacteria that causes Legionnaire's Disease), and lead and copper contamination ☐ from plumbing that has corroded.

- For more information, refer to the ASHRAE Guidance for Building Operations During the COVID-19 Pandemic ☐ ☐ , CDC Guidance for Reopening Buildings After Prolonged Shutdown or Reduced Operation and the Environmental Protection Agency's Information on Maintaining or Restoring Water Quality in Buildings with Low or No Use ☐ .

## Service Animals and Other Animals in Campus Buildings
- At this time, there is no evidence that animals play a significant role in spreading SARS-CoV-2, the virus that causes COVID-19, to people. We are still learning about this virus, but we know that it can spread from people to animals in some situations, especially during close contact.
- Refer to CDC's Guidance for Handlers of Service and Therapy Animals and the American Veterinary Medical Association (AVMA) services, emotional support and therapy animals ☐ page when making decisions about allowing therapy animals in campus buildings on a case-by-case basis.

## Health Equity
Long-standing systemic health and social inequities have put many racial and ethnic minority groups at increased risk of getting sick and dying from COVID-19. American Indian/Alaska Native, Black, and Hispanic persons are disproportionately affected by COVID-19; these disparities exist among all age groups, including school-aged children and young adults. Because of these disparities, in-person instruction on campuses might pose a greater risk of COVID-19 to disproportionately affected

populations. For these reasons, health equity considerations related to in-person instruction are an integral part of decision-making.

Addressing social and racial injustice and inequity is at the forefront of public health. Administrators can help to protect <u>people at increased risk for severe COVID-19</u> and <u>promote health equity</u> by implementing the following strategies:

- Encourage and support people to <u>get vaccinated</u> as soon as they can.
- Offer options for accommodations, modifications, and assistance to students, faculty, and staff at <u>increased risk for severe illness</u> that limit their exposure risk and allow for education and or work opportunities (such as virtual learning, telework, and modified job responsibilities) to remain available to them.
- Provide inclusive programming and make options available for people with special <u>healthcare needs</u> and <u>disabilities</u> that allow on-site or virtual participation with appropriate accommodations, modifications, and assistance (for example, people with disabilities may need additional support to access and use technology for virtual learning).
- Put in place policies to protect the privacy and health information of all people, consistent with applicable laws.
- Train people at all levels of the organization to identify and address all forms of discrimination consistent with applicable laws and IHE policies.
- Work with others to connect people with resources (for example, healthy foods and stable and safe housing) and services to meet their physical, spiritual, and mental health needs.
- Identify students who might be <u>experiencing homelessness</u> or <u>food insecurity,</u> and identify <u>resources</u> ☐ and strategies to address these and other needs related to COVID-19.

## Support Coping and Resilience
- Encourage employees and students to take breaks from watching, reading, or listening to news stories, including social media if they are feeling overwhelmed or distressed.
- Promote employees and students to eat healthy, exercise, get <u>sleep,</u> and find time to unwind.
- Encourage employees and students to talk with people they trust about their concerns and how they are feeling.
- Communicate with faculty, staff, and students about mental health support services available at the IHE.
- Offer an employee assistance program (EAP) through which faculty and staff can get counseling.
- Share facts about COVID-19 regularly with students, faculty, and staff through trusted sources of information to counter the spread of misinformation, reduce stigma, and lessen fear.

- Positive, pro-active messaging, education, and role-modeling is encouraged. Consistent with applicable laws and IHE policies, address negative behaviors that stigmatize individuals who test positive for or are exposed to COVID-19, including negative statements on social media, by promoting positive messaging that does not discourage vaccination, prevention behaviors, and testing.

- Consider posting signs for the national distress hotline: 1-800-985-5990, or text TalkWithUs to 66746.

- Ensure continuity of mental health services, such as offering remote counseling.

- Encourage students, faculty, and staff to call 911 or the National Suicide Prevention Lifeline at 1-800-273-TALK (1-800-273-8255), 1-888-628-9454 for Spanish, or Lifeline Crisis ☐ if they are feeling overwhelmed with emotions like sadness, depression, anxiety, or feel like wanting to harm themselves or others.

# Considerations for Students, Faculty, and Staff with Disabilities

- People with disabilities should be highly encouraged to get vaccinated and be fully integrated into the most appropriate learning environment with the proper accommodations.

- Disability resource centers should review policies and procedures to assess/qualify students for new accommodations, modifications, and assistance that might be needed due to changes in response to the COVID-19 pandemic.

- Consider the individualized approaches for COVID-19 prevention that may be needed for some people with disabilities.

- Provide accommodations for people who might have difficulty with mask use, such as some people with disabilities or certain medical conditions. Allow exceptions in the IHEs mask use policy. People concerned about their ability to consistently and correctly use a mask should consult with their healthcare provider or IHE disability resource center, for suggested adaptations and alternatives.

- Ensure education remains accessible for students with disabilities as prevention strategies to reduce cases of COVID-19 are implemented.

- Encourage all students, faculty, and staff to discuss any accommodations they might need with the IHE's disability resource center.

# Gatherings, Events, and Visitors

Crowded settings still present a greater risk of transmission among people who have not been fully vaccinated, especially when they bring together people of unknown vaccination status from different communities where community transmission is substantial to high. People who are not fully vaccinated should continue to avoid large gatherings, but if they choose to attend, they should wear well-fitting

masks that cover the mouth and nose, maintain physical distancing, and practice good hand hygiene. For mixed campus IHEs, in-person instruction should be prioritized over extracurricular activities, including sports and school events, to minimize risk of transmission in schools and to protect in-person learning. Mixed campus IHEs may consider limiting the size of gatherings to maintain physical distance as an additional measure.

## Sports

People who are fully vaccinated no longer need to wear a mask or physically distance in any setting including while participating in sports. People who are fully vaccinated can also refrain from quarantine following a known exposure if asymptomatic, facilitating continued participation in in-person learning and sports. Due to increased exhalation that occurs during physical activity, many sports put players, coaches, trainers, etc. who are not fully vaccinated at increased risk for getting and spreading COVID-19. Close contact and indoor sports are particularly risky.[10]

IHEs should follow CDC Guidance for Sports as long as it does not conflict with state, local, tribal, or territorial requirements and guidance. IHE administrators should also:

- Offer and promote vaccination to all athletes, coaches, trainers, etc.
- Prior to traveling, establish testing protocols for sport team members including coaches and support staff who are not fully vaccinated. Physical distancing can be difficult when flying or traveling by bus. Follow CDC guidance for travel during the COVID-19 pandemic.
- Prior to hosting large sporting events, establish policies for athletes, coaches, staff, and spectators.
- Learn more about NCAA's recommendations to protect health and safety of college athletes from COVID-19: https://www.ncaa.org/sport-science-institute/covid-19-coronavirus □

## Study Abroad and Travel

IHEs planning study-abroad programs should check CDC's destination-specific Travel Health Notices (THN) for information about the COVID-19 situation in the destination or host country □ . IHEs should postpone programs in destinations with very high COVID-19 levels (Level 4 Travel Health Notice). IHEs should have plans in place to take action if situations in the destination change and COVID-19 levels become very high during the program. IHEs may consider requiring vaccination as a condition of a study-abroad program.

IHEs planning study-abroad programs should advise and strongly encourage students to

- Get fully vaccinated against COVID-19 before traveling.
- Follow CDC guidance for international travel.
  Follow general public health considerations such as handwashing, cleaning/disinfection and

- respiratory etiquette.

Students may face unpredictable circumstances accessing medical care if they get sick or injured in their host country. Routine healthcare and emergency medical services may be impacted by COVID-19 at the destination.

Study-abroad programs should ensure that students are aware of and follow all airline and destination entry requirements, such as testing, vaccination, mask wearing and quarantine. They should be aware that if they do not follow the destination's requirements, they may be denied entry and required to return to the United States. Programs and students should check with the Office of Foreign Affairs or Ministry of Health or the US Department of State, Bureau of Consular Affairs, Country Information ⬜ page for destination-specific entry requirements. Before studying abroad, programs and students should consider obtaining insurance to cover health care and emergency evacuation while abroad.

Programs should advise students who are at increased risk for severe COVID-19 to discuss any study abroad plans with their healthcare provider. For more information and guidance on safety precautions for students before, during, and after travel, please visit CDC's Studying Abroad webpage or CDC's Yellow Book section Study Abroad and Other International Student Travel.

## International Students

International students vaccinated outside of the United States should refer to Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Authorized in the United States for the need for vaccinations upon arrival in the United States.

Top of Page

# Key Terms

**Campus**: The grounds and buildings of a university, college, or school (including community colleges and technical schools). The grounds include classrooms, libraries, outdoor and indoor common areas, sports stadiums, auditoriums, dorms and other housing, campus recreation centers, cafeterias, dining halls, etc.

**People who are not fully vaccinated**: People who are not fully vaccinated are individuals of all ages, including children, that have not completed a vaccination series to protect against COVID-19.

**Fully vaccinated people/People who are fully vaccinated:** People are considered fully vaccinated

for COVID-19 ≥2 weeks after they have received the second dose in a 2-dose series (Pfizer-BioNTech or Moderna), or ≥2 weeks after they have received a single-dose vaccine (Johnson and Johnson [J&J]/Janssen)±.

†This guidance applies to COVID-19 vaccines currently authorized for emergency use by the U.S. Food and Drug Administration: Pfizer-BioNTech, Moderna, and Johnson and Johnson (J&J)/Janssen COVID-19 vaccines. This guidance can also be applied to COVID-19 vaccines that have been authorized for emergency use by the World Health Organization □ □ (e.g. AstraZeneca/Oxford).

**Mixed campus:** A mixed campus includes people who have completed their COVID-19 vaccination series and people who have not completed their vaccination series to protect against COVID-19.

**Fully vaccinated campus:** IHEs where all students, faculty, and staff have completed their vaccination series to protect against COVID-19 prior to returning to campus except those people who are unable to get the COVID-19 vaccine due to medical or other reasons.

# Additional Resources

- Coronavirus Disease 2019 (COVID-19) Pandemic
- Resources for Colleges, Universities and Higher Learning
- Health Equity
- Worker Safety and Support
- Communication Resources
- CDC COVID-19 Vaccination Program Provider Requirements and Support
- Guidance for Businesses and Employers Responding to Coronavirus Disease 2019 (COVID-19)
- Workplace Vaccination Program
- Guidance for U.S. Healthcare Facilities about Coronavirus (COVID-19)
- COVID-19 Behaviors Encouraging Protective Among College Students □
- The Department of Education COVID-19 Handbook Volume 3: Strategies for Safe Operation and Addressing the Impact of COVID-19 on Higher Education Students, Faculty, and Staff) □ □

# References

1. Fouda B, Tram HPB, Makram OM, Abdalla AS, Singh T, Hung IC, Raut A, Hemmeda L, Alahmar M, ElHawary AS, Awad DM, Huy NT. Identifying SARS-CoV2 transmission cluster category: An analysis of country government database ⧉ . J Infect Public Health. 2021 Apr;14(4):461-467. DOI: 10.1016/j.jiph.2021.01.006. Epub 2021 Jan 18. PMID: 33743366; PMCID: PMC7813483.

2. Belosi F, Conte M, Gianelle V, Santachiara G, Contini D. On the concentration of SARS-CoV-2 in outdoor air and the interaction with pre-existing atmospheric particles ⧉ . Environ Res. 2021 Feb;193:110603. DOI: 10.1016/j.envres.2020.110603. Epub 2020 Dec 8. PMID: 33307081; PMCID: PMC7833947.

3. Bulfone TC, Malekinejad M, Rutherford GW, Razani N. Outdoor Transmission of SARS-CoV-2 and Other Respiratory Viruses: A Systematic Review ⧉ . J Infect Dis. 2021 Feb 24;223(4):550-561. DOI: 10.1093/infdis/jiaa742. PMID: 33249484; PMCID: PMC7798940.

4. Chirizzi D, Conte M, Feltracco M, Dinoi A, Gregoris E, Barbaro E, La Bella G, Ciccarese G, La Salandra G, Gambaro A, Contini D. SARS-CoV-2 concentrations and virus-laden aerosol size distributions in outdoor air in north and south of Italy ⧉ . Environ Int. 2021 Jan;146:106255. DOI: 10.1016/j.envint.2020.106255. Epub 2020 Nov 12. PMID: 33221596; PMCID: PMC7659514.

5. Qian H, Miao T, Liu L, Zheng X, Luo D, Li Y. Indoor transmission of SARS-CoV-2 ⧉ . Indoor Air. 2021 May;31(3):639-645. DOI: 10.1111/ina.12766. Epub 2020 Nov 20. PMID: 33131151.

6. Sundar V, Bhaskar E. Low secondary transmission rates of SARS-CoV-2 infection among contacts of construction laborers at open air environment ⧉ . Germs. 2021 Mar 15;11(1):128-131. doi: 10.18683/germs.2021.1250. PMID: 33898351; PMCID: PMC8057850.

7. Borowiak M, Ning F, Pei J, et al. Controlling the Spread of COVID-19 on College Campuses ⧉ . Mathematical Biosciences and Engineering. 18(1): 551-563. Published 2020 Dec 14. doi:10.3934/mbe.2021030

8. Fox M, Bailey D, Seamon M, Miranda M. Response to a COVID-19 Outbreak on a University Campus — Indiana, August 2020, MMWR Morb Mortal Wkly Rep. 2021;70(4):118-122. Published 2021 Jan 29. doi:10.15585/mmwr.mm7004a3.

9. The Corporation for Public Broadcasting. CPB Funds COVID-19 PSAs for Tribal and HBCU Public Radio Stations ⧉ . Press Release 2021 Apr 08.

10. Atrubin D, Wiese M, Bohinc B. An Outbreak of COVID-19 Associated with a Recreational Hockey Game — Florida, June 2020, MMWR Morb Mortal Wkly Rep. 2020;69(41):1492-1493. Published 2020 Oct 16. doi:10.15585/mmwr.mm6941a4

# Previous Updates

Last Updated July 23, 2021

☐ Community, Work, & School

Vaccination

Health Equity – Promoting Fair Access to Health

Cleaning, Disinfecting, & Ventilation

Workplaces & Businesses

Schools & Child Care

**Colleges & Universities**

**Considerations for Institutions of Higher Education**

Testing in Institutions of Higher Education

Parks, Sports, & Recreation

Community Organizations & Gatherings

Retirement & Shared Housing

Homeless Populations

Correctional & Detention Facilities

Tribal Communities

Guidance for COVID-19

Communication Resources

What's New

Archive

## ☐ Get Email Updates

To receive email updates about COVID-19, enter your email address:

Email Address

What's this?

Submit

**HAVE QUESTIONS?**

☐
Visit CDC-INFO

☐
Call 800-232-4636

☐
Email CDC-INFO

☐
Open 24/7

**CDC INFORMATION**
About CDC
Jobs
Funding
Policies
File Viewers & Players

Privacy
FOIA
No Fear Act
OIG
Nondiscrimination
Accessibility

**CONNECT WITH CDC**

☐ ☐ ☐ ☐
☐

☐ ☐ ☐ ☐
☐

U.S. Department of Health & Human Services
USA.gov
CDC Website Exit Disclaimer
☐

**LANGUAGE ASSISTANCE**

Español

☐☐☐☐

Tiếng Việt

☐☐☐

Tagalog

Русский

العربية

Kreyòl Ayisyen

Français

Polski

Português

Italiano

Deutsch

□□□

فارسی

English